UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
————————————————————————————

EMILIO PADILLA,

                              Plaintiff,

v.                                                  9:17-cv-1150
                                                    (MAD/TWD)
JASMINIQUE BOBB-DIALLO,

                              Defendant.
————————————————————————————

APPEARANCES:                                OF COUNSEL:

EMILIO PADILLA
*Plaintiff, pro se*
18-B-0719
Attica Correctional Facility
Box 149
Attica, NY 14011

BARCLAY DAMON LLP                           DAVID M. FULVIO, ESQ.
*Counsel for Defendant*                     JULIE M. CAHILL, ESQ.
Barclay Damon Tower                         MATTHEW J. LARKIN, ESQ.
125 East Jefferson Street
Syracuse, NY 13202


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### ORDER AND REPORT-RECOMMENDATION

*Pro se* Plaintiff Emilio Padilla ("Plaintiff"), an inmate, who was at all relevant times in

custody of the Onondaga County Justice Center ("Justice Center"), brings this action pursuant to

42 U.S.C. § 1983 ("Section 1983").  (Dkt. No. 1.)  Following the District Court's review of the

amended complaint in accordance with 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A, the only

claim remaining in this action is Plaintiff's Fourteenth Amendment deliberate indifference claim

against Nurse Practitioner Jasminique Bobb-Diallo ("N.P. Bobb-Diallo" or "Defendant").  (Dkt.

Nos. 9, 12.)  Currently before the Court is Defendant's motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 40.)  Plaintiff opposes the motion.

(Dkt. No. 45.)  For the reasons that follow, the Court recommends granting Defendant's motion.

## I.    RELEVANT BACKGROUND

Most material facts are undisputed.  (*Compare* Dkt. No. 40-1, *with* Dkt. No. 45.[1])

Plaintiff was incarcerated as a pretrial detainee at the Justice Center from February 13, 2016,

through March 19, 2019, during which time he received medical examinations and treatment.

(Dkt. No. 40-1 at ¶¶ 10, 11.)

On February 22, 2017, N.P. Bobb-Diallo conducted Plaintiff's periodic health

assessment.  (*Id*. at ¶ 12.)  He presented with a blood pressure of 120 (systolic) over 90

(diastolic) and weighed 241 pounds.  (*Id*.)  N.P. Bobb-Diallo encouraged Plaintiff to increase

clear fluids intake and decrease salt consumption.  (*Id*.)

In May of 2017, Dr. Monika Ziarth prescribed 90-day regimens of Tylenol (325 mg) and

Naproxen (500 mg), non-steroidal anti-inflammatory drugs ("NSAIDs"), to help Plaintiff

manage chronic shoulder pain.  (*Id*. at ¶ 13.)

---

[1]  Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in the statement of material facts and either expressly admitted by Plaintiff in his response thereto or not denied with appropriate record citations supporting such a denial.  (*See* Dkt. Nos. 40-1, 45.)  References to undisputed facts are to Defendant's statement of material facts.  (Dkt. No. 40-1.)  The transcript of Plaintiff's February 14, 2019, deposition is attached as Exhibit C to Defendant's motion.  (Dkt. No. 40-8.)  Copies of Plaintiff's certified medical records from the Justice Center are attached as Exhibit D to Defendant's motion.  (Dkt. Nos. 40-9 through 40-13.)  Copies of Plaintiff's certified medical records from St. Joseph's Hospital Health Center ("SJH") are attached as Exhibit E to Defendant's motion.  (Dkt. Nos. 40-14 through 40-19.)  In his response submission, Plaintiff submits copies of his healthcare requests, *i.e.*, sick call slips, dated July 23, 2017, through July 31, 2017, as Exhibits 1 through 7.  (Dkt. No. 45-4 at 1-9.)  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

On July 23, 2017, Plaintiff submitted or "dropped" a sick call slip reporting that "my thighs have become swollen for no apparent reason and my urine is very dark." (Dkt. No. 45-4 at 1.) The form was stamped received July 24, 2017, and the triaging staff noted on July 25, 2017, at 0450, "scheduled to be seen in sick call in AM." (*Id*.) Plaintiff submitted a sick call slip dated July 25, 2017, stating "from my hips all the way to my ankles my legs are swollen badly. I really need to see a doctor." (*Id*. at 2.) The form was stamped received July 25, 2017. (*Id*.)

On July 25, 2017, Plaintiff was examined by N.P. Bobb-Diallo and assessed for hypertension after "complaining of increased dark urine." (Dkt. No. 40-1 at ¶ 14; Dkt. No. 45 at ¶ 14; *see also* Dkt. No. 40-9 at 47.) It was noted Plaintiff has a "high salt diet and stated that he hydrates daily. Patient also has bilateral feet and leg swelling that he noticed a week ago. Patient also stated that has been getting headaches off and on." (Dkt. No. 40-9 at 47.[2]) At that time, Plaintiff's blood pressure was 144/100, he weighed 267 pounds, and his heart rate was recorded as 82 beats per minute. (Dkt. No. 40-1 at ¶ 15.) N.P. Bobb-Diallo performed a physical examination and found Plaintiff had "bilateral pitting edema to legs and feet" and "diminished lung sounds throughout" and indicated his heart appeared normal. (*Id*.) She also performed a neurological examination which revealed no abnormalities. (*Id*.) A urinalysis revealed the presence of protein and bilirubin. (*Id*.) According to Plaintiff during the examination, he "asked numerous times" to be taken to the hospital because he "was feeling very sick." (Dkt. No. 45 at ¶ 15.)

N.P. Bobb-Diallo concluded Plaintiff was in "fair condition" with hypertension. (Dkt. No. 40-1 at ¶ 16.) She issued Plaintiff prescriptions for Lisinopril (10 mg), an angiotensin-

---

[2] Plaintiff points out that "Defendant made her own assessment that I have a high salt diet because I told her that I eat Ramon noodle soup once and a while." (Dkt. No. 45 at ¶ 14.)

converting enzyme inhibitor, typically prescribed to lower blood pressure while acting to protect

the kidneys, and Hydrochlorothiazide (12.5 mg), a water pill or diuretic, typically prescribed to

treat high blood pressure and fluid retention. (*Id*. at ¶ 14; *see* Dkt. No. 40-3 at ¶¶ 13, 14.) She

also scheduled his blood pressure to be monitored for five days. (Dkt. No. 40-1 at ¶ 14.) N.P.

Bobb-Diallo advised Plaintiff to decrease his salt intake and ordered his living conditions

modified so that he may sleep on the bottom bunk. (*Id*.[3])

On July 26, 2017, Plaintiff was examined by Natalie Harris, R.N., who discussed the

medications prescribed by N.P. Bobb-Diallo the day before and advised him to wait to see if the

medication will work. (Dkt. No. 40-1 at ¶ 17.[4]) She wrote the following entry in Plaintiff's

Progress Notes:

> "[Plaintiff] assessed with [bilateral] pitting edema to lower
> extremities. Medications and assessment reviewed with MD
> Salomon. [Plaintiff] to continue with current new medications,
> elevate lower extremities as much as possible. [Plaintiff]
> scheduled for follow up in clinic."

(*Id*. at ¶ 18.) R.N. Harris also completed the triaging note on Plaintiff's sick call slip, dated July

25, 2017, and indicated "patient seen" on July 26, 2017, at 0930 and, among other things,

recorded Plaintiff's blood pressure at 150/100, and other vitals. (Dkt. No. 45-4 at 2.)

Plaintiff also submitted a sick call slip dated July 26, 2017, reporting "my entire body

continues to swell even after I have gotten high blood pressure medication. It started at my

ankles then my hips now my arm and face are swelling." (*Id*. at 4.) The form was stamped

---

[3] Although the encounter note indicates modifications for his housing were ordered,
Plaintiff testified he "always lived on the upper tier." (Dkt. No. 45 at ¶ 16.)

[4] Plaintiff explains he told R.N. Harris to tell N.P. Bobb-Diallo "that I really needed to
go to the hospital" and that his blood pressure was "dangerously high" at 150/100. (Dkt. No. 45
at ¶¶ 17, 18.)

received on July 26, 2017, at 2100.  (*Id*.)  On July 27, 2017, at 1251, triaging staff noted "Dr. Salaomon made aware on 7/26 Ø new orders."  (*Id*.)

Plaintiff submitted a sick call slip dated July 28, 2017, reporting "after starting my high blood pressure medication the swelling has not gone down for some reason I am getting worse. Now my whole body is beginning to swell and I get extremely exhausted and very nauseas (sic). My arm, face, chest, neck and hands are getting extremely swollen."  (*Id*. at 5.)  The form was stamped received July 28, 2017.  (*Id*)

On July 28, 2017, Plaintiff also complained of his condition to a Sheriff's Deputy, who then informed Jennifer Marquart, L.P.N.  (Dkt. No. 40-1 at ¶ 19.)  L.P.N. Marquart then contacted N.P. Bobb-Diallo, who prescribed Clonidine (0.1  mg), an additional medication to help reduce Plaintiff's hypertension.  (Dkt. No. 40-1 at ¶ 19.)  According to Plaintiff, he also asked L.P.N. Marquart to tell N.P. Bobb-Diallo that he needed to go to the hospital.  (Dkt. No. 45 at ¶ 19.)

On July 31, 2017, Plaintiff submitted a sick call slip wherein he stated:

> It's been a week, now taking medication.  My legs continue to get swollen to the point where they hurt and can't fully bend them and I am having massive headaches and I feel a lot of pressure in my chest.  My blood pressure has not gone down.

(Dkt. No. 40-1 at ¶ 20.)  On August 1, 2017, Plaintiff was seen by Justice Center medical staff. (*Id*.)  The attending nurse placed a telephone call to N.P. Bobb-Diallo who, upon learning of Plaintiff's condition at that time, ordered Plaintiff transported to SJH.  (*Id*.; *see also* Dkt. No. 45-4 at 6-8.)  On August 1, 2017, Plaintiff was admitted to SJH, where he was treated and several diagnostics tests and examinations were performed, including, but not limited to, the following:

> i.   Unrinalysis performed on August 1, 2017, confirming protein in Plaintiff's urine;

      ii.    An echocardiogram conducted on August 1, 2017, which was unremarkable;

      iii.   A lower extremity venous bilateral ultrasound conducted on August 1, 2017, which revealed no evidence of deep vein thrombosis;

      iv.   Posteroanterior and lateral chest x-rays taken on August 1, 2017, which ruled out acute cardiopulmonary disease;

      v.    Renal kidney bilateral ultrasounds conducted on August 2, 2017, which were unremarkable; and

      vi.   A guided left kidney biopsy ultrasound conducted on August 4, 2017, which revealed Plaintiff suffered from Focal Segmental Glomerulosclerosis ("FSGS").

(Dkt. No. 40-1 at ¶ 21.)

On August 8, 2017, Plaintiff was discharged from SJH and returned to the Justice Center with diagnoses of nephrotic syndrome, FSGS, acute tubular injury, primary pulmonary hypertension, essential (primary) hypertension, and other chronic pain. (*Id*. at ¶¶ 22, 24.) The medical records indicate doctors and staff at SJH modified Plaintiff's medication regimen so that it would no longer include NSAIDs, including Tylenol and Naproxen, which Plaintiff had been taking to treat chronic shoulder pain for the two to three months prior to his hospitalization. (*Id*. at ¶ 23.) It was further advised to discontinue Lisinopril with Hydrochlorothiazide, and instead take a reduced dosage of Lisinopril (5 mg). (*Id*.) SJH also prescribed Plaintiff with the following medications: amlodipine (5mg) and carvedilol (12.5 mg), used to treat hypertension; famotidine (20 mg), an anti-inflammatory steroid; and torsemide (20 mg), a diuretic used to reduce edema. (*Id*.) The Justice Center continued the medication regimen prescribed by SJH. (*Id*. at ¶ 24.)

On August 16, 2017, Plaintiff was admitted to SJH with hypotension related to overdiuresis from the medications he had been prescribed during his previous hospitalization. (*Id*. at ¶ 25.) It was determined that the protein and creatinine levels in Plaintiff's urine were "now nearly normal," his renal function was normal, and his blood pressure was stable. (*Id*.) On

August 18, 2017, Plaintiff was discharged from SJH with the same treatment plan, except

torsemide (20 mg).  (*Id*. at ¶ 26.)  Plaintiff remained in the care of the Justice Center until he was

transferred to Attica Correctional Facility on or about March 19, 2018.  (*Id*. at ¶ 27.)

Given this factual back drop, Plaintiff claims N.P. Bobb-Diallo was deliberately

indifferent to his medical needs by failing to transfer Plaintiff to a hospital when he presented

with high blood pressure and edema on July 25, 2017, despite his verbal and written requests.

(*See generally* Dkt. No. 9.)  Defendant submits she is entitled to summary judgment based upon

the absence of any genuine issues of material fact as to whether she was deliberately indifferent

to Plaintiff's serious medical needs.  (*See generally* Dkt. No. 40-4.)

## II.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party

moving for summary judgment bears the initial burden of showing, through the production of

admissible evidence, no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d

263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at

273 (citations omitted).  The nonmoving party must do more than "rest upon the mere allegations

. . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). Rather, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[5]

---

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## III.    DISCUSSION

### A.    Legal Standard for Deliberate Indifference

"[D]eliberate indifference to serious medical needs . . . constitutes the 'unnecessary and wanton infliction of pain,' . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (internal citation omitted).

As a pretrial detainee at the time of the incidents addressed in the amended complaint, Plaintiff's deliberate indifference claim is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d. Cir. 2017) (citation omitted).[6]

To establish a claim for deliberate indifference to medical needs under the Fourteenth Amendment, a plaintiff must satisfy a two-prong test. *Id.* First, the deprivation must have been "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citation omitted). Second, the defendant must have acted or failed to act with a "sufficiently culpable state of mind," which, "in prison conditions cases," is "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective. *Darnell*, 849 F.3d at 35. Thus, the "Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm."

---

[6] As discussed in the District Court's previous Orders, *Darnell* altered the subjective standard for claims of deliberate indifference under the Fourteenth Amendment. (*See* Dkt. No. 12 at 6; *see also* Dkt. No. 8 at 5-6.) The objective prong of the deliberate indifference claim, however, remains the same. (*Id.*)

*Richardson v. Correctional Medical Care*, No.9:17-cv-0420 (MAD/TWD), 2018 WL 1580316, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Darnell*, 849 F.3d at 35).

### 1.    First Prong

In order to meet the first prong, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 834). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47). Thus, "an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is adequate." *Groves v. Davis*, No. 9:11 CV-1317 (GTS/RFT), 2012 WL 651919, at *5 n.9 (N.D.N.Y. Feb. 28, 2012).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

Accordingly, the first prong is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin*, 467 F.3d at 279-80).

### 2.    Second Prong

To satisfy the second prong, concerning *mens rea*, a pretrial detainee "is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Richardson*, 2018 WL 1580316, at *5 (quoting, *inter alia*, *Darnell*, 849 F.3d at 35).[7] "Although *mens rea* is assessed from an objective perceptive, as opposed to the more demanding subjective recklessness employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." *Taft v. Fricke*, No. 9:17-cv-0346 (GTS/CFH), 2019 WL 5197180, at *8 (N.D.N.Y. July 26, 2019) (citation omitted).

Furthermore, prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not a plaintiff's constitutional rights. *Id.* Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate or pretrial detainee. *Id.*; *see*

---

[7] The parties do not address how *Darnell* altered the subjective standard for claims of deliberate indifference under the Fourteenth Amendment.

*also Davis v. McCready*, 283 F. Supp. 3d 108, 121 (S.D.N.Y. 2017) ("Even after *Darnell*, it remains the case that "something more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort."); *accord Darnell*, 849 F.3d at 36 ("But any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.").  Thus, any claims of malpractice or disagreement with treatment are not actionable under Section 1983.

**B.  Analysis**

Liberally construed, Plaintiff claims N.P. Bobb-Diallo violated his Fourteenth Amendment rights related to medical for heart failure and acute kidney failure.  (*See generally* Dkt. No. 12.)  Specifically, Plaintiff contends N.P. Bobb-Diallo was aware that there was protein in his urine, that his legs were swollen, and that he was having chest pains and deliberating ignored a serious risk to his health and safety resulting in his condition worsening.  (*Id*. at 6-7.) Plaintiff further claims N.P. Bobb-Diallo was deliberately indifferent to his serious medical needs by failing to immediately transfer Plaintiff to a hospital when he presented with high blood pressure and edema on July 25, 2017, despite his numerous requests, both verbal and written, that she do so:

> [Defendant] ignored my medical need when I requested for her to send me to the hospital when she knew there was protein in my urine which is a clear sign of kidney failure.  When she examined me on 7/25/17, she stated that my blood pressure was high, I have very bad edema and that I have protein in my urine.  She had the power to send me to the hospital . . . but she sent me back to my cell.  I was sent out to the hospital 6 days later only because RN Johnaellyn Waldron advised [N.P. Bobb-Diallo] to send me out.

(Dkt. No. 40-7 at ¶ 14.)

Similarly, Plaintiff testified during his deposition as follows:

> Q:  In your own words, what did nurse Bobb-Diallo do that you believe is deliberate?

A. I asked her to send me to the hospital because I was feeling really sick. My weight was up probably 270 from 220 in a matter of days. My body was bloated. Couldn't urine (sic). And when I went -- I put multiple sick call slips in and I kept asking her can she please send me to the hospital.

She just gave me medication and told me to go to the cell and let the medication work. I finally got seen by another nurse who called her and said, listen, this guy needs to really go to the hospital.

That's when they finally sent me probably about eight, nine days later.

(Dkt. No. 40-8 at 52.)

Turning to the first prong of the deliberate indifference standard, no material issue of fact exits as to whether Plaintiff was actually deprived of adequate medical care. *Salahuddin*, 467 F.3d at 279-80. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations . . . when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280). As indicated above, "[n]either differences of opinion regarding appropriate medical care nor a prisoner's mere disagreement with prescribed treatment constitute deliberate indifference." *Thompson v. Racette*, No. 9:11-cv-1372 (GLS/ATB), 2012 WL 12884469, at *2 (N.D.N.Y. Aug. 2, 2012). Rather, the essential test for appropriate care "is one of medical necessity and not one simply of desirability." *Id*. An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

Here, the record evidence demonstrates Plaintiff's medical needs were reasonably treated and monitored by N.P. Bobb-Diallo. As detailed above, on July 25, 2017, Plaintiff was evaluated by N.P. Bobb-Diallo for his complaints of dark urine, swelling in his legs, and

intermittent headaches. (Dkt. No. 40-9 at 47-50.) She conducted several diagnostic tests, including physical and neurological examinations and urinalysis, which revealed, among other things, Plaintiff: (1) weighed 267 pounds, his blood pressure was 144/100, and his heart beat at a rate of 82 beats per minute; (2) had bilateral pitting edema to his legs and feet with diminished lung capacity; (3) had no neurological abnormalities; and (4) his urine contained protein and bilirubin. (*Id.*) She concluded Plaintiff was in fair condition suffering primarily from hypertension. (*Id.* at 52.) N.P. Bobb-Diallo prescribed Plaintiff Lisinopril and Hydrochlorothiazide and scheduled his blood pressure to be monitored for five days. (*Id.*; Dkt. No. 40-13 at 17.)

On July 28, 2017, N.P. Bobb-Diallo added Clonidine to Plaintiff's medication regimen. (Dkt. No. 40-13 at 16.) On August 1, 2017, upon being informed over the telephone that Plaintiff's condition failed to improve and that he was complaining of chest pain, she ordered Plaintiff to be immediately transported to SJH. (Dkt. No. 45-4 at 6-8.)

Although not dispositive, nonparty medical professional Victoria A. Gessner, M.D.,[8] concluded that "Plaintiff received timely and appropriate medical attention when he was examined by N.P. Bobb-Diallo on July 25, 2017, and received subsequent care and treatment under her discretion through August 1, 2019, when he was transferred to [SJH]." (Dkt. No. 40-3 at ¶ 10.) Specifically, Dr. Gessner opines "Plaintiff was appropriately treated at the Justice

---

[8] Dr. Gessner is a physician licensed to practice medicine in New York, Pennsylvania, and Maryland. (Dkt. No. 40-3 at ¶ 2.) Her employment as a physician and medical director spans forty-four (44) years, with twenty-seven (27) years in correctional health care. (*Id.* at ¶ 4.) Dr. Gessner reviewed the amended complaint, Plaintiff's first set of answers to interrogatories, Plaintiff's deposition testimony, and Plaintiff's relevant medical records from the Justice Center and SJH before she opined on N.P. Bobb-Diallo's medical care of Plaintiff. (*Id.* at ¶ 8.) Dr. Gessner's declaration (Dkt. No. 40-3) is submitted in support of Defendant's motion. (Dkt. No. 40-3.) A copy of Dr. Gessner's *curriculum vitae* is attached as Defendant's Exhibit F. (Dkt. No. 40-20.)

Center and did not require hospitalization for his condition from July 25, 2017, to August 1, 2017." (*Id.* at ¶ 24.) According to Dr. Gessner, "Plaintiff's symptoms are common in a correctional setting and are routinely corrected without hospital intervention." (*Id.*) Thus, the Court finds Plaintiff does not meet the first inquiry of the objective prong. *See, e.g.*, *Dobbins v. Ponte*, No. 15-CV-3091 (JMF), 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2017) (granting summary judgment to prison official where undisputed facts showed that the pretrial detainee received adequate medical treatment); *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *4 (N.D.N.Y. Apr. 15, 2015) (finding the plaintiff was not deprived of adequate medical treatment where the record demonstrated that the inmate was frequently treated, prescribed pain medication, given an X-ray and an MRI, and referred to an orthopedic specialist).

Furthermore, since the evidence demonstrates Plaintiff was receiving on-going medical care, even if Plaintiff received inadequate medical care from N.P. Bobb-Diallo, the Court's inquiry is further narrowed to the question of "what harm, if any, the inadequacy has caused or will likely cause the [Plaintiff]." *Salahuddin*, 467 F.3d at 280. Otherwise stated, "it's the particular risk of harm faced by the [plaintiff] due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702-03).

Here, Plaintiff has failed to produce any evidence that his medical condition worsened or that he was subjected to an unreasonable risk of harm at the hands of N.P. Bobb-Diallo. Plaintiff's statement that "I can have kidney failure again" is insufficient. (Dkt. No. 45 at ¶ 28.) Similarly, Plaintiff's assertion that "I could have passed away" is speculative, conclusory, and

fails to create a material issue of fact. (Dkt. No. 45-3 at 5.) Dr. Gessner opines, however, that "Plaintiff's prognosis would not have been any different if he had been transported to the hospital sooner. (*Id*. at ¶ 29.)

In sum, Dr. Gessner declares:

> based upon my review of Plaintiff's medical records and my medical training, qualifications, expertise and experience, it is my opinion, within a reasonable degree of medical certainty, that N.P. Bobb-Diallo was not deliberately indifferent to Plaintiff's medical needs. Rather, N.P. Bobb-Diallo provided sufficient medical attention to Plaintiff upon learning of his symptoms, by thoroughly examining him and causing him to be regularly monitored in the days that followed, adjusting his treatment as deemed appropriate under the circumstances. N.P. Bobb-Diallo's treatment of Plaintiff was commensurate with the standard of care both in a correctional setting and in the community.

(*Id*. at ¶ 45.)

Based on the foregoing, the Court finds Plaintiff's claim does not meet the objective prong of the deliberate indifference test. *See, e.g.*, *Ray*, 2017 WL 4329722, at *8 (finding that where a plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay).

Additionally, Plaintiff fails to meet the mental element prong of the deliberate indifference standard. As it relates to N.P. Bobb-Diallo, there is simply no evidence that she "intentionally deprived [Plaintiff] of adequate medical care," nor does the evidence support a finding that she "acted recklessly and 'knew or should have known' that [her] acts or omissions 'posed an excessive risk to [Plaintiff's] health or safety.'" *Williams v. Sykes*, No. 9:17-CV-990 (TJM/ATB), 2019 WL 2374116, at *2 (N.D.N.Y. May 10, 2019) (quoting *Young v. Fricke*, No. 9:15-CV-1222 (MAD/TWD), 2018 WL 3121714, at *11 (N.D.N.Y. Feb. 12, 2018) (citing *Lloyd v. City of N.Y.*, 246 F. Supp. 3d 704, 720 (S.D.N.Y. 2017)).

Plaintiff's allegation that Defendant "was in fact deliberately indifferent to Plaintiff's medical need after drop[p]ing numerous sick call slips which were ignored which caused Plaintiff to arrive at hospital with right heart failure, protein in urine, accumulation of fluid in tissues and acute kidney failure 8 days later" is belied by the record. (Dkt. No. 45-3 at 2.) As detailed above, Plaintiff's complaints did not go ignored. On the contrary, the record indicates Plaintiff was monitored daily from July 25, 2017, the date he first presented to N.P. Dobb-Diallo, to August 1, 2017, the date N.P. Bobb-Diallo ordered him transported to SJH. Further, Plaintiff's first sick call slip complaining of chest "pressure" was dated July 31, 2017, and Plaintiff was transferred to SJH the next day upon Defendant being advised of Plaintiff's conditions via telephone. (*See* Dkt. No. 45-4 at 6-9.)

Moreover "[t]here is no evidence of 'conscious delay' or failure to treat an inmate's serious medical condition 'as punishment or for other invalid reasons.'" *Williams*, 2019 WL 2374116, at * 9 (citations omitted); *see also Taft*, 2019 WL 5197180, at *14 ("[A] physician who 'delay[s] . . . treatment based on a bad diagnosis or erroneous calculus of risk and costs does not exhibit the mental state necessary for deliberate indifference.") (citations omitted). Further, negligence is not actionable under Section 1983. *See Grimmet v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth Amendment."); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing the harm.") (internal quotation marks and citation omitted).

For the reasons stated, Plaintiff has failed to demonstrate N.P. Bobb-Diallo "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." *Darnell*, 849 F.3d at 35.  Thus, Plaintiff does not meet the requirements of the *mens rea* prong.

Accordingly, for the reasons stated above, the Court finds Defendant is entitled to summary judgment.

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 40) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 13, 2020
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

## *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

## **All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  3

2018 WL 1580316

2018 WL 1580316
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernita RICHARDSON, as Administratrix of
the Estate of Jimmy Richardson, Plaintiff,
v.
CORRECTIONAL MEDICAL
CARE, INC., et al., Defendants.

9:17-cv-0420 (MAD/TWD)
|
Signed 03/28/2018

**Attorneys and Law Firms**

LAW OFFICES OF ELMER R. KEACH, III, P.C., OF
COUNSEL: ELMER R. KEACH, III, ESQ., MARIA K.
DYSON, ESQ., One Pine West Plaza—Suite 109, Albany,
New York 12205, Attorneys for Plaintiff.

STEINBERG, SYMER & PLATT, LLP, Steinberg, Symer
& Platt, LLP, OF COUNSEL: JONATHAN E. SYMER,
ESQ., 27 Garden Street, Poughkeepsie, New York 12601,
Attorneys for Defendants Correctional Medical Care, Inc.,
CBH Medical, P.C., Emre Umar.

THUILLEZ, FORD LAW FIRM, OF COUNSEL: DAISY
F. PAGLIA, ESQ., MOLLY C. CASEY, ESQ., 20
Corporate Woods Boulevard—3rd Floor, Albany, New York
12211-1715, Attorneys for Defendant Russell Fricke.

GOLDBERG SEGALLA, LLP, OF COUNSEL: CHELSEA
E. MANOCCHI, ESQ. JONATHAN BERNSTEIN, ESQ.,
8 Southwoods Boulevard—Suite 300, Albany, New York
12211-2526, Attorneys for Defendants Schenectady County
and Dominic D'Agostino.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Bernita Richardson, as administratrix of the
estate of Jimmy Richardson, brought this action alleging
federal and state claims against Defendants Correctional
Medical Care, Inc. ("CMC"), CBH Medical, P.C. ("CBH"),

Emre Umar, John Doe Numbers 1-3 (collectively, the
"CMC Defendants"), Schenectady County, Sheriff Dominic
D'Agostino, and John Doe Number 4 (collectively, the
"County Defendants"), and Doctor Russell Fricke. See Dkt.
No. 30-4.[1] Plaintiff's claims arise out of Mr. Richardson's
medical care while incarcerated at the Schenectady County
Jail. Presently before the Court are three separate motions to
dismiss and a motion to strike filed by Defendants, as well
as a motion to amend filed by Plaintiff. See Dkt. Nos. 18,
19, 20, 30. For the following reasons, Plaintiff's motion to
amend is granted, Defendants' motion to strike is denied, and
Defendants' motions to dismiss are granted in part and denied
in part.

[1]    John Does 1-3 are unidentified medical staff who were
responsible for providing medical treatment to Mr.
Revels, and John Doe Number 4 was employed as a
corrections officer at the Schenectady County Jail. See
Dkt. No. 30-4 at ¶¶ 13-14.

**II. BACKGROUND**[2]

[2]    The following facts are based on the allegations in
Plaintiff's proposed amended complaint. See Dkt. No.
30-4.

**A. The Decedent's Medical Care**

Jimmy Richardson died on January 17, 2016. See Dkt. No.
30-4 at ¶ 15. In the month leading up to his death, Mr.
Richardson was in Schenectady County Jail two different
times. First, he was admitted on December 18, 2015 and
released on December 22, 2015. See id. at ¶¶ 16, 19. Second,
Mr. Richardson was readmitted to Schenectady County Jail
on January 4, 2016, where he remained until he died in the
early morning hours of January 17, 2016. See id. at ¶¶ 20, 32.

When he entered the jail on December 18, 2015, Mr.
Richardson was not particularly healthy. He suffered from
Brugada Syndrome, Chronic Obstructive Pulmonary Disease
("COPD"), hypertension, seizure disorder, chronic pain, and
he used a pacemaker, had recently undergone gastric bypass
surgery, and had a history of heart attacks. See id. at ¶ 17. Mr.
Richardson took numerous medications to treat his various
conditions, including Norco and Lortab, which are opioid
pain medications. See id. During Mr. Richardson's first period
of detention in Schenectady County Jail in December 2015,
he did not receive any of his prescribed medications. See id. at
¶ 18. As a result, he was experiencing a variety of symptoms,

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 23 of 112

Richardson v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 1580316

including withdrawal from his pain medications, before being released on December 22, 2015. *See id.*

After being admitted to the hospital for severe chest pain, shortness of breath, suicidal ideations, and diaphoresis, Mr. Richardson was stabilized and readmitted to Schenectady County Jail on January 4, 2016. *See id.* at ¶ 20. The following day, Mr. Richardson was evaluated by Defendant Fricke, the doctor at Schenectady County Jail, who confirmed Mr. Richardson's medical conditions. *See id.* Over the following twelve days, Mr. Richardson frequently complained about chest pain and other medical issues, including severe pain, knee pain, anxiety, and dizziness. *See id.* at ¶ 21. Mr. Richardson's medical records indicate that he reported his complaints on January 7, 9, 10, 11, 12, and 14, 2016. *See id.* The complaints reflect a sense of urgency. *See id.* at ¶ 24. In a January 11, 2016 health services request, Mr. Richardson pleads for his medication, and says "[I] need to see the Dr. I am hurting so bad. I need help!!!" *See id.*

**\*2** Plaintiff also alleges that Mr. Richardson made additional complaints and showed additional symptoms that were not reflected in his medical records. *See id.* First, an inmate reported observing Mr. Richardson repeatedly collapse in the days leading up to his death, but there is no mention of this in his medical records. *See id.* at ¶ 22. Second, a different inmate reported that Mr. Richardson was complaining of chest and left arm pain in the days leading up to his death. *See id.* at ¶ 23. The inmate sought help from a corrections officer, who called a medical emergency. *See id.* Medical staff took Mr. Richardson's blood pressure, but they did not provide any further treatment or document any of his symptoms, even though the symptoms were indicative of potentially serious heart problems. *See id.* Third, Mr. Richardson repeatedly complained to medical staff that he was not receiving his medications, and he included those complaints in written health services requests. *See id.* at ¶¶ 24-26. And on January 12, 2016, one of Mr. Richardson's medical providers wrote "meds ordered last week, not here yet." *See id.* at ¶ 26. [3] Despite the evidence to the contrary, Mr. Richardson's medical records indicate that he received his medications the entire time he was in the jail. *See id.* at ¶ 27.

---

[3]     This excerpt is from a handwritten note, and it is not clear exactly which medications the note is referencing. *See* Dkt. No. 1 at ¶ 26.

From January 4 to January 12, 2016, Mr. Richardson received only Tylenol for pain management, and he was not provided with his prescribed opioid pain medication. *See id.* at

¶ 28. Abruptly discontinuing such medication can cause withdrawal symptoms, which is particularly dangerous for patients with heart problems. *See id.* at ¶ 17. Eventually, Defendant Fricke provided Mr. Richardson with high doses of morphine instead of his prescribed medication. *See id.* at ¶ 30. Mr. Richardson's toxicology report shows that the level of morphine in his system far exceeded the therapeutic limit. *See id.* The high doses of morphine exacerbated Mr. Richardson's respiratory and cardiac and respiratory problems. *See id.* at ¶ 31.

Defendant Fricke did not contact Mr. Richardson's treating physicians or any specialist before changing Mr. Richardson's prescription. *See id.* Indeed, despite Mr. Richardson's deteriorating health, his frequent complaints, his clear symptoms, and his history of heart problems, medical staff at the jail never contacted Mr. Richardson's treating physicians, referred him to a specialist, or sent him to the hospital. *See id.* at ¶ 33. On the night before his death, Mr. Richardson sought medical assistance by alerting a corrections officer, John Doe Number 4, to the situation. *See id.* at ¶ 32. But John Doe Number 4 refused care and instead threatened Mr. Richardson with disciplinary action. *See id.* Mr. Richardson died of heart failure in the early morning hours of January 17, 2016. *See id.*

**B. CMC and CBH**
CMC is a corporation that provides medical care at numerous county jails, and Defendant Umar is the president of CMC. *See id.* at ¶¶ 7, 11, 34. CMC has "engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage, as well as inadequate medical care in general." *See id.* at ¶ 34. The complaint includes pages of troubling allegations regarding CMC's business practices and its track record of providing inadequate care in county jails throughout New York State. *See id.* at ¶¶ 35-50. But based on the allegations in the complaint, it is not clear what role, if any, CMC had at Schenectady County Jail during the time in question.

Plaintiff alleges that CBH is responsible for providing medical care at the Schenectady County Jail. *See id.* at ¶ 8. Plaintiff also alleges that, "upon information and belief, CBH Medical, P.C. is owned by Correctional Medical Care, Inc." *See id.* But the complaint includes no other allegations regarding CMC's relationship to CBH or CMC's role at the Schenectady County Jail. Additionally, the complaint does not contain any allegations relating to CBH or its policies, practices, or history of providing medical care.

2018 WL 1580316

## C. Procedural History

On April 14, 2017, Plaintiff Bernita Richardson filed the complaint in this action, and she filed a proposed amended complaint on October 17, 2017. *See* Dkt. Nos. 1, 30-4. In the proposed amended complaint, Plaintiff alleges three different causes of action: (1) deliberate indifference to a serious medical need in violation of the Fourteenth Amendment as to Defendants Fricke and John Does 1-4; (2) implementation of municipal policies that violated Mr. Richardson's constitutional rights as to Defendants CMC, CBH, Umar, Fricke, Schenectady County, and D'Agostino; and (3) conscious pain and suffering and wrongful death as to all Defendants. *See* Dkt. No. 30-4 at ¶¶ 55-72.

**\*3** Defendants filed three separate motions to dismiss. The County Defendants filed one motion to dismiss. *See* Dkt. No. 18. Defendant Russell Fricke filed a separate motion to dismiss. *See* Dkt. No. 20. Finally, the CMC Defendants move to dismiss, and they also move to strike certain allegations in the complaint. *See* Dkt. No. 19. Along with her opposition, Plaintiff filed a cross-motion to amend the complaint. *See* Dkt. No. 30.

## III. LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Sutton ex rel. Rose v. Wachovia Secs., LLC*, 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss,

a court may take judicial notice of documents filed in another court).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, 127 S.Ct. 1955 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570, 127 S.Ct. 1955.

## IV. DISCUSSION

### A. Motion to Amend

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A]bsent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed." *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 283 (2d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83, 83 (S.Ct. 227, 9 L.Ed.2d 222 1962)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 333 (E.D.N.Y. 2013) (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). "Therefore a proposed amendment is not futile if it states a claim upon which relief can be granted." *Waltz v. Bd. of Educ. of Hoosick Falls Cent. Sch. Dist.*, No. 12-CV-0507, 2013 WL 4811958, \*4 (N.D.N.Y. Sept. 10, 2013).

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 25 of 112
Richardson v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 1580316

**\*4** As Defendants have had sufficient opportunity to respond to the proposed amended complaint, and Plaintiff does not seek to add new defendants or claims, the merits of the motion to dismiss will be considered in light of the proposed amended complaint. See *Haag v. MVP Health Care*, 866 F.Supp.2d 137, 140 (N.D.N.Y. 2012). If the proposed amended complaint cannot survive the motion to dismiss, then Plaintiff's cross-motion to amend will be denied as futile.

**B. Deliberate Indifference**

As a pretrial detainee at the time of the incidents addressed in the complaint, Plaintiff's claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted). The Supreme Court recently distinguished between Eighth and Fourteenth Amendment excessive force claims, holding that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *See Kingsley v. Hendrickson*, ––– U.S. ––––, 135 S.Ct. 2466, 2470-71, 192 L.Ed.2d 416 (2015).

In *Darnell*, the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell*, 849 F.3d at 35. The court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

Although *Darnell* involved a challenge to conditions of confinement, district courts in this circuit have also held that *Kingsley* should be applied to pretrial detainees' claims of deliberate indifference to serious medical needs. *See Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, \*19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs"); *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"); *see also Torres v. Semple*, No. 17-CV-1211, 2017 WL 3841686, at \*3 (D. Conn. Sept. 1, 2017) ("[F]or a claim of deliberate indifference to mental health needs

or unconstitutional conditions of confinement under the Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants 'knew, or should have known, that the condition posed an excessive risk to health or safety' ").

Under either the Eighth or the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-prong test. "First, 'the alleged deprivation of adequate medical care must be "sufficiently serious." ' " *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

*1. Objective Prong* [4]

[4]   The standard for establishing the objective prong of a deliberate indifference claim was not affected by *Darnell*. *See Feliciano*, 2017 WL 1189747, at \*10. Therefore, "the objective prong of a deliberate-indifference claim is the same regardless of whether the inmate is a convicted prisoner or a pretrial detainee." *Id.* The Court notes, however, that the term "objective prong" is somewhat misleading in the context of a Fourteenth Amendment deliberate indifference claim. As the Court explains below, after *Darnell*, both prongs of such a claim are now analyzed under an objective standard.

**\*5** The objective prong requires "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith v. Carpenter*,

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 26 of 112

Richardson v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1580316

316 F.3d 178, 186 (2d Cir. 2003); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329712, *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

Generally, complaints of chest pain alone do not constitute a sufficiently serious medical condition. *See, e.g., Hutchinson v. N.Y. State Corr. Officers*, No. 02-CV-2407, 2003 WL 22056997, *5 (S.D.N.Y. Sept. 4, 2003). However, a number of district courts in this circuit have found that heart conditions can be sufficiently serious under certain circumstances. *See Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, *4 (S.D.N.Y. Sept. 30, 2017) (holding that a prisoner satisfies the objective prong of the deliberate indifference inquiry when he has a pre-existing heart condition, presents with chest pain and arm stiffness, has not been provided with his medication, and is denied treatment); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, *5 (S.D.N.Y. Mar. 29, 2016) (finding that a plaintiff's condition was sufficiently serious where he presented with severe chest pain, high blood pressure, and a very low pulse rate); *Zikianda v. County of Albany*, No. 12-CV-1194, 2015 WL 5510956, *28 (N.D.N.Y. Sept. 15, 2015) ("[F]ailing to treat congestive heart failure, which can cause a patient's heart to stop beating, surely qualifies as a serious medical need").

It is well established that the state " 'is not constitutionally obligated ... to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail [him]self of' outside of prison." *Thompson v. Racette*, No. 11-CV-1372, 2012 WL 12884469, *2 (N.D.N.Y. Aug. 2, 2012) (alterations in original) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment. *See Moolenaar v. Champagne*, No. 03-CV-1464, 2006 WL 2795339, *6 (N.D.N.Y. Sept. 26, 2006). But this is not a case of Plaintiff simply disagreeing with a particular medication or diagnostic technique. Plaintiff alleges that Mr. Richardson had a history of heart problems —including Brugada Syndrome and a history of heart attacks —and he frequently complained to the medical staff of his symptoms, which included chest pain radiating into the left arm, dizziness, and "collapsing incidents." Despite Mr. Richardson's medical history and his troubling symptoms, Plaintiff alleges that Mr. Richardson was not provided any of his medications for the majority of the time he was in

Schenectady County Jail, and that he was provided no other treatment for his heart conditions.

In a similar case in this district, the court found that the objective prong was satisfied where the plaintiff alleged that the treatment of the decedent's "congestive heart failure ... was grossly inadequate from the start." *Zikianda*, 2015 WL 5510956, at *29; *see also Johnson v. Wright*, 234 F.Supp.2d 352, 360 (S.D.N.Y. 2002) ("Although federal courts are reluctant to 'second guess medical judgments and constitutionalize [medical malpractice claims]' where the prisoner has actually received medical treatment, deliberate indifference will be found where 'the medical attention rendered was so woefully inadequate as to amount to no treatment at all' ") (alterations in original) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). In this case, the Plaintiff's allegations satisfy the objective prong because Mr. Richardson faced a substantial risk of serious harm due to the deprivation of care.

### 2. Mental Element Prong

**\*6** "After *Darnell*, 'deliberate indifference' is now 'defined objectively,' and the 'Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm.' " *Lloyd*, 246 F.Supp. at 719 (quoting *Darnell*, 849 F.3d at 35). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment "is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmett*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35).

### 3. Defendant Fricke and John Does 1-3

It has long been the rule in this circuit that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Clay v. Kellmurray*, 465 Fed. Appx. 46, 47 (2d Cir. 2012) (quoting *Chance*, 143 F.3d at 703). Even after *Darnell*, it remains the case that "something more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Davis v. McCready*, 283 F.Supp.3d 108, 121 (S.D.N.Y. 2017); *see also Darnell*, 849 F.3d at 36 ("But any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence"). But distinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of

Richardson v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1580316

expert opinion. *See* *McCready*, 283 F.Supp.3d at 121. The distinction between the two "depends on the degree of risk associated with the practitioner's conduct." *Id.*

Here, Defendant Fricke was allegedly aware of Mr. Richardson's history of heart problems, his complaints of chest and arm pain, and his recent hospitalization for chest pain. However, Plaintiff also alleges that Mr. Richardson was not provided with any medication during his first stint in the Schenectady County Jail, and he was not provided medication for nine of fourteen days during his second stint. He was not referred to a cardiologist, hospitalized, or provided any other treatment for his heart problems until his death on January 17, 2016, from a cardiac arrhythmia. In *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, *4 (S.D.N.Y. Sept. 30, 2017), the plaintiff had a pre-existing heart condition and complained of chest pain, as well as stiffness and numbness in the left arm. The court held that although those circumstances did not require the physician's assistant to provide any specific form of treatment, some action should have been taken. *See id.* Therefore, the Court found that the plaintiff had sufficiently alleged objective recklessness. *See id.* In this case, accepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, Dr. Fricke knew or should have known that depriving Mr. Richardson of his medication and other forms of care would result in an excessive risk to Mr. Richardson's health.

Plaintiff also alleges that medical staff at the Schenectady County Jail omitted certain events from Mr. Richardson's medical records and fabricated other records. In particular, Plaintiff alleges that medical staff failed to record the fact that Mr. Richardson repeatedly collapsed in the days leading up to his death, that they did not document a medical emergency caused by Mr. Richardson's chest and arm pain, and that they falsified records pertaining to Mr. Richardson's medication. Therefore, Plaintiff has alleged that the medical staff acted with a sufficiently culpable state of mind and were deliberately indifferent to Mr. Richardson's serious medical needs. *See Grimmett*, 2017 WL 2274485, at *4 (finding the mental-state prong satisfied where the plaintiff alleged that a doctor intentionally omitted facts from the plaintiff's medical records).

### 4. Municipal Liability

**\*7** A municipality "may not be held liable under Section 1983 unless the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson*, No. 04-CV-6338, 2004 WL 2123490, *2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This is because "[m]unicipalities are not subject to Section 1983 liability solely on the basis of a *respondeat superior* theory." *Id.*, at *2. As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection—an affirmative link'—between the policy and the deprivation of his constitutional rights.' " *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

"Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." *Powell v. Correc. Med. Care, Inc.*, No. 13-CV-6842, 2014 WL 4229980, *6 (S.D.N.Y. Aug. 15, 2014) (quoting *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990)); *see also Feder v. Sposato*, No. 11-CV-93, 2014 WL 1801137, *6 (E.D.N.Y. May 7, 2014) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, Armor ... [was] 'acting under the color of state law' for purposes of Section 1983").

"A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted).

Here, Plaintiff alleges that the inadequate care was caused by a policy or custom of CMC. Indeed, the complaint contains pages of allegations regarding CMC's "pattern and practice of ... providing inadequate medical care." *See* Dkt. No. 1 at ¶ 34. But Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail. Instead, she alleges that CBH had that responsibility; it is not clear what role, if any, CMC played at the jail. *See id.* at ¶ 8. Although the complaint alleges, upon information and belief, that CBH is owned by CMC, it does not provide any further information regarding the relationship between the two entities. Even if CMC does own CBH, that alone

Richardson v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1580316

is not sufficient to hold CMC liable for CBH's conduct. *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) ("As a general matter ... a corporate relationship alone is not sufficient to bind [a parent corporation for the actions of its subsidiary]" (alteration in original)). Additionally, the complaint only mentions CBH a handful of times, and it does not contain any allegations that could allow the Court to conclude that CBH itself has a custom or practice of providing inadequate care. [5]

[5]   The CMC Defendants move to strike large chunks of Plaintiff's complaint that are related to the allegations of municipal liability against CMC. *See* Dkt. No. 19-2 at 19-23. Since the Court dismisses the municipal liability claims against CMC and CBH, the motion to strike is denied as moot.

**\*8** Similarly, Plaintiff's § 1983 allegations against the County Defendants rest entirely on CMC's alleged custom or practice of providing inadequate medical care. Since Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail, CMC's policies and practices do not provide a sufficient basis for establishing liability as to the County Defendants. Therefore, the County Defendants' motion to dismiss Plaintiff's § 1983 claims is granted.

**C. State Law Claims**

*1. The County Defendants*

The County Defendants move to dismiss Plaintiff's state law claims against Schenectady County and D'Agostino. *See* Dkt. No. 18-1 at 6, 11. First, the County Defendants argue that Defendant D'Agostino cannot be held liable for the acts or omissions of corrections officers. *See id.* at 6 (citing *Barr v. Albany County*, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980)). Second, the County Defendants argue that state law claims against the County must be dismissed because it may not be held vicariously liable for the acts of corrections officers. *See id.* at 11 (citing *De Ratafia v. County of Columbia*, No. 13-CV-174, 2013 WL 5423871, \*10 (N.D.N.Y. Sept. 26, 2013)).

Plaintiff fails to address these arguments in her opposition to the County Defendants' motion to dismiss. Since Plaintiff does not assert any other basis for liability under state law against the County Defendants, Plaintiff's state law claims against the County Defendants are dismissed. *See Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, \*10 (S.D.N.Y.

Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim"); *see also Div. 1181 Amalgamated Transit Union–N.Y. Emps. Pension Fund v. R & C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, \*4 (E.D.N.Y. Feb. 7, 2018) (collecting cases).

*2. The CMC Defendants*

The CMC Defendants argue that Plaintiff's state law claims should be dismissed because Plaintiff did not file a certificate of merit along with her complaint as required by C.P.L.R. § 3012-a. *See* Dkt. No. 19-2 at 16. The statute "requires counsel to submit a certificate of merit declaring that he or she has consulted with at least one licensed physician who is knowledgeable regarding the relevant issues in the action, has reviewed the case," and has concluded that there is a reasonable basis for commencement of an action. *Calcagno v. Orthopedic Assoc. of Dutchess Cty., PC*, 148 A.D.3d 1279, 1280, 48 N.Y.S.3d 832 (3d Dep't 2017). However, "the mere failure to timely file [a certificate of merit] does not support dismissal of [an] action," *id.*, and Plaintiff submitted a certificate of merit on November 13, 2017, *see* Dkt. No. 37. Therefore, the CMC Defendants' motion to dismiss Plaintiff's state law claims is denied.

**D. Punitive Damages**

The CMC Defendants argue that Plaintiff has failed to allege facts that would support an award of punitive damages. *See* Dkt. No. 19-2 at 18-19. "To recover punitive damages under § 1983 against a government official in his individual capacity, the Plaintiff must show that the official acted with a malicious or evil intent or in callous disregard of the Plaintiff's federally protected rights." *Helijas*, 2016 WL 5374124, at \*17 (quoting *Pritchard v. Town of New Hartford*, No. 14-CV-1477, 2016 WL 4523986, \*4 n.2 (N.D.N.Y. Aug. 22, 2016)). In this case, the question of whether Defendants possessed such "callous disregard" is better addressed with the benefit of an evidentiary record. *See id.*; *see also Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, \*15 (E.D.N.Y. Sept. 20, 2005) ("Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct' ") (quoting *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

2018 WL 1580316

## V. CONCLUSION

**\*9** After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's cross-motion to amend (Dkt. No. 30) is **GRANTED**; and the Court further

**ORDERS** that the County Defendants' motion to dismiss (Dkt. No. 18) is **GRANTED** and Defendants Schenectady County and Dominic D'Agostino may be terminated;[6] and the Court further

[6]  The County Defendants do not move to dismiss the deliberate indifference claim against John Doe Number 4.

**ORDERS** that Defendant Fricke's motion to dismiss (Dkt. No. 20) is **DENIED**; and the Court further

**ORDERS** that the CMC Defendants' motion to dismiss (Dkt. No. 19) is **GRANTED in part** as to the deliberate indifference and municipal liability claims against Correctional Medical Care, Inc., CBH Medical, P.C., and Emre Umar, and the motion is **DENIED in part** as to Plaintiff's state law claims, and Plaintiff's deliberate indifference claims against Defendants Russell Fricke and John Does 1-3; and the Court further

**ORDERS** that the CMC Defendants' motion to strike (Dkt. No. 19) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1580316

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central New
York Psychiatric Center ("Defendants"), are Plaintiff's motion
to proceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his motion
for appointment of counsel. (Dkt.Nos.2, 3, 4.)[1] For the
reasons set forth below, Plaintiff's motion to proceed *in
forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel
is denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this
action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

| 1 | This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation. |

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with a
motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to
"adequately train the staff under their supervision" and to take
appropriate action in response to the incident. (*See generally*
Dkt. No. 1.) For a more detailed description of Plaintiff's
claims, and the factual allegations giving rise to those claims,
the reader is referred to Part III.B of this Decision and Order.

[2]   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis*. (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[3]

[3]   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view,

this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained

2012 WL 651919

that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading

are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4]  *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]  *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]  It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision in *Erickson v. Pardus,* two weeks later) in (when (reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**
The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at \*7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under

Case 9:17-cv-01150-MAD-TWD Document 48 Filed 01/13/20 Page 33 of 112
Groves v. Davis, Not Reported in F.Supp.2d (2012)
2012 WL 651919

the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    See *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

### 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses

Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.)

2012 WL 651919

Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!'" (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct.

2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[9]

[8] Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9] Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any

of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

 **\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through

a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

[12]   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at \*7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6645, 1995 WL 232736, at \*4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at \*5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right

2012 WL 651919

to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymmillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymmillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2

Groves v. Davis, Not Reported in F.Supp.2d (2012)
2012 WL 651919

(N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Separation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on

mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See*

2012 WL 651919

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.*, 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez*, 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

[15]   Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New

York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 40 of 112

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

2017 WL 4329722
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Clark P. RAY, Plaintiff,

v.

Dr. Gaetan ZAMILUS and
Kathleen Gerbing, Defendants.

13 Civ. 2201 (PGG)

|

Signed 09/27/2017

**Attorneys and Law Firms**

Michael Langsdorf Nadler, Sipoura Barzideh, Kimberly
Amanda Francis, Michael Joseph Biondi, Paul, Weiss,
Rifkind, Wharton & Garrison LLP, New York, NY, for
Plaintiff.

Daniel A. Schulze, James Brennan Cooney, Attorney General
of the State of New York, New York, NY, for Defendants.

**MEMORANDUM OPINION & ORDER**

Paul G. Gardephe, United States District Judge

**\*1** Plaintiff Clark P. Ray is a former inmate at
Otisville Correctional Facility ("Otisville"). The Amended
Complaint alleges that Defendants Dr. Gaetan Zamilus
and Superintendent Kathleen Gerbing acted with deliberate
indifference in failing to provide Ray with necessary medical
treatment over an eleven month period while Ray was
incarcerated at Otisville. (Am, Cmplt. (Dkt. No. 23) ¶¶
41-42)[1]

[1]
    Unless otherwise indicated, (1) all cites are to the docket
in the instant action; and (2) the page numbers of
documents referenced in this Order correspond to the
page numbers designated by this District's Electronic
Case Filing system.

Defendants have moved for summary judgement, contending
that Plaintiff cannot satisfy the objective and subjective
elements of deliberate indifference under the Eighth
Amendment, and that Defendants are entitled to qualified
immunity. (Def. Br. (Dkt. No. 87)) Ray argues that material
issues of fact preclude a grant of summary judgment. (Pltf.
Opp. Br. (Dkt. No. 101))

**BACKGROUND**[2]

[2]
    To the extent that this Court relies on facts drawn from
a party's Local Rule 56.1 statement, it has done so
because the opposing party has either not disputed those
facts or has not done so with citations to admissible
evidence. See Giannullo v. City of New York, 322
F.3d 139, 140 (2d Cir. 2003) ("If the opposing party ...
fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed
admitted.") (citations omitted). Where Plaintiff objects to
Defendants' characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court
relies on Plaintiff's characterization of the evidence. See
Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)
(court must draw all rational factual inferences in non-
movant's favor in deciding summary judgment motion).
Unless otherwise indicated, the facts cited by the Court
are undisputed.

**A. The Parties**

Ray served two terms of imprisonment in the New York
State Department of Corrections and Community Supervision
("DOC") prison system. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶
1-2) Ray's first term of incarceration ran from June 30, 1998
to January 4, 2011, while his second term ran from October
27, 2011 to May 25, 2013. (Id. ¶¶ 2-3) During his second
term of incarceration, Ray was held at several prisons. In early
2012 he was transferred from Franklin Correctional Facility
to Fishkill Correctional Facility ("Fishkill"). (Id. ¶ 22) On
April 23, 2012, he was transferred from Fishkill to Otisville
Correctional Facility, where he remained until his release on
May 25, 2013. (Id. ¶¶ 3, 62)

Defendant Zamilus is employed by DOC as the acting Facility
Health Services Director at Otisville, and he was the only
doctor assigned to Otisville's medical unit during the relevant
time period (2012-2013). (Id. ¶¶ 5-6) During this time, Dr.
Zamilus worked as a "half-time physician (i.e., two days
per week; seven-and-a-half hours per day) at Otisville and
a half-time physician at Fishkill." (Id. ¶ 5) Otisville held
approximately 570 inmates in 2012. (Def. R. 56.1 Reply (Dkt.
No. 108) ¶ 81)

**\*2** Defendant Gerbing is the Superintendent of Otisville.
(Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 8) Her duties
include providing "overall supervision of the facility's
staff and inmates, including security, administration, and

**Ray v. Zamilus, Not Reported in Fed. Supp. (2017)**

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 41 of 112

2017 WL 4329722

programs." (Gerbing Decl. (Dkt. No. 88) ¶ 2) Under DOC policy, however, the superintendent is not responsible for directing inmate medical care. (Id. ¶ 5)

### B. Hepatitis C

In October or November of 2000, Ray was diagnosed with Hepatitis C. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 11) It is undisputed that Ray suffered from chronic Hepatitis C during the period between April 23, 2012 and May 25, 2013, while he was incarcerated at Otisville. (Id. ¶¶ 4, 15)

Hepatitis C is a liver disease caused by the Hepatitis C virus ("HCV"), which can cause scarring of the liver known as "fibrosis," (Id. ¶¶ 12, 16; Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:19-25) There are four stages of fibrosis of the liver. Stage four fibrosis is known as "cirrhosis," also known as "liver failure." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:16-17, 162:5-11) "[T]here is much more urgency to treat" patients suffering from advanced fibrosis, because it may be too late to treat a patient once the disease has progressed to cirrhosis. (Id. at 201:4-16, 203:10-21) It is undisputed that Ray's disease had progressed to stage three by the time Ray had arrived at Otisville. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶ 4, 15; Def. R. 56.1 Reply (Dkt No. 108) ¶ 68)

The extent to which Hepatitis C has progressed is a key determinant of whether medical treatment is necessary. Dr. Zamilus and Dr. Carl Koenigsmann—Deputy Commissioner and Chief Medical Officer of DOC—testified that DOC policy as of August 2012 was that those inmates without fibrosis "will not be treated"; those with stage one fibrosis "will be evaluated on an individual basis"; and those with stage two fibrosis or above "will be offered treatment." (Def. R. 56.1 Reply (Dkt No. 108) ¶ 91)

During the relevant time period (2012-2013), the state-of-the-art treatment for Hepatitis C was a drug cocktail made up of Ribavirin, Peginterferon, and Telaprevir. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 26) Peginterferon may cause "[l]ife-threatening or fatal neuropsychiatric reactions[,] including suicidal ideation, homicidal ideation, [and] depression ... with or without previous psychiatric illness." (Id. ¶ 27) Moreover, a Hepatitis C patient who did not complete the full prescribed course of treatment with Telaprevir faced a significant risk that his disease would become drug-resistant. (Id. ¶¶ 48-49)

### C. Liver Biopsy While at Fishkill

On March 16, 2012—during Ray's incarceration at Fishkill —Dr. Zamilus conducted a pre-operation physical on Ray to assess whether he could undergo a liver biopsy to analyze the status of his Hepatitis C. (Id. ¶ 23) On March 28, 2012, Ray underwent a liver biopsy at Fishkill. (Id. ¶ 25)

The results of Ray's liver biopsy became available on April 5, 2012. The biopsy results indicated that Ray had chronic Hepatitis C, stage three fibrosis. (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 68) A nurse's notes from April 23, 2012 state that Ray was "[r]equesting the results of his biopsy done on 3-28-12 also info about treatment for Hep C," and that a follow-up appointment had been scheduled for May 22, 2012. (Nadler Decl., Ex. 36 (Apr. 23, 2012 Progress Notes) (Dkt. No. 102-39) at 2) The nurse's notes further state, "Told PCP to review results + notify him. Has appointment to F/U PCP + discuss Tx. Chart to PCP to review results." [3] (Id.)

[3]     Testimony from Dr. Zamilus and Dr. Koenigsmann establishes that "TX" refers to treatment; "F/U" refers to follow up; and "PCP" refers to primary care physician. (See Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 242:5-12; id., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 200:8-12)

**\*3** Ray testified that he was informed at Fishkill that he "was ready for a treatment plan" and that "as soon as [he] arrived [at his] next facility"—Otisville—"it was in [his] file that [he] was ready for a treatment plan to start treatment for chronic Hepatitis C." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 95:11-96:6; see Nadler Decl., Ex. 33 (Mar. 1, 2012 Request and Report of Consultation) (Dkt. No. 102-36) at 2 ("PT meets criteria for Hep C Tx. Please schedule for BA seline liver BX to determine extent of liver damage and consideration for Hep C Tx."))

### D. Medical Treatment at Otisville

Ray was transferred to Otisville on April 23, 2012. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3) Ray claims that he did not receive proper medical care at Otisville during the period between April 23, 2012 and March 5, 2013, when he began multi-drug therapy for his Hepatitis C disease. (Id. ¶¶ 3, 61)

Under DOC Policies on Health Screening of Inmates, when an inmate is transferred to a new facility, he first meets with a facility nurse to undergo a health screening and receive orientation concerning health care services, including the procedures for Sick Call. (Id. ¶ 31; Koenigsmann Decl., Ex. G (Dkt. No. 91-7)) On Ray's first day at Otisville—April 23,

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 42 of 112

2017 WL 4329722

2012 (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3)—he requested treatment for his Hepatitis C condition. (Id. ¶ 28; Def. R. 56.1 Reply (Dkt No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5)

Ray visited Sick Call at Otisville on July 2, 2012 and July 3, 2012. Progress Notes from the July 2, 2012 Sick Call visit state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex, 35 (Progress Notes) (Dkt. No. 102-38) at 2) The progress notes also report that Ray "would like Tx for Hep C." (Id.) Dr. Zamilus's notes concerning Ray's July 3, 2012 visit state that Ray had "cold symptoms," "fever + chills," and "general malaise." (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2) Ray was held in the infirmary overnight and Dr. Zamilus signed Ray's discharge summary, which indicated that Ray had "no malaise." (Id.; see Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 197; 19-198:1; Nadler Decl., Ex, 8 (Ray Dep.) (Dkt. No. 102-8) at 210:9-13 ("When I went to sick call, on several occasions, I complained of cold and flu-type symptoms, severe abdominal pains, fatigue, vomiting, diarrhea, and feeling like I had been run down by a dump truck."))

On August 21, 2012, Ray had his first scheduled appointment with Dr. Zamilus at Otisville, (Pltf. 56.1 Resp. (Dkt. No. 103) ¶ 33) Dr. Zamilus's notes of this visit reflect the following: "Hep C treatment [was] discussed"; "lab ordered PT/PTT, V[iral] L[oad], Hep B s[urface] [antibody], will do E-form after lab/psych eval[uation]." (Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2; see also Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15 (Zamilus testimony that this is "a note that I saw the patient, follow-up Hep C, I put patient interested in treatment, RX, and I put abdominal negative, so that means I checked the abdomen, he didn't have any complaint, and I put my assessment Hep C treatment discussed, lab order[ed], these are the lab[s] that I ordered, PT/PTT, viral load, VL, and also check Hep B surface antibody, and I added will do e-form after labs slash psych evaluation, eval or evaluation"); id. at 277:19-25 (Zamilus testimony that "PT/PTT" stands for "[p]rothrombin time, partial prothrombin"); Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 166:18-167:2 (Koenigsmann testimony that in order to treat a patient with Hepatitis C, "you have to have a measurable viral load, meaning that you have an active hepatitis C infection")) That same day, Dr. Zamilus made a referral for Ray to receive a psychiatric evaluation and additional lab work. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶¶ 36, 39)

**\*4** Dr. Zamilus states in his declaration that he "understood that a psychiatric evaluation was part of the clearance required by [DOC] to obtain final approval to start Hepatitis C treatment." (Zamilus Deck (Dkt. No. 93) ¶ 17) Dr. Zamilus further states that

> [i]t was my understanding and belief that I could not start Plaintiff's Hepatitis C treatment without having a definite continuity care plan finalized. Due to the risk that the virus could develop resistance to drug therapy if the course of treatment is not completed, it was critical to successful treatment, and [DOC] policy, to ensure that a plan for continuity of care was in place prior to starting treatment if the inmate could be released before the treatment's completion.

(Id. ¶ 26) The standard course of drug treatment for a Hepatitis C patient in Plaintiff's condition ran forty-eight weeks. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 45)

Dr. Koenigsmann states that he "required the [DOC] Infection Control Unit to consult and advise on situations where there was a potential that an inmate would not finish the entire course of the prescribed triple therapy," due to concerns about drug resistance. (Koenigsmann Deck (Dkt. No. 91) ¶ 11) Ray's conditional release date was in April 2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

DOC's Hepatitis C Primary Care Guidelines (the "Guidelines" or "DOC Guidelines") provide that

Anti-HCV therapy should be considered in accordance with the following criteria:

....

10. No history of major depression or other major psychiatric illness unless cleared by a psychologist or psychiatrist to receive anti-HCV treatment. A history of suicide attempts is generally regarded as an absolute contraindication of treatment.

....

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

13. The primary care provider should assess if the inmate will be incarcerated for the duration of the required HCV treatment. If there is a possibility that the inmate will be released prior to completion of treatment[,] then the provider should have the inmate sign the Hepatitis C Continuity Program Acceptance Form.... Upon the patient[']s agreement to participate and comply with the Hepatitis [C] Continuity Program the provider will contact the Regional Infection Control Nurse to initiate the enrollment process into the Continuity Program.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt No. 102-24) at 7-8)

Ray's next appointment with Dr. Zamilus was on November 29, 2012. Ray and Dr. Zamilus again discussed the treatment for Ray's Hepatitis C condition. (Pltf. R. 56.1 Resp. to 56.1 (Dkt. No. 103) ¶ 43) Dr. Zamilus claims that on December 13, 2012, he sent Dr. Koenigsmann a request for Hepatitis C treatment via an e-file form. (Zamilus Decl. (Dkt. No. 93) ¶ 20) Although the record contains a "Hep C Treatment Request" form dated December 13, 2012 that contains Ray's name, the form does not indicate to whom it was sent, or whether any action was taken in response to the request. (Zamilus Decl., Ex. A (Dec. 13, 2012 Hep C Treatment Request) (Dkt. No. 93-1) at 5)

Dr. Koenigsmann states in his declaration that on October 24, 2012, he issued a "Revision Notice" to medical staff stating that there was a "new [DOC] Hepatitis C Treatment Request E-Form." (Koenigsmann Decl. (Dkt, No. 91) ¶ 8) Dr. Koenigsmann testified that if Dr. Zamilus submitted the request to him using the new system in December 2012, he would have a record of that submission, but no such record exists. (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 258:16-259:1, 260:4-14) [4]

[4]    Dr. Koenigsmann testified that the transition to the new Outlook e-form system was made in about August 2012, and that Dr. Zamilus should have been aware of the system switch at least four months before he requested Ray's Hepatitis C treatment. (Id. at 259:2-260:3)

*5   On January 23, 2013, Ray filed a grievance complaining that he had not received treatment for his Hepatitis C condition. (Nadler Decl., Ex. 67 (First Grievance) (Dkt. No. 102-70) at 2-13) [5]

[5]

On February 1, 2013, the Inmate Grievance Resolution Committee ("IGRC") issued a split decision concerning Ray's grievance. Some members of the IGRC concluded that Ray's grievance was "outside the purview of the IGRC," while others recommended that Ray be given "immediate medical treatment for his chronic illness, due to the serious nature of [his] disease, which cause[s] permanent liver damage." The IGRC recommended that Ray's grievance be "sen[t] to Superintendent [Gerbing] for review." (Nadler Decl., Ex. 68 (IGRC Split Decision) (Dkt. No. 102-71) at 2)

On February 6, 2013, Superintendent Gerbing denied Ray's grievance, agreeing that it was outside the purview of the IGRC:

This grievance has been investigated and responded to by the Facility Health Services Director of the facility, Dr. Zamilus. Per Dr. Zamilus, the grievant was last seen 11/29/12 regarding his Hepatitis C. On December 13, 2012 a request to begin Hepatitis C treatment was submitted to the Medical Director in Albany. The medical department is currently waiting for a response. All actions are outside the purview of the IGRC. The medical department has done their part in putting in the request to begin treatment. However, they are waiting for approval from Albany prior to beginning such treatment.

(Nadler Decl., Ex. 58 (Gerbing Grievance Response) (Dkt. No. 102-61) at 2)

In a January 31, 2013 e-mail to Dr. Koenigsmann, Dr. Zamilus reported that Ray had filed a grievance complaining that his Hepatitis C treatment was being delayed. (Koenigsmann Decl., Ex. D (E-Mail Exchange) (Dkt. No. 91-4) at 1) In his email, Dr. Zamilus asks, "Can you tell me where are we on the application, Eform for his hep c. I sent it around early December." (Id.)

Later that day, Dr. Koenigsmann replied:

I have no approval listed under this pt. If not approved I would have sent you a response asking for more info etc[.], I have no record of any e mail sent to you regarding this pt. I recommend that you send me the Outlook treatment request again. We are not using the sysm e mail requests any longer as is noted in the Hep C tx practice guideline addendum. If you

**Ray v. Zamilus, Not Reported in Fed. Supp. (2017)**

2017 WL 4329722

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 44 of 112

are unclear what request to use please
contact me.

(Id.) [6]

[6]    Dr. Koenigmann states in his declaration that "[o]n
December 13, 2012, according to Plaintiff's medical
records, Dr. Zamilus filled out and sent to me a request
for Hepatitis C treatment for Plaintiff via the new e-file
form.... However, on January 31, 2013, since I could not
locate the initial e-form request sent by Dr. Zamilus on
December 13, 2012, I instructed Dr. Zamilus to re-send
the treatment request form." (Koenigsmann Decl. (Dkt.
No. 91) ¶ 9)

That same day, Dr. Zamilus submitted an email request to Dr.
Koenigsmann for "HEPC Treatment" for Ray. (Nadler Decl.,
Ex. 50 (Jan. 31, 2013 E-Mail Request) (Dkt. No. 102-53) at
2-4) Dr. Koenigsmann approved the request later that day.
(Nadler Decl. Ex, 42 (Jan. 31, 2013 E-Mail Response) (Dkt.
No. 102-45) at 2) At his deposition, Dr. Koenigsmann testified
that he generally approved Hepatitis C treatment requests
within "twenty minutes to a half an hour." (Nadler Decl. Ex.
5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 253:11-19)

 **\*6**  In approving Ray's treatment on January 31, 2013, Dr.
Koenigsmann informed Dr. Zamilus that Ray's conditional
release date was scheduled for April 2013—before the
48-week Hepatitis C treatment would be completed. Dr.
Koenigsmann "recommend[ed] referral to the continuity
program," and suggested that Dr. Zamilus "contact the
Regional Infection Control Nurse." (Nadler Decl. Ex. 42 (Jan.
31, 2013 E-Mail Response) (Dkt. No. 102-45) at 2; see Pltf.
R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

Ray's psychological evaluation—which Dr. Zamilus had
requested on August 21, 2012—occurred on February 5,
2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) 51)

On February 7, 2013, Nurse Becky Reddish met with Ray to
explain the Continuity of Care Program. (Id. ¶ 53) Ray told
Nurse Reddish where he expected to be living after he was
released. Nurse Reddish determined that the closest medical
provider that could continue Ray's Hepatitis C treatment was
located approximately 150 miles away. (Id. ¶ 54)

Accordingly, on February 22, 2013, Ray signed a waiver to
stay in prison beyond his conditional release date. (Nadler

Decl., Ex. 60 (Ray Waiver) (Dkt. No. 102-63) at 5) The next
day, Ray signed an addendum to his waiver stating:

> It should be made clear that my waiver
> of my April 7, 2013, conditional
> release date was done solely to receive
> treatment for my hepatitis C. Without
> the agreement from Health Services
> to treat my hepatitis C, I would not
> have any reason or desire to waive my
> conditional release. Finally, it should
> be mentioned that although I have
> been required to sign a waiver of my
> conditional release date, my treatment
> for hepatitis C has not yet begun.

(Id. at 3)

On April 21, 2013, Ray filed a second grievance seeking
to be released from prison and to rescind his waiver of
his conditional release date. (Nadler Decl., Ex. 59 (Second
Grievance) (Dkt. No. 102-62) at 2-4) In his second grievance,
Ray states:

> On February 14, 2013, I, Clark P. Ray (Grievant), was
> informed by Dr. Gaetan Zamilus, Health Service Director,
> that to receive treatment for my hepatitis C (HCV) infection
> I would have to agree to remain incarcerated beyond my
> conditional release date of April 7, 2013.
>
> On February 22, 2013 I was informed by Ms. Reddish
> of Disease Control, that to begin treatment for my HCV
> infection I must sign a waiver of my conditional release
> date.
>
> On February 22, 2013 I was given a waiver of my
> conditional release date to sign and return for distribution.
> I signed the waiver and gave it to Mr. Richard Colon,
> Offender Rehabilitation Coordinator ...
>
> On February 24, 2013, I served Mr. Richard Colon with
> an Addendum to the Conditional Release Waiver signed
> February 22, 2013....
>
> I have repeatedly asked the Health Service Department,
> to place me in the continuity program, My request began
> September of 2012....

(Id. at 3)

**Ray v. Zamilus, Not Reported in Fed. Supp. (2017)**
2017 WL 4329722

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 45 of 112

Dr. Zamilus testified that Ray signed a conditional release waiver "[b]ecause ... we could not start treatment until he agreed to stay for the treatment." (Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 314:3-5) Dr. Koenigsmann states in his declaration that "[f]rom approximately February 7, 2013, to February 28, 2013, the [DOC] Infection Control Unit and I were considering whether Plaintiff should begin his Hepatitis C treatment without having a definite continuity of care plan in place. Dr. Zamilus did not participate in my conversations with Ellen Turner and Becky Reddish of the [DOC] Infection Control Unit, and did not participate in the decision of whether Plaintiff should begin treatment." (Koenigsmann Decl. (Dkt. No. 91) ¶ 12)

**\*7** On March 5, 2013, Ray began the triple drug therapy treatment for Hepatitis C. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 61) On May 25, 2013, Ray was released from Otisville, with continuity of care in place in Albany. (Id. ¶ 62) Ray completed his treatment on September 18, 2013. (Id. ¶ 64) Although the standard course of therapy with the three-drug protocol runs forty-eight weeks, Ray's treatment was terminated much earlier—at about twenty-eight weeks. Ray's treatment was ended early, because his system was found to contain no active Hepatitis C infection. (Id. ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24-319:5; Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2)) As of August 21, 2015, Ray remained virus-free. (Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2)

### DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment will be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." De Los Santos v. HYS Livery Serv., Inc., No. 12 Civ. 8124 (LTS) (JCF), 2014 WL 1979924, at *2 (S.D.N.Y. May 14, 2014); see Fed. R. Civ. P. 56(a). A fact is considered material "if it 'might affect the outcome of the suit under the governing law,' and an issue of fact is a genuine one where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986)).

The Second Circuit has instructed that "[t]he party against whom summary judgment is sought ... 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted)); see De Los Santos, 2014 WL 1979924, at *2.

### II. STANDARD FOR EIGHTH AMENDMENT CLAIMS

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A prisoner must satisfy two requirements—one objective and one subjective in order to prevail on such a 'deliberate indifference' claim." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). First, the prisoner must prove that the alleged deprivation of medical treatment is—in objective terms—"sufficiently serious," that is, the prisoner must prove that his medical need was "a condition of urgency, one that may produce death, degeneration, or extreme pain." See id. (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996))). Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). "This requires that the prisoner prove that the charged official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' Johnson, 412 F.3d at 403 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Deliberate indifference exists when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2002) (citing cases).

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 46 of 112

**\*8** "It is well-established that Hepatitis C qualifies as a serious medical condition for purposes of an Eighth Amendment analysis." Pabon v. Wright, No. 99 Civ. 2196 (WHP), 2004 WL 628784, at \*1 (S.D.N.Y. Mar. 29, 2004), aff'd, 459 F.3d 241 (2d Cir. 2006). Where a plaintiff "suffered from a delay in treatment, rather than a complete lack of treatment, [however,] the objective element must be satisfied by harm that resulted from the delay." Graham v. Wright, No. 01 Civ. 9613 (NRB), 2004 WL 1794503, at \*5 n.7 (S.D.N.Y. Aug. 10, 2004), aff'd, 136 Fed.Appx. 418 (2d Cir. 2005) (citing Smith, 316 F.3d at 186).

Courts (and juries) may "consider the absence of adverse medical effects in evaluating the objective sufficiency of [an] Eighth Amendment claim." Smith, 316 F.3d at 187 ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.") (citing cases). "Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Id.

Proof of actual physical harm is not required, however. "[A]n Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and ... actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." Id. at 188 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993) (the potential future health risk caused by exposure to second hand smoke may form the basis for relief under the Eighth Amendment)). " '[A]lthough demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm.' " DiChiara v. Wright, No. 06 Civ. 6123 (KAM) (LB), 2011 WL 1303867, at \*7 (E.D.N.Y. Mar. 31, 2011) (quoting Smith, 316 F.3d at 188).

## III. ANALYSIS

Defendants argue that (1) Ray cannot satisfy either the objective or subjective elements of his deliberate indifference claim against Dr. Zamilus; (2) Superintendent Gerbing had no personal involvement, because she "never participated in Plaintiff's Hepatitis C treatment or supervised Dr. Zamilus' treatment of Plaintiff's Hepatitis C"; and (3) both Defendants are entitled to qualified immunity, (Def. Br. (Dkt. No. 87) at 1.7-26)

Ray argues, however, that for an "eleven month span, the minimal attention that Dr. Zamilus provided to Mr. Ray was 'so woefully inadequate as to amount to no treatment at all." ' (Pltf. Opp. Br. (Dkt. No. 101) at 23 (quoting Johnson, 234 F. Supp. 2d at 360)) As to Superintendent Gerbing, Ray argues that she "was personally involved in the denial of Mr. Ray's medical care through her role in rejecting his grievance" (id. at 28-29), and that she "is responsible for the violation of Mr. Ray's Eighth Amendment rights because she was 'aware of the [under] staffing problem [at Otisville] but fail[ed] to take corrective action.' " (Id. at 31) (quoting Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990)) Ray also asserts that "[n]either Defendant has established an affirmative defense of qualified immunity." (Id. at 32)

### A. Delay of Treatment v. Denial of Treatment

"Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment [and ...] the analyses are subtly different." Ippolito v. Goord, No. 05 Civ. 6683 (MAT), 2012 WL 4210125, at \*9 (W.D.N.Y. Sept. 19, 2012).

**\*9** In the Amended Complaint—filed while Ray was proceeding pro se, Ray asserts a claim for "delay in treatment" under the Eighth Amendment. (See Am. Cmplt. (Dkt. No. 23) 11, 44) In opposing Defendants' motion for summary judgment, however, Ray—now represented by counsel—argues that he was "denied treatment for his advanced Hepatitis C from April 2012 through March 2013" and that "Defendants incorrectly classify this action [as] a 'delay of treatment' case in order to heighten Mr. Ray's burden." (Pltf. Opp. Br. (Dkt. No. 101) at 21)

There is evidence before the Court showing that (1) Ray requested treatment for his Hepatitis C when he arrived at Otisville on April 23, 2012 (Pltf R. 56.1 Resp. (Dkt. No. 103) ¶¶ 3, 28; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5); (2) Ray began treatment on March 5, 2013, while incarcerated at Otisville (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 61); (3) Ray was released from Otisville on May 25, 2013, with continuity of care in place (id. ¶ 62); (4) as of May 30, 2013, there was no evidence of the Hepatitis C virus in Ray's system (id. ¶ 63); (5) Ray completed his treatment on September 18, 2013 (id. ¶ 64); and (6) there continues to be no evidence of the Hepatitis C virus in Ray's system. (Id.)

Given this record, this Court concludes that this case involves a delay in treatment, rather than a denial of treatment.

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 47 of 112

2017 WL 4329722

See, e.g., Graham, 2004 WL 1794503, at *5 (plaintiff was diagnosed with Hepatitis C on March 12, 2001 but his drug therapy did not begin until February 26, 2003; court addressed Eight Amendment claim as a "delay in treatment" case); DiChiara, 2011 WL 1303867, at *7 (plaintiff contended that defendant had provided no treatment for his Hepatitis C condition for one year; court addressed Eight Amendment claim as a "delay in treatment" case).

**B. Ray Has Not Offered Sufficient Evidence to Satisfy the Objective Prong of an Eighth Amendment Deliberate Indifference Claim**

Defendants argue that Ray "does not meet the objective component [of his deliberate indifference claim] because the undisputed facts show that the alleged delay did not exacerbate his condition or worsen his prognosis for effective treatment." (Def. Br. (Dkt. No. 87) at 18) Ray argues, however, that summary judgment is precluded because "[d]uring the eleven months that Mr. Ray was denied treatment, he not only suffered from severe abdominal pain, but also nausea, diarrhea, cold- and flu-like symptoms, and intense fatigue." (Pltf. Opp. Br. (Dkt. No. 101) at 22)

As noted above, in order to establish an Eighth Amendment violation for deliberate indifference, plaintiff must satisfy both an objective and a subjective element. See Smith, 316 F.3d at 183. To satisfy the objective prong of an Eighth Amendment claim, a plaintiff's injury must be sufficiently serious. See id. at 184 (holding that " '[b]ecause society does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care") (quoting Hudson v. McMillan, 503 U.S. 1, 9 (1992)).

Moreover, where an inmate alleges a delay in treatment—rather than an absolute denial of treatment—"it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." Id. at 185 (quoting Chance, 143 F.3d at 702) (emphasis in Smith). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a 'substantial risk of injury.' " Graham, 2004 WL 1794503, at *4 (quoting Smith, 316 F.3d at 186). "Conversely, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that

which would occur even with complete medical attention." Id. (citing Smith, 316 F.3d at 186).

**\*10** In sum, "the case law clearly establishes that the delay in treatment does not become a constitutional violation merely because the underlying medical condition, here, Hepatitis C, is indisputably a serious one." DiChiara, 2011 WL 1303867, at *7. "The court must instead look to 'all relevant facts and circumstances' when determining whether a delay in treatment is 'objectively serious' for Eighth Amendment purposes." Id. (quoting Smith, 316 F. 3d at 187). In determining whether a delay in treatment is "objectively serious" for Eighth Amendment purposes, courts and juries are "entitled to consider the absence of adverse medical effects" associated with the delay in treatment. Smith, 316 F.3d at 187.

Although the Second Circuit has "never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony," Hathaway, 37 F.3d at 68, multiple district courts in this Circuit, and at least four Circuit courts, have concluded that a plaintiff who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment. See, e.g., Bennett v. Erie Cty. Holding Ctr. Med. Dep't, No. 03 Civ. 6393 (P), 2006 WL 897817, at *9 (W.D.N.Y. Mar. 31, 2006) (granting summary judgment where "[plaintiff] has not shown that the surgery should have been performed sooner ... or that substantial harm resulted from the delay.... He has simply offered no persuasive medical evidence that surgery should have been conducted during the period of time that he was incarcerated ... or that his offset jaw resulted from the failure to perform such surgery during that time frame."); R.T. v. Gross, 298 F. Supp. 2d 289, 296-97 (N.D.N.Y. 2003) (granting summary judgment "[b]ecause Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis"); Llorente v. Rozeff, No. 99 Civ. 1799, 2001 WL 474261, at *4 (N.D.N.Y. Apr. 12, 2001) (granting summary judgment where plaintiff "acknowledges that he has not identified any expert who will testify that his injury was aggravated as a result of the claimed delay in medical treatment ... and admits that no medical records exist which supports that a delay in medical care resulted in aggravation of his injury"); see also Smith, 316 F.3d at 186 (citing Hill v. Dekalb Reg'l Youth Pet. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994) for the proposition that the "delay in medical treatment must be interpreted in the context of the

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay"); Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm.... That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."); Surber v. Dixie County Jail, 206 Fed. Appx. 931, 933 (11th Cir. 2006) (same); Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (same); Napier v. Madison Cty., Ky., 238 F.3d 739, 742 (6th Cir. 2001) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed").

 *11 Numerous courts have considered whether a delay in providing treatment for Hepatitis C rises to the level of an Eighth Amendment violation, Where such claims have survived summary judgment, they generally have been supported by medical evidence demonstrating that the delay in treatment either made the eventual treatment less effective, or presented a risk that treatment would be less effective. See, e.g., Parks v. Blanchette, 144 F. Supp. 3d 282, 314 (D. Conn. 2015) (finding that plaintiff "introduced evidence sufficient to raise a genuine question of material fact as to whether the delay in receiving Hepatitis C treatment was sufficiently serious" where plaintiff's expert "has indicated that a delay in treatment for Hepatitis C decreases its effectiveness"); Ippolito, 2012 WL 4210125, at *11-12 (where treatment for Hepatitis C had been delayed for seven to nine years, and plaintiff had offered expert testimony that early treatment presented a better chance of arresting the disease's progression, plaintiff had offered evidence sufficient to raise a triable question of fact on the objective prong); DiChiara, 2011 WL 1303867, at *7-8 (finding that "the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment" where "plaintiff ... presented the affidavit and testimony of his expert, Dr. Klion, which ... supports plaintiff's position that the delay in treatment was serious"). [7]

[7] The DiChiara court relied on extensive medical evidence in finding "a question of fact about whether the delay in treating his HCV was 'objectively serious' ": Plaintiff's expert, "Dr. Klion[,] stated that treatment should be initiated '[o]nce diagnosis of hepatitis C is established

and there is evidence of progressive disease' because treatment at that stage 'has the best chance of arresting the disease'.... Further, Dr. Klion stated that 'treatment with interferon, which is one of the drugs used in treating hepatitis C, protects the liver from further damage by slowing scarring and is therefore beneficial even to patients who end up being non-responders." DiChiara, 2011 WL 1303867, at *8.
Moreover, the record demonstrated that "prior to the delay in treatment, plaintiff possessed only one of the negative predictors to treatment, his genotype, and not the other, the high viral load. It was only after the delay that his viral load increased ... and that his chances of succeeding in the treatment decreased even further." Id. at *7. In DiChiara, unlike here, plaintiff also failed to clear the virus to undetectable amounts during his first 48-week course of treatment. See id. "Plaintiff was left with two options after this: leave the infection untreated, risking cirrhosis of the liver, cancer, or death, or go through a second round of treatment, enduring the number of side effects associated with the antiviral therapy." Id.

> [A]lthough Dr. Klion could not quantify how the success in treatment would be affected by a delay, it was his expert opinion that early treatment presented a better chance of arresting progression of the disease and protecting the liver. While plaintiff was ultimately successful in clearing the virus after he was released from prison, he has still presented sufficient evidence to raise a disputed question of material fact for the jury whether the delay in treatment had an adverse medical effect of decreasing his chance of clearing the virus and was sufficiently serious, even if he cannot show a physical injury.

Id. at *8.

Conversely, where a plaintiff has not offered medical evidence demonstrating disease progression or a worse prognosis, defendants have been granted summary judgment. See, e.g., Byng v. Wright, No. 09 Civ. 9924 (PKC) (JCF), 2012 WL 967430, at *10 (S.D.N.Y. Mar. 20, 2012) (finding that plaintiff's "allegation [of a delay in treatment of his Hepatitis C] ... fails under both prongs of the deliberate indifference standard," because he "comes forward with no evidence that he sustained a serious adverse health effect between his September 27[, 2007] visit with Dr. Mamis and his October 23[, 2007] consultation with Dr. Rush"); Motta v. Wright, No. 9:06 Civ. 1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) (three and a half year delay in Hepatitis C treatment; "[t]he court ... [found] that plaintiff ha[d] not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis [because t]here

Case 9:17-cv-01150-MAD-TWD Document 48 Filed 01/13/20 Page 49 of 112

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

[wa]s no evidence that the delay was 'substantially serious' '; plaintiff had not offered evidence that "drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006," and thus had "not raised a genuine issue regarding the objective prong of the test"); Farid v. Ellen, No. 01 Civ. 8292 (PKC), 2006 WL 59517, at * 10-11 (S.D.N. Y, Jan. 11, 2006), aff'd, 593 F.3d 233 (2d Cir. 2010) (granting summary judgment in Hepatitis C delay in treatment case, where "[d]espite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"; "no reasonable jury could conclude that the alleged delay in plaintiff's medical treatment caused any harm to him that would be actionable under the Eighth Amendment"); Graham, 2004 WL 1794503, at *5 (granting summary judgment in delay in treatment Hepatitis C case where evidence showed that plaintiff had "no more than a five percent chance" of responding to the medication had it been administered earlier).

*12 Here, Plaintiff has not introduced "verifying medical evidence" that his Hepatitis C condition worsened as a result of the delay in treatment, or that he faced a worse prognosis as a result of the delay in treatment. Indeed, the undisputed evidence shows that once Ray received treatment, the virus was quickly eradicated, and he remains virus-free. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24-319:5; Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2))

As to medical evidence, Ray offers only Dr. Koenigsmann's testimony that "there is much more urgency to treat" patients suffering from advanced fibrosis, because it may be "too late" to treat a patient "once a patient has cirrhosis." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 201:4-16, 203:10-21, 204:10-16) But Dr. Koenigsmann did not speak to the issue of whether Ray's Hepatitis C condition worsened— or whether he faced a risk of it worsening—as a result of the delay in treatment.

Instead of offering "verifying medical evidence," Ray relies on his own subjective account of symptoms he experienced during the eleven month delay in treatment. At his deposition, Ray testified that—between April 2012 and March 2013— he experienced "vomiting," "diarrhea," "cold and flu-type symptoms," "a fog of major fatigue" such that he "barely

[could] function," "abdominal pain like a sword" and that he felt as if he had been "run over by a truck." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 140:16-141:24, 232:12-234:7) Ray contends that all of these symptoms are associated with Hepatitis C. (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32)

DOC's Hepatitis C Primary Care Practice Guidelines indicate that the following "symptoms and consequences" are associated with a Hepatitis C infection:

> Approximately 20% of persons exposed to the virus develop symptoms which may include jaundice (yellowing of the skin and whites of the eyes), fatigue, dark colored urine, stomach pain, loss of appetite and nausea. After the initial infection, 15-25 percent will recover and 75-85 percent will become chronically infected (life-long infection). Approximately 70 percent of persons chronically infected may develop liver disease, sometimes decades after initial infection.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-25) at 10)

When asked at his deposition "what are the symptoms of ... liver disease," Dr. Koenigsmann testified:

> You can develop ascites, which is fluid collections in the abdomen. You can have protein imbalances where you develop frank congestive heart failure, leg edema. You can have, I presume, to some degree fatigue. You can get problems with your— a substance called bilirubin as the liver fails and that can cause pigment changes, you turn yellow, you can have a lot of itching from that, and ultimately chronic hepatitis C can cause the development of liver cancer,

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 50 of 112

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

which has a whole host of other symptoms and problems.

(Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:1-12) Dr. Koenigsmann further testified that symptoms could also include excess fluid in the abdomen that could result in abdominal pain. (Id. at 163:18-23) Nurse Shylo Goin Tavares testified that late-stage symptoms of HCV could also include "an enlarged liver, you could have pain in your liver area, which is your right upper quadrant of your abdomen." (Nadler Dec., Ex. 3 (Tavares Dep.) (Dkt. No. 102-3) at 18:12-20)

 **\*13** There is no evidence that Ray suffered jaundice, itching, heart failure, leg edema, dark colored urine, or liver cancer during the eleven-month delay in treatment.[8] There is evidence that Ray made Sick Call visits to Otisville's infirmary on July 2 and 3, 2012 because of a cold. According to an Admission and Discharge Summary entered on July 3, 2012 by Zamilus, at that time Ray suffered from "cold symptoms," "fever + chills," and "general malaise." (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No, 102-27) at 2) Ambulatory Health Record Progress Notes entered on July 3, 2012 state "cold Sx" "general malaise"; skin—cold + clammy" "fatigue" "fever/chills," (Nadler Decl., Ex. 34 (Progress Notes) (Dkt. No. 102-37) at 2) Notes entered on "7-2-1 [2]" state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex, 35 (Progress Notes) (Dkt. No.102-38) at 2) Ray was treated by Dr. Zamilus, and by July 4, Ray was "feel[ing] much better." Doctor Zamilus's discharge sheet states that, by July 4, 2012, Ray had "no malaise," (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2-4) In any event, there is no evidence that cold and flu-like symptoms are associated with a delay in receiving treatment for Hepatitis C.

[8]     Ray has submitted a letter he wrote to his mother on August 23, 2012, in which he states that "there is [b]lood in my urine." (Nadler Decl., Ex. 25 (Ray Letter) (Dkt. No. 102-28) at 4) This letter constitutes inadmissible hearsay and cannot be considered at summary judgment. See Fed. R. Civ. P. 56(c) (requiring parties to "produce admissible evidence to support [factual assertions]"); Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (" 'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment' " (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)); Colon ex

rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("When deciding a motion for summary judgment, a federal district court may consider only admissible evidence").

Ray now alleges, however, that he was suffering from abdominal pain during the eleven-month period of delay, and he argues that this is a symptom that is associated with Hepatitis C. (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32) While the parties have provided extensive records concerning Ray's infirmary visits drying the eleven-month period of delay—including visits on July 2 and 3, 2012, August 21, 2012, and November 29, 2012—there is no indication in these records that Ray ever complained about stomach pain. To the contrary, Dr. Zamilus's notes for Ray's August 21, 2012 visit indicate that Dr. Zamilus explicitly asked Ray whether he was experiencing abdominal discomfort, and Ray indicated that he "didn't have any complaint."[9] (Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15, 223:2-23; see Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2 (Dr. Zamilus circled "negative" for "ABD"—abdomen)) The Court concludes that Ray has not offered evidence sufficient to demonstrate that he suffered abdominal pain that was caused by the delay in initiating treatment for his Hepatitis C condition.

[9]     While there are no medical records before the Court indicating that Ray complained about abdominal pain during the eleven-month period of delay in treatment, there is evidence that Ray complained about stomach pain on September 25, 2015, more than two years after his treatment for Hepatitis C had been completed. (Cooney Decl., Ex. A (Sept. 25, 2015 Doctor's Visit) (Dkt. No. 107-1) at 2-3)

More generally, the Court finds that Ray has not offered evidence sufficient to demonstrate that the alleged eleven-month delay in his Hepatitis C treatment (1) caused his Hepatitis C condition to worsen; (2) presented a risk that the eventual treatment would not be successful or otherwise caused him to have a worse prognosis; or (3) caused any adverse medical effect. Because Ray has not offered evidence sufficient to create a material issue of fact as to the objective prong of the Eighth Amendment inquiry, Defendants are entitled to summary judgment.

## CONCLUSION

**\*14**  For the reasons stated above, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion (Dkt. No. 86) and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4329722

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5197180
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn TAFT, Plaintiff,

v.

Russell A. FRICKE; John/Jane Does, Defendants.

No. 9:17-CV-0346 (GTS/CFH)
|
Signed 07/26/2019

**Attorneys and Law Firms**

Shawn Taft, 21892-052, Allenwood Medium Federal Correctional Institution Inmate Mail/Parcels, P.O. Box 2000, White Deer, Pennsylvania 17887, Plaintiff, Pro Se.

OF COUNSEL: DAISY F. PAGLIA, ESQ., Thuillez, Ford Law Firm, 20 Corporate Woods Boulevard, 3rd Floor, Albany, New York 12211-1715, Attorneys for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Shawn Taft ("plaintiff"), an inmate, who was at all relevant times in the custody of the Rensselaer County Jail ("RCJ"), brings this action pursuant to 42 U.S.C. § 1983 ("§ 1983"). Plaintiff alleges that defendant Russell Fricke, M.D. ("Dr. Fricke") violated his rights under the Fourteenth Amendment. See Dkt. No. 1. Plaintiff also alleges that unnamed defendants, John/Jane Does, violated his rights under the Fourteenth Amendment. [2] Presently pending before the Court is Dr. Fricke's Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 47. [3] For the following reasons, it is recommended that Dr. Fricke's motion be granted.

[2]  Plaintiff filed his complaint on March 27, 2017. Dkt. No. 1. In the more than two years that have passed since then, plaintiff has not identified the John Doe defendants and has not served process upon them. This failure is not the result of lack of opportunity. The undersigned has extended the discovery deadline twice to accommodate plaintiff's requests. See Dec. 14, 2017 Order (Dkt. No. 18); Apr. 20, 2018 Order (Dkt. No. 28). The plaintiff has had more than two years, far more than the typical 120-day period, to identify and serve the John Doe defendants, and the Court is under no obligation to extend the deadline indefinitely. See Petway v. City of New York, No. 02-CV-2715 (NGG)(LB), 2005 WL 2137805, at *5 (E.D.N.Y. Sept. 2, 2005) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly three years of filing complaint); Thomas v. Keane, No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); Cammick v. City of New York, No. 96 Civ. 4374(RPP), 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and two months of filing complaint); Waldo v. Goord, No. 97-CV-1385 (LEK)(DRH), 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint). The undersigned, therefore, recommends sua sponte dismissal without prejudice of the claims against the unidentified defendants for lack of timely service.

[3]  Plaintiff filed a document entitled "Motion for Summary Judgment" on April 12, 2019. Dkt. No. 62. Plaintiff's submission fails to meet the requirements of a Motion for Summary Judgment, despite plaintiff's labeling it as such. First, under N.D.N.Y Local Rule 7.1(a)(3), a Motion for Summary Judgment "shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y. L.R. 7.1 (a)(3). Plaintiff does not file a Statement of Material Facts in support of his purported Motion for Summary Judgment. See Dkt. No. 62. His response to defendants' Statement of Material Facts, dkt. no. 61, does not suffice. Additionally, plaintiff's submission does not contain numbered paragraphs or citations to the record, as required by the Local Rules. Dkt. No. 62. Second, the dispositive motion filing deadline expired on January 25, 2019. Dkt. No. 46. Plaintiff filed his purported "Motion for Summary Judgment" over two months past that deadline. He did not request from the Court an extension of the dispositive motion deadline. In light of special

solicitude, the undersigned will construe plaintiff's submission, dkt. no. 62, as a part of plaintiff's response in opposition to defendant's Motion for Summary Judgment; however, the undersigned will not consider this submission to be a Motion for Summary Judgment for the reasons set forth herein.

## I. BACKGROUND [4]

[4]    Unless otherwise indicated, page citations refer to the pagination generated by this Court's electronic filing system, located at the header of each page, not to the pagination of the individual documents.

## A. Undisputed Facts

**\*2**  On July 8, 2015, RCJ admitted plaintiff as a pretrial detainee. Dkt. No. 47-13 at ¶ 4 (citing Dkt. No. 47-10 at 2). RCJ contracts with Correctional Medical Care, now called CBH Medical, to provide medical care at RCJ. Dkt. No. 47-13 at ¶ 9. CBH Medical employs Dr. Fricke as a part-time physician at RCJ. Dkt. No. 47-11 at ¶ 7.

While incarcerated, plaintiff visited Dr. Fricke and nursing staff. See generally Dkt. No. 47-9 (documenting numerous visits with nursing staff and Dr. Fricke). After initial booking, plaintiff received a physical exam. Id. at 22. Plaintiff's eyesight exam results were 20/40, 20/40, 20/30. Id. Plaintiff had eyeglass when he was booked into RCJ. Id. at 2. On February 9, 2016, nonparty Nurse Practioner Claudia Graham saw plaintiff for a skin condition. Id. at 52. During this visit, Nurse Practioner Graham diagnosed plaintiff with elevated blood pressure and possible hypertension. Id. Following this visit, medical staff checked plaintiff's blood pressure daily. Id. On February 27, 2016, nonparty Dr. Irani prescribed plaintiff a daily dose of 12.5 mg. of hydrochlorothiazide ("HCTZ") for his elevated blood pressure. Dkt. No. 47-13 at ¶ 13. On March 1, 2, and 8, 2016, nursing staff saw plaintiff for cough and cold symptoms. Id. at ¶ 14. On March 13, 2016, nonparty Nurse Heather Holliday checked plaintiff's blood pressure. Dkt. No. 47-9 at 71. During this visit, plaintiff coughed up yellow sputum and requested antibiotics. Id. Dr. Fricke ordered a sputum culture, gram stain, complete blood count, and an erythrocyte sedimentation rate to test for infection. Id.

On March 16, 2016, Dr. Fricke saw plaintiff for his cough and cold symptoms. Dkt. No. 47-9 at 71. Plaintiff had elevated blood pressure. Id. at 71. Plaintiff told Dr. Fricke that he had a splenectomy in the past and requested antibiotics. Id. Dr. Fricke performed a physical examination and obtained a chest X-ray. Id. at 71, 77. Dr. Fricke examined plaintiff's lymph nodes and found that they were not enlarged. Id. at 71. Dr. Fricke determined that plaintiff was not in respiratory distress. Id. Dr. Fricke concluded that plaintiff was most likely recovering from a viral illness and prescribed three days of symptomatic treatment. Id. Aware of plaintiff's increased risk of bacterial infection from his splenectomy, Dr. Fricke agreed to prescribe antibiotics if plaintiff did not improve. Id.

On March 17, 2016, nonparty BioReference Laboratories faxed the sputum culture test resuls to RCJ. Dkt. No. 47-9 at 74. The results were normal. Dkt. No. 47-11 at ¶ 39. On March 20, 2016, RCJ staff notified Dr. Fricke that plaintiff was not feeling better. Dkt. No. 47-9 at 84. Dr. Fricke prescribed amoxicillin. Id. On March 23, 2016, Dr. Fricke renewed plaintiff's HCTZ prescription for his high blood pressure. Id. at 81. On April 16, 2016, plaintiff complained of shortness of breath, dizziness, and chest pain. Id. at 86. On April 23, 2016, nonparty Nurse Practioner Jennifer Augone ordered an echocardiogram ("EKG"). Id. at 90. On April 23, 2016, Nurse Practioner Augone informed plaintiff that his EKG showed possible ischemia, a restriction in the blood supply to cardiac tissue. Dkt. No. 47-11 at ¶ 55; Dkt. No. 47-9 at 92. Nurse Practioner Augone prescribed aspirin, a beta blocker, and a cardiology consult. Dkt. No. 47-9 at 92.

**\*3**  On May 9, 2016, nonparty Dr. Ruslan Feygin, a cardiologist, saw plaintiff and ordered an EKG and nuclear stress test. Dkt. No. 47-9 at 113. On May 18, 2016, plaintiff met with nonparty Nurse Practioner Renee Leonard. Id. at 105. Plaintiff was refusing his daily beta blocker as he believed it was making him lightheaded. Id. Nurse Practioner Leonard discontinued plaintiff's beta blocker and increased his daily dose of HCTZ to 25 mg. Id. Nurse Practioner Leonard also ordered blood work to check plaintiff's potassium levels. Dkt. No. 47-11 at ¶ 58. The blood work included a basic metabolic panel and a blood glucose test. Dkt. No. 47-13 at ¶ 36.

On May 26, 2016, plaintiff went to Samaritan Hospital for an EKG and nuclear stress test. Dkt. No. 47-9 at 124. Plaintiff's EKG suggested mild concentric left ventricular hypertrophy, a thickening of the heart's muscle wall. Dkt. No. 47-9 at 124; Dkt. No. 47-11 at ¶ 60. The results of the EKG, blood pressure response, and isotope distribution were otherwise normal. Dkt. No. 47-11 at ¶ 61. On or about May 27, 2016,

plaintiff complained of deteriorating vision. Dkt. No. 47-9 at 129. RCJ staff put plaintiff on the list for the eye doctor. Id.

On June 1, 2016, Dr. Fricke saw plaintiff again. Dkt. No. 47-9 at 132. Plaintiff complained of blurry vision and trouble breathing. Id. Plaintiff believed his HCTZ medication caused his blurred vision. Id. Dr. Fricke assessed plaintiff's respirations with a peak flow meter. Id. Dr. Fricke also tested plaintiff's vision using a Rosenbaum Pocket Vision Card and referred plaintiff to an optometrist. Id. at 132-33. Dr. Fricke offered a substitute for HCTZ, which plaintiff refused. Id. at 132. Dr. Fricke lowered plaintiff's dose of HCTZ to its original level of 12.5 mg. a day and ordered continued blood pressure checks. Id.

On June 2, 2016, plaintiff met with nonparty Nurse Heather Holliday. Dkt. No. 47-9 at 138-40. Plaintiff complained of an inability to see, constipation, headaches, and an inability to drink water due to its metallic taste. Id. at 138. Nurse Holliday prescribed Motrin and Aspirin and advised plaintiff to ambulate and drink fluids. Id. at 140.

At approximately 9:00 A.M. on June 3, 2016, Nurse Holliday saw plaintiff in his cell. Dkt. No. 47-9 at 141. Plaintiff said he could not see and was dizzy. Id. Plaintiff also complained of dry mouth, weight loss, and an inability to eat. Id. Nurse Holliday tested plaintiff's blood glucose. Id. Plaintiff's blood glucose level was 528. Id. Dr. Fricke ordered 12 units of Humalog, a fast-acting insulin, and emergency transportation to the hospital. Id. at 147.

At approximately 10:00 A.M. on June 3, 2016, plaintiff was admitted into Samaritan Hospital. Dkt. No. 1-1 at 21. Plaintiff received insulin and intravenous fluids. Dkt. No. 47-9 at 157. Samaritan medical staff diagnosed plaintiff with diabetes. Id. On June 6, 2016, Samaritan doctors discovered a small bowel obstruction during an abdominal X-ray. Id. at 167. On June 9, 2016, nonparty Dr. Christina Sanders removed the obstruction and a portion of plaintiff's small bowel. Id. at 171, 173, 174. Dr. Sanders also lysed adhesions between the loops of plaintiff's small bowel and anterior abdominal wall. Id. at 174. On June 20, 2016, Samaritan Hospital discharged plaintiff. Id. at 192.

**B. Plaintiff's Recitation of Facts**

Plaintiff contends that he had medical issues throughout his detention at RCJ. Dkt. No. 1 at 11. Plaintiff argues

that Dr. Fricke was aware of plaintiff's complications two months before his "organ failure." Id. at 9. During his March 16, 2016, appointment Dr. Fricke gave plaintiff a breathing exam. Dkt. No. 47-8 at 41. During the exam, Dr. Fricke told him, "he can get a 4-foot, 11 girl to blow into the apparatus harder than I could." Id. at 42. At that exam, and at other times, Dr. Fricke accused plaintiff of malingering. Dkt. No. 1 at 9. Plaintiff contends that Dr. Fricke should have known of plaintiff's diabetes from his symptoms or from the BioReference Laboratories report and taken action before plaintiff's "organs failed." Dkt. No. 1 at 8; Dkt. No. 61 at 4.

**\*4** Plaintiff argues that Dr. Fricke's failure to provide adequate care led to a delay in plaintiff's diabetes diagnosis and his hospitalization. Dkt. No. 1-1 at 32. Plaintiff contends that Dr. Fricke's acts or omissions led him to experience "organ failure," loss of vision, a small bowel obstruction that required surgery, and "probable morbidity." Dkt. No. 1-1 at 7, 32; Dkt. No. 61 at ¶ 71. Plaintiff contends that, before his incarceration, he did not have vision problems, high blood pressure, or diabetes. Dkt. No. 1 at 9. Plaintiff further contends that his bowel obstruction developed during his incarceration at RCJ. Dkt. No. 61 at ¶ 71.

**C. Defendants' Recitation of Facts**

In support of his motion, Dr. Fricke filed a Statement of Material Facts.[5] Dkt. No. 47-13. Dr. Fricke saw plaintiff two times before plaintiff's hospitalization on June 3, 2016. Dkt. No. 47-13 at ¶ 11. On May 18, 2016, Nurse Practioner Leonard ordered blood work. Id. at ¶ 34. She did not order blood work to test for diabetes. Id. at ¶ 35. The blood work was sent to BioReference Laboratories. Id. at ¶ 36. BioReference Laboratories did not call RCJ to report plaintiff's elevated blood glucose levels. Id. at ¶ 38. It was "standard procedure" for laboratories to call RCJ "to report critical values such as elevated blood glucose levels." Id. at ¶ 39. Further, BioReference Laboratories did not fax or mail the lab report to RCJ although it was also "standard procedure" for outside laboratories to fax and mail lab reports to RCJ. Id. at ¶¶ 40, 41.

---

[5]     N.D.N.Y. Local Rule 7.1 (a)(3) states:
        Summary Judgment Motions
        Any motion for summary judgment shall contain
        a Statement of Material Facts. The Statement of
        Material Facts shall set forth, in numbered paragraphs,
        each material fact about which the moving party
        contends there exists no genuine issue. Each fact listed

shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

On June 1, 2016, Dr. Fricke saw plaintiff for the second time. Dkt. No. 47-13 at ¶ 47. Dr. Fricke was unaware of plaintiff's blood work results at this time. Id. at ¶ 49. Plaintiff did not cooperate with a peak-flow meter test. Id. at ¶ 58. Dr. Fricke also tested plaintiff's eyesight, which had improved since his initial eye test in 2015. Dkt. No. 47-11 at ¶ 74. During this visit, plaintiff did not complain about increased urination, intense thirst, the urge to drink increasing amounts of water, nausea, vomiting, abdominal pain, weight loss, or lethargy, which are symptoms of uncontrolled hyperglycemia or emerging diabetes. Dkt. No. 47-13 at ¶¶ 50-53. On June 5, 2016, Samaritan Hospital discovered a bowel obstruction which developed at Samaritan Hospital. Id. at ¶ 71.

## II. DISCUSSION [6]

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

**\*5** Plaintiff alleges that Dr. Fricke was deliberately indifferent to his serious medical needs in violation of the Due Process Clause of the Fourteenth Amendment. See generally Dkt. No. 1. Dr. Fricke argues that plaintiff cannot demonstrate deliberate indifference because the record demonstrates that he was not subjectively reckless. See Dkt. No. 47-14.

### A. Legal Standards

### 1. Summary Judgment standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party satisfies this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of a genuine issue of material fact. Id. There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skuble v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

A non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted). Instead, a non-moving party must support his or her assertions with evidence showing a genuine issue of material fact. See id. at 586, 106 S.Ct. 1348. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " Smith v. Woods, 9:03-CV-480 (DNH), 2006 WL 1133247, at \*3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005)) (additional citations omitted). "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Liberty Lobby, 477 U.S. at 247, 106 S.Ct. 2505. The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 257, 106 S.Ct. 2505. "Mere conclusory statements or reliance on the pleadings, ... will not suffice, ...." Celotex, 477 U.S. at

324, 106 S.Ct. 2548. The court must look to the substantive law to identify which facts are material. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505.

When, as here, a party seeks judgment against a pro se litigant, a court must afford a non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). The Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ...

 **\*6** Triestman, 470 F.3d at 477 (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### 2. Deliberate Indifference standard

As plaintiff is a pretrial detainee his deliberate indifference claim falls under the Due Process Clause of the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2007) (quoting inter alia Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) ("Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any manner-neither cruelly and unusually nor otherwise.' ")). Until recently, the Second Circuit instructed that " '[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.' " V.W. ex rel. Williams v. Conway, 236 F. Supp. 3d 554, 582-83 (N.D.N.Y. 2017) (quoting Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)). However, in 2017 the Darnell Court extended the Supreme Court's decision in Kingsley v. Hendrickson, —— U.S. ——, 135 S. Ct. 2466, 2470, 192 L.Ed.2d 416 (2015) to allegations related to unconstitutional conditions of confinement. [7] See Darnell, 849 F.3d at 35. The Darnell Court reasoned, "[u]nlike a violation of the Cruel and

Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

[7]     The Kingsley Court held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment "must show only that the force purposely or knowingly used against him was objectively unreasonable." 135 S. Ct. at 2470.

Although Darnell involved a challenge to conditions of confinement, district courts within this Circuit have applied Kingsley to all pretrial detainees' deliberate indifference claims. See, e.g., Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at \*19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied Kingsley to claims for deliberate indifference to medical needs"); Lloyd v. City of New York, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of Darnell applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); Feliciano v. C.O. Anderson, No. 15-CV-4106 (LTS)(JLC), 2017 WL 1189747, at \*13 (S.D.N.Y. Mar. 30, 2017) ("Applying Darnell to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite mens rea when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result.") (collecting cases).

To establish a claim for deliberate indifference under the Due Process Clause, a plaintiff must satisfy a two-prong test. Darnell, 849 F.3d at 29. First, the deprivation must have been "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation and internal quotation marks omitted). Second, the defendant must have acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases," is "deliberate indifference to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

### a. First Prong standard

 **\*7** Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective. [8]

Darnell, 849 F.3d at 35.[9] The objective prong is satisfied "when (a) the prisoner was actually 'deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007) (summary order) (quoting Salahuddin, 467 F.3d at 279-80).

[8] Although the second prong of the deliberate indifference analysis differs from Eighth Amendment cases, the first prong remains the same. See Padilla v. Corr. Care Solutions, No. 9:17-CV-1150 (MAD/TWD), 2018 WL 550610, at *3 (N.D.N.Y. Jan. 22, 2018).

[9] In Darnell, the Second Circuit clarified that the second element of a deliberate indifference claim, though characterized as "subjective," is better understood as an element analyzing "*mens rea*" because it is "defined objectively." Darnell, 849 F.3d at 29, 35.

To determine whether an alleged deprivation of medical care is "sufficiently serious" -- the first prong of the deliberate indifference analysis -- a court is required to, (1) determine whether the medical care was inadequate, and, (2) if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 279-80 (citing Helling v. McKinney, 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). However, "[n]ot every lapse in medical care is a constitutional wrong." Salahuddin, 467 F.3d at 279.

In assessing the adequacy of care -- the first inquiry in assessing whether a deprivation of care was sufficiently serious -- "the prison official's duty is only to provide reasonable medical care." Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845, 114 S.Ct. 1970). "Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable ... and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." Id. at 279 (internal quotation marks and citations omitted; brackets in original.). The second inquiry in assessing whether a plaintiff's deprivation of care was sufficiently serious varies according to the plaintiff's allegations. See Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280.[10] If, however, the plaintiff alleges that medical

treatment was received but it was inadequate, the inquiry is narrower, and the court should focus on the specific inadequacy of the treatment, not the underlying medical condition alone. Id. (citing Smith, 316 F.3d at 186).

[10] "There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." Smith, 316 F.3d at 185-86.

Finally, where a delay in medical treatment is alleged, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the [detainee's] underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious....' " Smith, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280. A delay in medical treatment must be interpreted in the "context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." See id. at 186 (citing Chance, 143 F.3d at 702) ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.").

### b. Second Prong standard

**\*8** For a plaintiff to satisfy the second prong, concerning *mens rea*, the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. "Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." Smith v. Outlaw, No. 15-CV-9961 (RA), 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (citing Darnell, 849 F.3d at 36); see also Kingsley, 135 S.Ct. at 2472 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

### B. Analysis

Plaintiff claims that Dr. Fricke was deliberately indifferent to plaintiff's serious medical needs. Dkt. No. 1 at 4. He alleges that Dr. Fricke was "aware of plaintiff's complications two months before plaintiff's organs failed," but failed to diagnose and treat the underlying problem. Id. at 9. Plaintiff contends that, as a result of Dr. Fricke's failings, he now suffers irreversible injury. Id. Plaintiff has high blood pressure, diabetes, and wears eyeglasses. Id. Plaintiff takes Lisinopril, Atorvastatin, HCTZ, and Metformin for these conditions. Id. at 10. Plaintiff suggests that Dr. Fricke's deliberate indifference to his medical needs resulted in a delay in the diagnosis and treatment of plaintiff's diabetes and his subsequent hospitalization, bowel surgery, and decreased lifespan. Id. at 9. Additionally, plaintiff suggests that Dr. Fricke's deliberate indifference to his medical needs caused or contributed to the development of his high blood pressure and vision troubles. Id. Viewing the facts and drawing all reasonable inferences in plaintiff's favor, for the reasons that follow, the Court concludes that no reasonable factfinder could find that Dr. Fricke was deliberately indifferent to plaintiff's serious medical needs.

### 1. First Prong: Objective Component

Plaintiff alleges both inadequate medical care and a delay in treatment. See generally Dkt. No. 1. However, plaintiff fails to show how Dr. Fricke's care was inadequate under the circumstances and what harm the alleged inadequacy caused him or will likely cause him. See infra at 17-26. Additionally, plaintiff fails to show how Dr. Fricke's alleged delay in treatment was unreasonable and how the alleged delay worsened plaintiff's medical conditions. Id.

### a. Adequacy of Care

As to the first inquiry of the objective component, adequacy of care, no reasonable juror could find that plaintiff was actually deprived of adequate medical care. Salahuddin, 467 F.3d at 279-80. Dr. Fricke and nonparty RCJ staff closely monitored plaintiff's medical conditions and complaints. See generally Dkt. No. 47-9. Plaintiff saw RCJ medical staff over fifty-six times between September 27, 2015, and his hospitalization on June 3, 2016. Id. at 29-144. Plaintiff received a nuclear stress test, an EKG, a physical, an eye exam, a sputum culture test, a complete blood count, a breath exam, a chest X-ray, blood pressure medication, rash medication, and over thirty-one blood pressure checks during this period. Id.

Plaintiff points to the BioReference Laboratories report ordered on May 18, 2016, as evidence of Dr. Fricke's deliberate indifference and inadequate care. Dkt. No. 52 at 8-9. Plaintiff claims that this report was available to Dr. Fricke on the BioReference Laboratories website on May 21, 2016, suggesting that Dr. Fricke had received the report at that time or had the ability to access the results. Id. at 4. However, based on Dr. Fricke's affidavit, BioReference Laboratories never sent this report to the jail or called to alert him of plaintiff's elevated blood glucose levels, which is their standard procedure. Dkt. No. 47-11 at ¶ 97. Further, other record evidence supports Dr. Fricke's assertions. On the May 21, 2016, lab report in the record, there is a handwritten note stating, "June 3-pulled from website" with Nurse Holliday's signature. Dkt. No. 47-9 at 121. This copy of the report does not have a "time received" fax stamp. Id. However, BioReference Laboratories did fax plaintiff's prior gram culture and sputum results. Id. at 74. The gram culture and sputum test results do have a "time received" fax stamp. Id. Although not dispositive, the absence of a time received fax stamp on plaintiff's May 21, 2016, report suggests that BioReference Laboratories did not fax the May 21, 2016, to the jail. Plaintiff has presented no evidence or non-conclusory argument to the contrary. See Dkt. Nos. 1, 22, 52, 61.

**\*9** Plaintiff also alleges that even if BioReference Laboratories failed to fax or mail the May 21, 2016, bloodwork report to RCJ, Dr. Fricke had access to the BioReference Laboratories website where the results were available, and, therefore, Dr. Fricke should have obtained the results sooner than June 3, 2016. Dkt. No. 52 at 4. Plaintiff appears to argue that if Dr. Fricke had obtained the blood results sooner, he would not have suffered negative medical consequences, or they would have been less severe. Id. at 4-5. Even if the lab had faxed or otherwise sent the report to RCJ, plaintiff has failed to demonstrate inadequacy of care because he does not demonstrate that Dr. Fricke was aware, or should have been aware, of plaintiff's elevated glucose levels.

As indicated above, when evaluating adequacy of care, the court examines if an individual providing care to a detainee acted unreasonably under the circumstances. Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845, 114 S.Ct. 1970). Dr. Fricke was not unreasonable in failing to seek out plaintiff's blood results before June 3, 2016. First, plaintiff admits that he did not have a history of diabetes before his incarceration at RCJ. Dkt. No. 1 at 11. Second, before June 3, 2016, plaintiff did not present with telltale signs of diabetes

at either of his visits with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Dr. Fricke addressed and treated the medical symptoms with which plaintiff did present. Plaintiff complained of cold-like symptoms on March 16, 2016. Id. at 84. Dr. Fricke suspected that plaintiff had a "viral illness in convalescent phase" and tested for a bacterial infection. Dkt. No. 47-11 at ¶¶ 38, 39. When the tests were negative, Dr. Fricke prescribed three days of symptomatic treatment. Id. at ¶ 42. When plaintiff complained of chest pain on April 16, 2016, Dr. Fricke had plaintiff tested by a cardiologist on May 9, 2016. Dkt. No. 47-9 at 86, 113. When plaintiff complained of vision trouble on June 1, 2016, Dr. Fricke tested his vision and referred him to an optometrist. Id. at 129. During these visits, Dr. Fricke listened to plaintiff's complaints and treated them in accordance with his medical judgment. Dr. Fricke did not test for diabetes or seek out the May 21, 2016, bloodwork results because plaintiff's symptoms and history did not indicate that plaintiff was suffering from diabetes. Although not dispositive, nonparty medical professional Dr. Toll concluded that "[t]reatment recommendations by Dr. Fricke were appropriate at both visits." [11] Dkt. No. 47-12 at ¶ 28. Dr. Toll further opined that "Dr. Fricke evaluated all of [plaintiff's] presenting complaints, especially the visual and respiratory complaints, preformed appropriate physical examinations and reviewed all available testing data." Id. (emphasis in original).

[11]    Dr. Toll is a board-licensed doctor who practiced internal medicine from 1979 to 2016 in the capital region of New York State. Dkt. No. 47-12 at ¶ 1. Dr. Toll reviewed plaintiff's medical records, complaint, response to interrogatories, and deposition transcript, along with defendant's answer before submitting his medical opinion regarding Dr. Fricke's medical care of plaintiff. Id. at ¶ 4.

For the reasons stated, plaintiff fails to demonstrate how Dr. Fricke was unreasonable, as defined by the deliberate indifference standards, in not discovering the May 21, 2016, lab report at an earlier date. It is important to note that,

> Disagreement with prescribed treatment does not rise to the level of a constitutional claim. Sonds, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. Id. (citations omitted). An inmate does

not have the right to treatment of his choice. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. Id. Thus, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. Sonds, 151 F. Supp. 2d at 312 (citing Estelle v. Gamble, 429 U.S. at 107, 97 S.Ct. 285).

**\*10**  Allen v. Cooley, No.9:04CV91, 2006 WL 2376927, at \*3 (N.D.N.Y. Aug. 16, 2006).

There is ample evidence of plaintiff receiving medical care following each complaint he made to Dr. Fricke. "[P]rison officials may not be held liable ... if they responded reasonably to a known risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 826, 114 S.Ct. 1970. Insofar as plaintiff disagrees with Dr. Fricke's treatment of his symptoms or conditions or his method for checking on results from outside labs, because Dr. Fricke's conduct was reasonable under the circumstances, plaintiff fails to demonstrate a deprivation of adequate medical care. See Farmer, 511 U.S. at 847, 114 S.Ct. 1970; see also Salahuddin, 467 F.3d at 279. For reasons stated, plaintiff fails the first inquiry of the objective prong.

### b. Sufficiently Serious

Even if, *arguendo*, plaintiff had demonstrated a denial of adequate medical care, plaintiff has failed to show that the denial was "sufficiently serious." Salahuddin, 467 F.3d at 279-80. Insofar as plaintiff argues that the care he received was inadequate, plaintiff fails to show how "the offending conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280. To the extent plaintiff argues that a delay in diagnosis or treatment caused him injury, plaintiff fails to show how "the alleged delay in treatment worsened plaintiff's medical conditions."

Carpenter, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280.

Plaintiff seems to allege that Dr. Fricke's inadequate medical care and subsequent delay in treatment led to his development of diabetes, high blood pressure, vision problems, a bowel obstruction necessitating surgery, and "probable morbidity." Dkt. No. 1 at 4. These allegations fail for the following reasons.

### i. Diabetes

The onset of diabetes can be "a sufficiently serious medical condition" to meet the threshold of a serious medical need. Beatty v. Davidson, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010). "A serious medical need is generally characterized by 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Edmonds v. Central N.Y. Psychiatric Ctr., No. 10: Civ. 5810 (DAB)(KNF), 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011) (quoting Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citation omitted)). However, when looking at deprivation of care, "[i]t's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." Carpenter, 316 F.3d at 186. Further, when a plaintiff alleges a delay in treatment, the court considers the "context of the seriousness of the medical need ... whether the delay worsened the medical condition ... and the reason for delay." See Salahuddin, 467 F.3d at 186 (citing Chance, 143 F.3d at 702).

Plaintiff's claims rest on Dr. Fricke's failure to diagnose him with diabetes before his hospitalization on June 3, 2016. Dkt. No. 1 at 4, 8. As discussed, plaintiff did not present with the usual signs of diabetes at either visit with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Plaintiff argues he satisfies the objective prong of the deliberate indifference analysis because doctors discovered his diabetes while he was incarcerated. See Dkt. No. 52 at 6. To support this position plaintiff cites to Edmonds. Id. In Edmonds, the Court does recognize the onset of diabetes as a sufficiently serious medical condition to meet the threshold of serious medical need; however, Edmonds is factually distinguishable. 2011 WL 3809913, at *5. In Edmonds, the plaintiff was tested for diabetes numerous times because it was a side effect

of her prescribed medication. Id. Tests revealed that the plaintiff had diabetes, but doctors neglected to tell her of her diagnosis and did not treat her condition for five months. Id. Here, plaintiff was not specifically tested for diabetes because he did not display the usual diabetic symptoms and had no history of diabetes. Dkt. No. 47-9 at 71, 132. Once plaintiff exhibited these symptoms, he was tested and hospitalized. Id. at 141. There was a two-week period between BioReference Laboratories' uploading of the test results online and plaintiff's hospitalization. Id. at 121-141. However, plaintiff continued to see medical staff during this period and actively received treatment. Id. Although there is a two-week delay between the "availability" of plaintiff's lab work and his hospitalization, unlike in Edmonds, where the doctors were aware of the plaintiff's diagnosis, Dr. Fricke was unaware that plaintiff had diabetes during this two-week period. 2011 WL 3809913, at *5. Further, although plaintiff may have preferred Dr. Fricke to diagnose his diabetes sooner, Dr. Fricke still provided him with reasonable care insofar as he responded to all of plaintiff's complaints and referred him to other medical professionals. see Thomas v. Wright, No. 99-CV-2071, 2002 WL 31309190, at *8-9 (N.D.N.Y. Oct. 11, 2002) (holding that, "[a]lthough the[ defendants] may have failed to diagnose or even detect his cancer," the defendants did not act with "deliberate indifference" because they "ordered medical tests, prescribed courses of treatments, and monitored his laboratory and radiological reports").

**\*11** When looking at a delay in treatment, the court focuses on the deprivation of care, rather than seriousness of medical need. Carpenter, 316 F.3d at 186. Plaintiff's delay in treatment was minimal and not a result of Dr. Fricke's inadequate care. To the extent that plaintiff argues that Dr. Fricke should have discovered plaintiff's diabetes earlier than June 3, 2016, even if BioReference Laboratories did not notify him of the results, as discussed, plaintiff did not present with signs of diabetes at either visit with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Dr. Fricke did not discover plaintiff's diabetes before June 3, 2016, because of a lack of typical diabetic symptoms, which does not amount to a lack of adequate care.

In addition to the delay in treatment of his diabetes, plaintiff also seems to allege that Dr. Fricke's treatment, or lack of treatment, led to his development of diabetes. Dkt. No. 1 at 4. Plaintiff cites no evidence to support this claim, nor is there any support in his medical record; thus, plaintiff failed to show how any of Dr. Fricke's acts or omissions caused him to develop diabetes. See Dkt. Nos. 1, 22, 47-9, 52, 61; See also Celotex, 447 U.S. at 324, 100 S.Ct. 2214 (requiring

"the nonmoving party to go beyond the pleadings" to defeat summary judgment). Accordingly, plaintiff has failed to show that Dr. Fricke provided inadequate care with respect to his diabetes or that such inadequacy was sufficiently serious.

### ii. High Blood Pressure

Plaintiff seems to allege that Dr. Fricke's inadequate medical care led to his development of high blood pressure, arguing that he did not have high blood pressure before his incarceration at RCJ. Dkt. No. 1 at 9. Nurse Practioner Claudia Graham diagnosed plaintiff with high blood pressure on February 9, 2016. Dkt. No. 47-9 at 52. Plaintiff's diagnosis took place over one month before his first visit with Dr. Fricke on March 16, 2016. Id. at 71. After plaintiff's diagnosis, he was prescribed HCTZ for his high blood pressure. Dkt. No. 47-13 at ¶ 13. Plaintiff's high blood pressure was also monitored throughout his detention at RCJ. See generally Dkt. No. 47-9. Plaintiff's blood pressure was checked over thirty-four times between his diagnosis and hospitalization on June 3, 2016. Id. at 29-144. Although plaintiff contends that he "did not suffer from high blood pressure before his incarceration," plaintiff cites no evidence to support his claims that his blood pressure developed or worsened because of Dr. Fricke's treatment or lack of treatment. See Dkt. Nos. 1, 22, 52, 61. Additionally, plaintiff's May 26, 2016, EKG showed "mild concentric left ventricular hypertrophy." Dkt. No. 47-9 at 124. According to Dr. Toll, hypertrophy of this nature "was likely caused by high blood pressure" and "not of recent origin." Dkt. No. 47-12 at ¶ 18. Dr. Fricke also submitted his medical opinion that plaintiff's left ventricular hypertrophy "is associated with chronic high blood pressure." Dkt. No. 47-11 at ¶ 60. Accordingly, plaintiff has failed to show how Dr. Fricke's conduct surrounding his high blood pressure was inadequate and caused, or will likely cause, plaintiff harm in the future. Salahuddin, 467 F.3d at 280.

### iii. Vision

Plaintiff claims that he did not wear prescription eyeglasses before his incarceration and arguably suggests that Dr. Fricke's unspecified acts or omissions are responsible for his declining vision. Dkt. No. 1 at 4. However, the record shows that plaintiff had eyeglasses upon his admission to RCJ. Dkt. No. 47-9 at 22. The record further demonstrates that plaintiff's vision stayed roughly the same throughout his detention at RCJ, as evidenced by his two eye exams. Id. at 22, 132.

Additionally, upon plaintiff's complaint of blurry vision, on May 27, 2016, Dr. Fricke referred plaintiff to an optometrist. Id. at 129. Therefore, plaintiff has failed to show how Dr. Fricke's conduct surrounding his vision was inadequate or caused him any harm. Salahuddin, 467 F. 3d at 280.

### iv. Bowel Obstruction

**\*12** Plaintiff cites his June 9, 2016, laparotomy (Dkt. No. 47-9 at 187) and bowel surgery as further evidence of Dr. Fricke's inadequate care and resultant harm. Dkt. No. 52 at 6. However, RCJ staff and Samaritan doctors note that plaintiff had bowel sounds present before hospitalization (Dkt. No. 47-11 at ¶ 88) and upon entering Samaritan Hospital. Dkt. No. 47-9 at 157. It was not until June 5, 2016, that nonparty Dr. Sanders noticed increased distention in plaintiff's bowel. Id. at 165. On June 6, 2016, doctors discovered the bowel obstruction during an abdominal X-ray. Id. at 167. On June 9, 2016, plaintiff underwent surgery to remove the previously-discovered obstruction and lyse extensive adhesions around his bowels. Id. at 171-74. Upon discharge, Samaritan doctors noted that plaintiff's bowel blockage was resolved. Id. at 187. Although plaintiff claims that Dr. Fricke's acts or omissions led to plaintiff's bowel problems, even if plaintiff had been able to demonstrate that his bowel obstruction developed while he was incarcerated at RCJ, there is no medical evidence to support a claim that Dr. Fricke's acts or omissions were responsible for plaintiff's bowel issues. Id. at 171. Accordingly, plaintiff has failed to show how Dr. Fricke's conduct surrounding his bowel problems was inadequate or caused any resultant harm. Salahuddin, 467 F. 3d at 280.

### v. "Probable Morbidity" and "Organ Failure"

Plaintiff also alleges, in a wholly conclusory fashion, that his "organs failed" and now he has "probable morbidity" as a result of Dr. Fricke's care. Dkt. No. 1 at 4. Liberally construed, it appears that plaintiff is claiming that his medical condition worsened, leading to "organ failure" and risk of death, as a result of Dr. Fricke's alleged failure to identify and treat his diabetes. See id. It is unclear what plaintiff means by "organ failure"; however, Dr. Fricke submitted an uncontroverted medical opinion demonstrating that plaintiff's "acute renal failure" came from "loss of blood to plaintiff's kidneys" that is "entirely reversible when normal blood volume and glucose levels are restored." Dkt. No. 47-11 at ¶ 87. Plaintiff presents no evidence that the bowel obstruction occurred due

to Dr. Fricke's acts or omissions. Upon discharge from the hospital, Samaritan doctors noted that plaintiff's renal failure was resolved. Dkt. No. 47-9 at 187. Although plaintiff uses the phrase "probable morbidity," at no point in the record does any medical professional conclude that plaintiff's life expectancy is lessened as a result of Dr. Fricke's alleged delay in diagnosing plaintiff's diabetes. See generally Dkt. No. 47-9. For the reasons stated, plaintiff has failed to show how Dr. Fricke's conduct was inadequate and what harm the inadequacy would cause, or will likely cause, plaintiff in the future. Salahuddin, 467 F.3d at 280.

Based on the foregoing, the undersigned finds that there exists no material issue of fact as to whether plaintiff "was actually deprived of adequate medical care" as it relates to his diabetes, high blood pressure, vision, bowel obstruction and resultant surgery, and life expectancy. Plaintiff does not satisfy the requirements of the first prong in Darnell. See id. at 29 (establishing that deliberate indifference under the Fourteenth Amendment is the same as under the Eighth Amendment and therefore a pretrial detainee must satisfy two prongs to prove a claim of deliberate indifference, the objective prong and the subjective prong); Dobbins v. Ponte, No. 15-CV-3091 (JMF), 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2017) (granting summary judgment to prison official where undisputed facts showed that the pretrial detainee received adequate medical treatment); Gray v. Kang Lee, No. 9:13-cv-258 (GLS/JMF), 2015 WL 1724573, at *4 (N.D.N.Y. Apr. 15, 2015) (finding that the plaintiff was not deprived of adequate medical treatment where the record demonstrated that the inmate was frequently treated, prescribed pain medication, given an X-ray and an MRI, and referred to an orthopedic specialist).

**2. Second Prong: Subjective Component**

Even assuming, *arguendo*, that plaintiff demonstrated that he was actually deprived of adequate medical care, plaintiff cannot satisfy the second prong of the analysis, the *mens rea* prong. Darnell, 849 F.3d at 35. To satisfy the *mens rea* prong, a plaintiff must prove that the defendant "knew, or should have known, the condition posed an excessive health risk to health or safety." Id. In other words,

> **\*13** The pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act

> with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

Id.

Plaintiff fails to demonstrate how Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. Plaintiff claims that Dr. Fricke "knew of or should have known" of his diabetes because Dr. Fricke "received" the May 21, 2016, BioReference Laboratories report showing his elevated blood glucose levels. Dkt. No. 62 at 4. Plaintiff also claims that Dr. Fricke should have known of his diabetes because his "pain and symptoms grew more severe." Dkt. No. 1 at 4.

As discussed, although it was standard procedure for BioReference Laboratories to mail and fax lab results, the record suggests these results were not sent to RCJ. Dkt. No. 47-9 at 121; Dkt. No. 47-11 at ¶ 97; Dkt. No. 47-9 at 74. The nurses at RCJ "check the fax machine and review the reports for any results that are unusual or require immediate attention." Dkt. No. 47-11 at ¶ 14. Plaintiff's previous lab reports were faxed and received by nurse practioners. Dkt. No. 47-9 at 74-76. Additionally, Dr. Fricke stated, "it was standard procedure for outside laboratories to call the jail to report any critical values such as an elevated blood glucose" and "[n]o one at the jail had alerted me about the lab report." Dkt. No. 47-11 at ¶¶ 97, 98. Although plaintiff may disagree over the way nonparty RCJ staff and Dr. Fricke obtain lab reports and his report specifically, plaintiff's disagreement is not enough to show that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35; Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) ("disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

Plaintiff's claim that Dr. Fricke should have known about his diabetes because of his symptoms fails for three reasons. First, plaintiff did not present with typical diabetic symptoms

during either visit with Dr. Fricke (Dkt. No. 47-9 at 71, 132) or visits with nursing staff before June 3, 2016. See Dkt. No. 47-9 at 1-141. Plaintiff did complain about vision trouble, eye pain, nausea, constipation, trouble breathing, and extreme dizziness while at RCJ. Id. As a result of his complaints, plaintiff stopped taking his beta blockers, and Dr. Fricke referred him to a cardiologist. Id. at 113. Plaintiff also complained that when his HCTZ medication was doubled, his symptoms worsened. Id. at 132. However, plaintiff does not show that these symptoms and complaints were indicative of diabetes or that his high blood pressure should have led Dr. Fricke to discover or diagnose his diabetes. See Dkt. Nos. 1, 22, 52, 61. Additionally, Dr. Fricke notes that plaintiff did not present with key symptoms of diabetes, such as increased urination, or lesser symptoms, such as vomiting, weight loss, or lethargy, at his June 1, 2016, appointment. Dkt. No. 47-11 at ¶ 93. Second, plaintiff was confrontational during his June 1, 2016, appointment, which prevented Dr. Fricke from assessing fully plaintiff's condition or symptoms. Id. at ¶ 76. Third, plaintiff had no medical history of diabetes. Dkt. No. 47-9 at 8. Absent a diabetic history and diabetic symptoms, Dr. Fricke had no reason to test plaintiff for diabetes. See Dkt. No. 47-11 at ¶ 93; Dkt. No. 47-12 at ¶ 26. Even if, in hindsight, it can be argued that certain complaints plaintiff made should have led Dr. Fricke to realize that plaintiff was diabetic, because plaintiff did not have a diabetic history or the usual diabetic symptoms, as Dr. Fricke continued to treat plaintiff and attempt to respond to his complaints, his failure to identify any symptoms as signs of diabetes does not demonstrate intentional or reckless failure to act with reasonable care. See, e.g., Sheils v. Flynn, 9:06-CV-407, 2009 WL 2868215, at *17 (N.D.N.Y. Sept. 2, 2009) ("While Defendants' failure to immediately diagnose the lesion on Plaintiff's shoulder as cancer was undoubtedly frustrating and frightening for Plaintiff, the record simply does not indicate any behavior on Defendants' part that elevates the situation from possible medical malpractice to the level of a constitutional violation. Plaintiff received frequent medical care, as his voluminous medical records demonstrate. Medical staff prescribed various medications in an attempt to relieve his symptoms.").

**\*14** Once Dr. Fricke was notified of plaintiff's elevated blood glucose level, he immediately had plaintiff transported to the hospital. Dkt. No. 47-9 at 133. Due to the lack of typical diabetic symptoms, known positive test results, and no medical history of diabetes, plaintiff cannot satisfy the *mens rea* prong as plaintiff cannot show that Dr. Fricke "acted

intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35.

Plaintiff's allegations could be construed as suggesting that Dr. Fricke had a duty to seek out the lab results, even if he had no reason to think they were abnormal. See Dkt. No. 62 at 4. However, even if Dr. Fricke "misdiagnosed" plaintiff and that misdiagnosis caused plaintiff unintended harm, or if Dr. Fricke were negligent in failing to seek out the results of plaintiff's blood work, his conduct is at most negligence, as he had no reason to suspect that plaintiff had diabetes before June 3, 2016.

> It has ... been held that a delay in medical treatment may constitute deliberate indifference, but that "such a classification is reserved for 'cases in which, for example officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years.' "

Allen, 2006 WL 2376927, at *4 (quoting Magee v. Childs, No. CIV904CV1089 (GLS/RFT), 2006 WL 681223, at *12 (N.D.N.Y. Feb. 27, 2006), Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000)).

"Thus, a physician who 'delay[s] ... treatment based on a bad diagnoses or erroneous calculus of risks and costs' does not exhibit the mental state necessary for deliberate indifference." Harrison, 219 F.3d at 129. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate."

Groves v. Davis, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *5 n.9 (N.D.N.Y. Feb. 28, 2012).

Here, plaintiff presents no argument or evidence to even suggest that Dr. Fricke intentionally failed to diagnose his diabetes as a form of punishment. Thus, the two-week delay in diagnosis is, at most, a "bad diagnosis or erroneous calculation of risks and costs," Harrison, 219 F.3d at 139, and plaintiff cannot demonstrate that Dr. Fricke had the requisite mental state. Groves, 2012 WL 651919, at 5 n.9. Further, negligence is not actionable under § 1983. See Grimmet v. Corizon Med. Assocs. of N.Y., No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth

2019 WL 5197180

Amendment."); Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing the harm.") (internal quotation marks and citation omitted); Roberts v. City of New York, 1:14-CV-5198 (GHW), 2016 WL 4146135, at *6 (S.D.N.Y. Aug. 2, 2016) (Where the plaintiff contended that the defendant misdiagnosed him with gas when he was experiencing elevated blood sugar levels as a result of diabetes, the Court noted, "even if [the defendant medical professional] was negligent in failing o properly diagnose Plaintiff's symptoms and failing to prescribe the proper medication, the complaint fails to state a claim for deliberate indifference" because negligence, even if it amounts to medical malpractice, does not, without more, rise to the level of a constitutional claim).

**\*15** As such, plaintiff has failed to demonstrate that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. For the reasons stated, plaintiff does not satisfy the requirements of the *mens rea* prong. Accordingly, as the undersigned concludes that there is no genuine dispute of material fact with respect to either the objective or *mens rea* prongs, plaintiff fails to establish a deliberate indifference claim. Accordingly, it is recommended that Dr. Fricke's motion for summary judgment be granted.

### III. CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 47) be **GRANTED**; and it is

**RECOMMENDED**, that the John and Jane Doe defendants be *sua sponte* **DISMISSED** from this action without prejudice, due to plaintiff's failure to identify and serve these defendants, and it is further

**RECOMMENDED**, that plaintiff's submission, dkt. no. 62, be construed as supporting his response in opposition to defendant's Motion for Summary Judgment; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

### IT IS SO ORDERED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [12]

[12]    If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2019 WL 5197180

---

**End of Document**                                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 65 of 112

Thompson v. Racette, Not Reported in Fed. Supp. (2012)

2012 WL 12884469

2012 WL 12884469
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wayne THOMPSON, Plaintiff,
v.
Stephen RACETTE, Superintendent, Great
Meadow Correctional Facility, et al., Defendants.

9:11-cv-1372(GLS/ATB)
|
Signed 08/02/2012

**Attorneys and Law Firms**

Wayne Thompson, Fort Edward, NY, pro se.

Adele M. Taylor-Scott, Office of Attorney General—Albany,
Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Gary L. Sharpe, Chief Judge

**I. Introduction**

*1 Plaintiff *pro se* Wayne Thompson commenced this
action against defendants [1] under 42 U.S.C. § 1983, alleging
violations of his Eighth Amendment rights. (*See* Compl., Dkt.
No. 1.) Pending is defendants' motion to dismiss pursuant to
Fed. R. Civ. P. 12(b)(6). (*See* Dkt. No. 25.) For the reasons
that follow, defendants' motion is granted. [2]

[1]    Stephen Racette, Superintendent of Great Meadow
       Correctional Facility; Brian Fischer, Commissioner
       of New York State Department of Corrections and
       Community Supervision; Carl Koenigsmann, Chief
       Medical Officer; Lester Wright, Chief Medical Officer;
       Kenneth S. Perlman, Deputy Commissioner of Program
       Services; Gail Haponik, Deputy Commissioner of
       Administrative Services; Anthony J. Annucci, Deputy
       Commissioner and Counsel; Dr. Whalen, Regional
       Medical Director; and John Doe, Division of Health
       Services.

[2]    Defendants also request that the court stay discovery
       in this matter pending its determination on defendants
       motion. (*See* Dkt. No. 25, Attach. 1 at 10-11.) In light of

the court's decision to dismiss Thompson's Complaint,
defendants' request is denied as moot.

**II. Background** [3]

[3]    The facts are drawn from Thompson's Complaint and
       presented in a light most favorable to him. (*See* Compl.,
       Dkt. No. 1.)

During the summer of 2007, Thompson, who had a
pre-existing medical condition that caused his shoulder
to repeatedly dislocate, dislocated his shoulder on two
occasions: once while he attempted to do pull-ups and once
when he stretched his arms over his head. (*See* Compl. at
1-2.) Thompson informed his treating physician, Dr. David
Thompson, of both dislocations. (*See id.* at 2.) On July
11, 2008, Dr. Thompson referred Thompson to orthopedic
specialist Dr. Mitchell Rubinovich for examination, [4] who,
after reviewing an MRI, ultimately concluded that Thompson
exhibited recurrent anterior instability and suggested that his
rotator cuff be left "as is," but that he should undergo an
anterior repair of his shoulder. (*See* Dkt. No. 1, Attach. 1 at 2.)

[4]    Though not attached to the Complaint, the court may
       still consider Department of Corrections and Community
       Supervision's records in the context of a motion under
       Fed. R. Civ. P. 12(b)(6) where, as here, the records
       are "integral to the complaint." *Int'l Audiotext Network,
       Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.
       1995) (internal quotation marks and citation omitted);
       *accord Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.
       2000) (deeming "a complaint to include any written
       instrument attached to it as an exhibit or any statements
       or documents incorporated in it by reference").

Prior to authorizing surgery, however, the Department of
Corrections and Community Supervision (DOCCS) ordered
Thompson to undergo a second MRI. (*See* Dkt. No. 1, Attach.
1 at 3.) On January 16, 2009, Dr. Rubinovich concluded that
Thompson's second MRI revealed the same pathology, and
recommended surgery to repair his anterior capsular. (*See
id.*) According to Thompson's medical record, Dr. Thompson
agreed with Dr. Rubinovich's recommendation, and arranged
for Thompson to undergo surgery. (*See* Dkt. No. 1, Attach. 3
at 3-4.) Thompson's surgery was cancelled, however, because
he had not been cleared by cardiology. (*See id.* at 4.)

*2 Thompson then filed a series of grievances contesting
the delay and ultimate denial of his recommended medical
treatment, alleging that his surgery was denied in retaliation

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 66 of 112

Thompson v. Racette, Not Reported in Fed. Supp. (2012)

2012 WL 12884469

for filing grievances and submitting a medical complaint. (*See* Dkt. No. 1, Attach. 4 at 1; *see* Compl. at 3.) A response to Thompson's grievance indicated that the surgery was denied by the "department's independent review company, APS [5] with the Regional Medical Director, Dr. Whalen concurring with the decision." (Dkt. No. 1, Attach. 1 at 11.) The response additionally indicated that "[p]hysical therapy was recommended so that a medical decision could be made to determine if surgery was necessary," but Thompson refused the physical therapy. (*Id.*) A second grievance response indicated that two medical supervisors reviewed Thompson's records and reported that, prior to his July 2008 request to see an orthopedic specialist, Thompson did not complain about his shoulder for five months. (*See* Dkt. No. 1, Attach. 4 at 5.)

[5]     APS Healthcare Bethesda ("APS").

Thompson now contends that, due to his shoulder condition, he can no longer play basketball or throw a ball with much velocity, and he must remain "ever vigilant" not to position his arm in an uncompromising way. (Compl. at 5.) Furthermore, Dr. Thompson has previously recommended that Thompson exercise with weights in order to maintain and strengthen the muscle mass in his shoulder. (*See id.* at 4.) Thompson alleges that despite these recommendations, defendants (medical staff) have denied his requests for a medical permit to exercise with weights. (*See id.*) However, in violation of defendants' order, Thompson continues to exercise using weights, thus exacerbating his shoulder injury by doing so. (*See id.*)

### III. Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well established and will not be repeated here. [6] For a full discussion of the standard, the court refers the parties to its previous opinion in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

[6]     Because Thompson is proceeding *pro se*, the court will construe his Complaint liberally. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

### IV. Discussion

Among other things, defendants argue that Thompson fails to state an Eighth Amendment deliberate indifference claim, and, alternatively, that they are entitled to immunity under the

Eleventh Amendment. (*See generally* Dkt. No. 25, Attach. 1 at 4, 8-10.) The court agrees with both arguments.

### A. Deliberate Indifference to Medical Care

Defendants principally argue that Thompson failed to state a plausible claim for deliberate indifference. (*See* Dkt. No. 25, Attach. 1 at 8-10.) Thompson contends, however, that defendants demonstrated deliberate indifference to his shoulder injury by attempting to substitute physical therapy for surgery. (*See* Dkt. No. 28 at 1-3.) Thompson further avers that defendants denied him surgery as a form of retaliation for filing the present action as well as inmate grievances for inadequate medical care. (*See id.*)

To establish deliberate indifference, an inmate must prove that a prison official: (1) knows of and disregards an excessive risk to inmate safety; (2) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (3) actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *accord Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). In doing so, the inmate "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Neither differences of opinion regarding appropriate medical care nor a prisoner's mere disagreement with prescribed treatment constitute deliberate indifference. *See Goros v. Cent. Office Review Comm.*, 9:03-CV-407, 2006 WL 2794415, at *7 (N.D.N.Y. Sept. 26, 2006). Further, the State "is not constitutionally obligated ... to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail [him]self of" outside of prison. *Id.* at 7-8 (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). Rather, the essential test for appropriate care "is one of medical necessity and not one simply of desirability." *Id.* Accordingly, an inmate does not have a constitutional right to the "treatment of his choice." *Irvis v. Seally*, No. 9:09-CV-543, 2011 WL 454792, at *3 (N.D.N.Y. Feb. 4, 2011).

**\*3** Here, Thompson alleges that defendants were callous in their indifference toward his recommended treatment and "utilized customs and policies in a manner so as to by-pass proper procedures for providing meaningful medical treatment for prisoners." (Compl. at 3.) Specifically, Thompson claims defendants knew that his injury was subjectively serious when they obtained and "callously" disregarded Dr. Rubinovich's recommendation for surgery. (Compl. at 5.) However, assuming without deciding, that Thompson's shoulder injury constitutes an objectively serious

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 67 of 112

Thompson v. Racette, Not Reported in Fed. Supp. (2012)
2012 WL 12884469

medical need, he has not sufficiently plead facts satisfying the second prong of a claim for deliberate indifference. At most, Thompson's factual allegations indicate that a difference of opinion existed between Dr. Rubinovich, Dr. Thompson, and APS regarding whether surgery or physical therapy constituted appropriate treatment for Thompson's condition. (*See* Dkt. No. 1, Attach. 2 at 2-3, 9-11; *see* Dkt. No. 1, Attach. 3 at 2-4.) These differing opinions are insufficient to establish deliberate indifference. *See Goros*, 2006 WL 2794415, at *7. As such, Thompson failed to show that defendants acted with the requisite state of mind to satisfy his claim.

Similarly, Thompson's retaliation claim fails because it—even construed liberally—is incongruous with his medical records. Thompson's earliest grievance for inadequate treatment of his shoulder condition was not filed until July 2009, a full three months after his surgery was cancelled, (*see* Dkt. No. 1, Attach. 3 at 4), and nearly a month after APS denied his request for surgery, (*see* Dkt. No. 1, Attach. 1 at 11). Given these failures, Thompson's claim is unsustainable.

**B. Eleventh Amendment**
Alternatively, defendants argue, and the court agrees, that they are immune from Thompson's compensatory damage claims asserted against them in their official capacities. (*See* Dkt. No. 25, Attach. 1 at 4.) The Eleventh Amendment shields states and their agencies, departments, and officials in their official capacities from suit in federal court, regardless of the relief sought. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986). This immunity gives way in only three circumstances: (1) where it is waived by the state; (2) where it has been abrogated by Congress, and (3) where a state official is sued in her official capacity for prospective injunctive relief. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see Ex parte Young*, 209 U.S. 123, 157 (1908); *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). Because Thompson's claims do not fall within any of these recognized exceptions, Eleventh Amendment immunity provides an alternative basis to grant defendants' motion with respect to the compensatory damages claims asserted against them in their official capacities.

**C. Unnamed Defendants and Amendment**
Although the claims against the named defendants' fail, Johnson also alleges constitutional violations on the part of "John Doe reviewing members of the Div. of Health

Services." (Compl. at 1.) "Courts have rejected the dismissal of suits against unnamed defendants described by roles, until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials." *Johns v. Goord*, No. 9:09-CV-1016, 2010 WL 3907826, at *7 (N.D.N.Y. Sept. 30, 2010) (citing *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998)). In *Davis*, 160 F.3d at 922, however, the Second Circuit predicated the need to provide *pro se* plaintiffs the opportunity to ascertain the identities of unnamed defendants on the existence of "a colorable claim." As discussed above, Thompson cannot state an Eighth Amendment claim, and dismissal of his Complaint in its entirety is appropriate.

Additionally, while a *pro se* complaint "should not [be] dismiss[ed] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo v. City of N.Y.*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks and citation omitted), there is no indication that permitting the filing of an Amended Complaint would enable Thompson to state a valid claim. Accordingly, leave to amend is inappropriate.

**V. Conclusion**

**\*4  WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (*see* Dkt. No. 25) is **GRANTED**; and it is further

**ORDERED** that defendants' request to stay discovery in this matter is denied as moot; and it is further

**ORDERED** that Thompson's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close the case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2012 WL 12884469

**Thompson v. Racette, Not Reported in Fed. Supp. (2012)**

2012 WL 12884469

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 69 of 112

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

2017 WL 3309726
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kashawn DOBBINS, Plaintiff,
v.
Commissioner Joseph PONTE et al., Defendants.

15-CV-3091 (JMF)
|
Signed 08/02/2017

**Attorneys and Law Firms**

Kashawn Dobbins, Jamaica, NY, pro se.

John L. Garcia, Tobias Eli Zimmerman, City of New York
Law Department, New York, NY, for Defendants.

OPINON AND ORDER

JESSE M. FURMAN, United States District Judge

**\*1** Plaintiff Kashawn Dobbins, a New York State prisoner
proceeding *pro se*, brings claims against the City of New York
(the "City"), several New York City Department of Correction
("DOC") officers, and a DOC Hearing Officer. (Docket No.
22 ("Second Am. Compl.")). Specifically, Dobbins alleges
that he was subjected to the use of excessive force, that
his Fourteenth Amendment due process rights were violated,
and that he was denied necessary medical treatment. (*Id.* at
2-4). The parties now cross-move, pursuant to Rule 56 of
the Federal Rules of Civil Procedure, for summary judgment.
(Docket No. 53; Docket No. 55 ("Defs.' Mem."); Docket No.
58 ("Pl.'s Mem.")). Additionally, Dobbins moves for leave
to amend his complaint to add claims against another DOC
Officer. For the reasons discussed below, Defendants' motion
for summary judgment is granted in part and denied in part,
Dobbins's motion for summary judgment is denied, and his
motion for leave to amend is denied.

**BACKGROUND**

The relevant facts, taken from the Second Amended
Complaint and admissible materials submitted by the parties,
are either undisputed or described in the light most favorable

to the non-moving party. *See Costello v. City of Burlington,*
632 F.3d 41, 45 (2d Cir. 2011). [1]

| [1] | As required by Local Rule 56.1, Defendants filed a Statement of Undisputed Facts with citations to the record. (Docket No. 57 ("Defs.' Rule 56.1 SUF")). Pursuant to Local Rule 56.2, they also served Dobbins with notice that, in opposing their motion, he could not rely only on his Complaint, but had to submit evidence to support his claims. (Docket No. 56). Dobbins, however, did not file his own statement of undisputed facts; instead, he submitted a ten-page "Opposition" (Docket No. 61 ("Pl.'s Opp'n")), and a seven-page letter requesting summary judgment and leave to amend his complaint. (Pl.'s Mem.). Nevertheless, in light of the "special solicitude" owed to *pro se* litigants, *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d Cir. 2010), the Court has considered the evidence submitted by Dobbins— as well as the transcript of his deposition, which was submitted by Defendants. *See Wali v. One Source Co.,* 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."). Additionally, the Court has independently reviewed Defendants' Local Rule 56.1 statement to ensure that it is supported by admissible evidence in the record. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) ("[E]ven [if] plaintiff's Rule 56.1 counter-statement failed to specifically controvert [defendant's Rule 56.1] assertions, the unsupported assertions must nonetheless be disregarded and the record independently reviewed."); *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) (noting that a court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file" a Local Rule 56.1 statement (internal quotation marks omitted)). |
|---|---|

**\*2** In early 2014, Dobbins was in pretrial custody at the
Otis Bantum Correction Center ("OBCC"), a DOC facility
on Rikers Island. (Second Am. Compl. 2; Docket No. 54-1
("First Am. Compl."), at 2). On the evening of February
1, 2014, DOC Officers from the Emergency Services Unit
("ESU") conducted a search of Dobbins's housing area and
cell. (Second Am. Compl. 2; Defs.' Mem. 2). During the
search, Officer Rivera—a Defendant here—escorted Dobbins
to his cell and began to search his person. (Defs.' Mem.
2). Officer Rivera came to believe that Dobbins was hiding
something in his mouth and ordered him to spit it out. (*Id.* at
2-3). Defendants allege that Dobbins refused and that Officer

Case 9:17-cv-01150-MAD-TWD Document 48 Filed 01/13/20 Page 70 of 112

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

Rivera, soon assisted by Officer Ortiz, began struggling with Dobbins to place him in handcuffs. (*Id.* at 3). Dobbins contends that after he turned around to be handcuffed, one of the Officers "slammed" him "on the bed," choked him, and hit him "about three times" in the ribs. (Docket No. 54-2 ("Dobbins Depo."), at 32-38). He alleges that he suffered injuries to his wrist, back, and ribs as a result. (*Id.* at 32).

Officers Boyd and Richardson—Defendants here as well— then removed Dobbins from his cell and escorted him out of the housing area, events that were captured on videotape by DOC personnel. (Docket No. 54-3 ("Video")). The videotape shows Officers Boyd and Richardson forcefully holding Dobbins's handcuffed arms behind him in what Defendants describe as "control holds ... to gain his compliance" and "to ensure that [he] did not escape them and run." (*Id.* at 21:10-22:35; Docket No. 57 ("Defs' Rule 56.1 SUF") ¶¶ 7-8). On the videotape, Dobbins is heard screaming "I'm not resisting nothing!" and, at one point, looks directly at the camera and says: "For the camera, they're breaking my wrists, seriously!" (Video 21:51-53). The officers then took him to a hallway right outside the housing area, where they secured him facing a wall for a few minutes, during which he continued to yell "My wrist!" and the like. (*Id.* at 22:05-25:34). The videotape then shows a group of officers escorting Dobbins away from the housing area, apparently to the intake unit. (*Id.* at 26:28-27:10). Notably, in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69).

In the intake unit, Dobbins was strip-searched by Officer Richardson. (Docket No. 54-8 ("Richardson Report")). Dobbins alleges that during the course of the strip-search —which was not captured by the camera, even though the videotape continued to run—Officer Richardson punched him until he was knocked unconscious and that he awoke bleeding from the head. (Second Am. Compl. 3). Defendants do not dispute that Officer Richardson punched Dobbins, or that the latter was knocked unconscious, but insist that Officer Richardson defended himself after Dobbins "threw the first punch." (Defs.' Mem. 4; Richardson Report). Later the same day, Dobbins received medical treatment for a three-centimeter laceration to the right side of his scalp and a contusion on his left eye. (Docket No. 54-11 ("Feb. 1, 2014 Medical Records")). The records from that visit specifically note the absence of any "neck pain." (*Id.*). One week later,

Dobbins returned to the OBCC medical clinic complaining of "chest discomfort" and "hand pain," citing the February 1, 2014 incident. (Docket No. 54-12 ("Feb. 8, 2014 and Feb. 12, 2014 Medical Records")). He received treatment for an abrasion on his right wrist. (*Id.*).

Defendants allege that during the search, a small plastic bag was found outside of Dobbins's cell, the contents of which later tested positive for crack cocaine. (Docket No. 54-13). On February 4, 2017, Dobbins received a notice charging him with three disciplinary infractions: assaulting staff, possession of a controlled substance, and refusing to obey a direct order. (Docket No. 54-15 ("Notice of Infraction")). Three days later, Hearing Officer Wiley—also a Defendant here—conducted a hearing. (Docket No. 54-18 ("Hearing Tr."), at 1). Despite repeated requests, Dobbins was not permitted to review any of the Officers' statements or other paperwork that was read into the hearing record. (Hearing Tr. 8-11). He was, however, allowed to call two witnesses. (*Id.* at 12-21). Following the hearing, Hearing Officer Wiley found Dobbins guilty of all three infractions and sentenced him to seventy days in the Central Punitive Segregation Unit ("CPSU"). (Docket No. 54-19 ("Disciplinary Disposition Notice")). Thereafter, the Bronx County District Attorney's Office prosecuted Dobbins for the substance recovered during the February 1, 2014 search. (Docket No. 54-21). On September 30, 2014, Dobbins pleaded guilty to one count of Promoting Prison Contraband in violation of New York Penal Law Section 205.20, and was sentenced to one year of imprisonment, to be served concurrently with his underlying sentence. (*Id.*).

**\*3** After exhausting the prison grievance procedures, Dobbins filed this action, naming as Defendants the DOC, the Commissioner of DOC, the Warden of OBCC, several named and unnamed DOC officers, and medical staff ("to[sic] many to name.") (First Am. Compl. 1). By Order dated May 4, 2015, this Court dismissed the claims against the DOC, the OBCC Warden, the DOC Commissioner, and medical staff for pleading deficiencies. (Docket No. 6 ("Order of Service")). The Court also construed the Complaint to assert state law claims against the City under a theory of *respondeat superior*, but dismissed any claim against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). (Order of Service 2-3). Thereafter, Dobbins filed the operative complaint, the Second Amended Complaint, naming as Defendants the City; DOC Officers Ortiz, Rivera, Boyd, and Richardson; and Hearing Officer Wiley. (Docket No. 22). [2] Liberally construed, the Second

2017 WL 3309726

Amended Complaint asserts against the DOC Officers or Hearing Officer Wiley claims under state and federal law for excessive force, violations of due process, and the deprivation of medical treatment; and asserts against the City a *respondeat superior* claim under state law. (*Id.*). [3]

[2]    In a letter dated October 18, 2016, Dobbins requested that the Court "accept" his Second Amended Complaint, and referenced the document filed on August 5, 2015. (Docket No. 65). Attached to the letter, however, was another complaint—also labelled "Second Amended Complaint"—that is identical in substance, if not form, to that filed on August 5, 2015. For the purposes of this Opinion, the Court will treat the Second Amended Complaint filed on August 5, 2015, rather than the attachment to the October 18, 2016 letter, to be the operative complaint.

[3]    It is not entirely clear whether Dobbins repleads a municipal liability claim against the City in the Second Amended Complaint. To the extent he does, however, it fails for the same reason that his earlier claim failed: He does not sufficiently plead the existence of an unconstitutional policy or practice. *See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (internal quotation marks omitted)).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the

nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

**\*4**    To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

It is well established that courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment. *Tracy*, 623 F.3d at 101. Thus, a *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to raise the strongest arguments that they suggest. *See, e.g., Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011). This special solicitude is not unlimited, however, and does not "relieve" a plaintiff of his

2017 WL 3309726

or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Nor is the "duty to liberally construe a plaintiff's opposition the equivalent of a duty to re-write it." *Johnson v. N.Y.C. Dep't of Correction*, No. 14-CV-8450 (JMF), 2016 WL 4030854, at *2 (S.D.N.Y. July 25, 2016) (internal quotation marks and alterations omitted).

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Dobbins's claims. Liberally construed, Dobbins's motion appears to seek summary judgment on his excessive force and due process claims. (Pl.'s Mem. 1-5). The Court will address each claim in turn.

### A. Excessive Use of Force
Dobbins's excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment, as he was a pretrial detainee at the time of the alleged incident. *See, e.g.*, *Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016). For a pretrial detainee to establish an excessive force claim, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). To be unreasonable, the conduct at issue—judged "from the perspective and with the knowledge of the defendant officer[s]," *id.* at 2474, and evaluated "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted)—must be "sufficiently serious ... to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted). A court may consider, among other factors, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Musaid v. Manka*, No. 13-CV-7880 (PKC) (MHD), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (applying this analysis). [4]

4    To the extent Dobbins also alleges claims for battery and assault under state law, those claims are subject to the same standard as his excessive force claim. *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 295 (S.D.N.Y. 2015) ("Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims.").

**\*5**  Applying those standards here, the parties' cross-motions for summary judgment are borderline frivolous to the extent they relate to the incident in Dobbins's cell and in the intake unit. As to the former, there is a clear factual dispute: Defendants maintain that Officers Rivera and Ortiz used only the force necessary to restrain Dobbins, who resisted an order to reveal what was in his mouth, while Dobbins contends that the Officers body slammed, choked, and punched him—conduct that would be objectively unreasonable even if Dobbins had resisted a lawful order. (Defs.' Mem. 9-10; Dobbins Depo. 33-34, 37). Defendants contend that "no reasonable juror could credit Plaintiff's version" of the event because his allegations are "contradicted by Plaintiff's medical records." (Defs.' Mem. 11). But putting aside the question of whether the Court could grant summary judgment on that basis, it is not the case. Dobbins sought additional medical treatment only one week after the incident, complaining of "chest discomfort" and "hand pain," and he was treated for an abrasion on his right wrist. (Feb. 8, 2014 and Feb. 12, 2014 Medical Records). The fact that Dobbins sought additional treatment "only ... once, more than one week after the Incident" (Defs.' Mem. 11), and the fact that he was not diagnosed with serious injuries at any time, may well cast doubt on the veracity of Dobbins's claims. But those are factual issues of credibility for a jury to decide at trial, not for the Court on summary judgment.

As for the incident in the intake unit, the factual disputes are even more transparent. According to Defendants, Dobbins initiated the physical alteration when he "threw a punch at Officer Richardson," "[struck] him in the shoulder," and "simultaneously rais[ed] his hands in a fighting stance." (Docket No. 54-4; *see also* Richardson Report). Defendants maintain that Richardson's punches were thus necessary to defend himself "from imminent physical assault." (Richardson Report). By contrast, Dobbins claims that Richardson threatened him during the walk to the intake unit and then punched him in the face at the end of the strip search, without reason or provocation. (Dobbins Depo. 75-76). Defendants assert that "the majority of evidence supports" their version of the incident. (Defs.' Mem. 14). But whether or not that is true, it is "axiomatic" that

Case 9:17-cv-01150-MAD-TWD Document 48 Filed 01/13/20 Page 73 of 112

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

courts may not assess credibility or weigh the evidence on summary judgment, except in limited circumstances where the "evidence is so contradictory and fanciful that it cannot be believed by a reasonable person" and thus "may be disregarded." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476-77 (S.D.N.Y. 2003). Drawing all inferences in the non-moving party's or parties' favor, the Court cannot say that either side's account of the incidents in Dobbins's cell and in the intake unit cannot be believed by a reasonable person. Accordingly, summary judgment must be and is denied as to those incidents. [5]

[5]  Defendants' argument that they are entitled to qualified immunity fares no better as to the incidents in Dobbins's cell and in the intake unit. (Defs.' Mem. 15-18). As a general matter, qualified immunity protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On February 1, 2014, it was well established that the Constitution prohibited corrections officers from using objectively unreasonable force against pretrial detainees. *See, e.g., Toliver v. City of New York*, 530 Fed.Appx. 90, 92 n.1 (2d Cir. 2013); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17, 33-35 (2d Cir. 2017). Thus, if Dobbins's accounts of the two incidents are true, Defendants would not be entitled to immunity.

By contrast, to the extent Dobbins asserts an excessive force claim with respect to the conduct of the officers who escorted him from his cell to the intake unit, it fails as a matter of law. As an initial matter, it is not clear whether Dobbins even asserts a claim as to that conduct. Although the Second Amended Complaint refers to "the walk out of the cell," it is not clear whether the conduct it describes took place in the cell or after. (Second Am. Compl. 2-3). And in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69). In any event, the period during which Dobbins was transferred from his cell to the intake unit was the one and only part of the February 1, 2014 events that was captured entirely on video, and the video makes clear that the force used to restrain Dobbins was not "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Dobbins was indisputably acting in a belligerent and defiant manner, and—"account[ing] for the 'legitimate interests that stem from [the government's] need to manage the facility

in which the individual is detained,' " and "appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security,' " *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979))—no reasonable jury could conclude that the force used was "sufficiently serious ... to reach constitutional dimensions." *Romano*, 998 F.2d at 105 (internal quotation marks omitted).

**B. Due Process**

*6  Dobbins's due process claim can be addressed more swiftly. As a pretrial detainee, Dobbins was entitled under the Due Process Clause of the Fourteenth Amendment to (1) written notice of the charges against him at least twenty-four hours before the hearing, (2) a written statement of the factual allegations against him, and (3) at least a limited ability to present witnesses and evidence. *See Best v. N.Y.C. Dep't of Correction*, 14 F. Supp. 3d 341, 347-48 (S.D.N.Y. 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). Here, all three of those requirements were indisputably met. He was provided with written notice of the charges against him —assaulting staff, possession of controlled substances, and refusing to obey a direct order—on February 4, 2014, three days before his disciplinary hearing was held. (Defs.' Mem. 7; Notice of Infraction; Dobbins Depo. 91). The document included a statement (titled "Details of Incident"), derived from Officer Richardson's account of what had occurred, that sufficed to put Dobbins on notice of the factual allegations against him—even without the more complete reports and "paperwork" that he later requested. *See Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607-08 (S.D.N.Y. 2009) (discussing adequate notice). And finally, Dobbins was allowed to call two witnesses to testify at the hearing (Hearing Tr. 10, 12-21), although he himself was not permitted to question them. *See e.g., Bullock v. Reckenwald*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5793974, at *11-14 (S.D.N.Y. Aug. 24, 2016), *report and recommendation adopted*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5719786 (S.D.N.Y. Sept. 30, 2016); *Sowell v. Bullis*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1696454, at *9 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016).

Liberally construed, the Second Amended Complaint also includes allegations that Hearing Officer Wiley was biased and "conducted an unfair hearing by [siding] with coworkers to cover up wrong doings." (First Am. Compl. 9; *see also* Second Am. Compl. 11; Pl.'s Opp'n 39). An inmate facing a disciplinary hearing is entitled to an impartial

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 74 of 112

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

hearing officer who does not "prejudge the evidence" or an inmate's guilt. *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990) (citing *Wolff*, 418 U.S. at 570-71). But a claim of hearing officer bias requires more than an inmate's own subjective beliefs and conclusory allegations. *See Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014) (citing *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). In this case, Hearing Officer Wiley was not involved in the underlying incidents, and the undisputed facts show that she allowed Dobbins to state his version of facts on the record, considered the available documentary evidence, and questioned Dobbins's witnesses. (Hearing Tr. 1-21; Disciplinary Disposition Notice). That is, Dobbins's conclusory assertions of Hearing Officer Wiley's bias aside, there is no evidence in the record from which a reasonable jury could conclude that Dobbins was denied his right to an impartial hearing officer. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Dobbins's due process claims, and denies Dobbins's cross-motion as to those claims.

## C. Deprivation of Medical Care

Dobbins's final claim—for deprivation of mental health treatment—requires even less ink. To determine whether allegations of inadequate medical care are sufficient, a court must decide, among other things, "whether the prisoner was actually deprived of adequate medical care" and, if so, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006); *see also Darnell v. Pineiro*, 849 F.3d 17, 27 (2d Cir. 2017) (discussing the applicable standards for pretrial detainees). Here, the Court dismissed Dobbins's initial claim for deprivation of mental health treatment on the ground that he failed to identify anyone who was personally involved in the alleged deprivation of mental health care. (Order of Service 4-5). Dobbins repleaded the claim in the Second Amended Complaint, but he failed to remedy that fundamental defect. (*See* Second Am. Compl. 3 (stating only that Dobbins "was sent to the S.H.U. and was den[i]ed mental health for over 70 days")). In any event, the undisputed facts show that Dobbins did receive both medical treatment and mental health treatment during this period. (Docket No. 54-20; Feb. 1, 2014 Medical Records; Feb. 8, 2014 and Feb. 12, 2014 Medical Records; Pl.'s Opp'n 8). Thus, Defendants' motion for summary judgment with respect to Dobbins's deliberate indifference claim must be and is granted.

## MOTION FOR LEAVE TO AMEND

**\*7** In his motion for summary judgment, Dobbins also requests leave to add Captain O'Hara, the supervisor during the events described above, as a defendant. (Pl.'s Mem. 1-2). Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), Dobbins's request is denied, for two independent reasons. First, this case is now all but trial ready, and adding claims against Captain O'Hara would cause undue delay. Furthermore, Dobbins provides no good reason for not seeking to add claims against Captain O'Hara earlier in the case. Defendants identified Captain O'Hara as a witness to the incidents in question, and provided Dobbins with a copy of his witness report, as far back as March 2016. Yet, Dobbins inexplicably waited more than seven months, until discovery had closed and Defendants had filed their summary judgment motion, before proposing to add Captain O'Hara as a defendant. *See, e.g., Rodriguez v. Kittles*, No. 92-CV-1154 (SHS), 1996 WL 14442, at \*2 (S.D.N.Y. Jan. 16, 1996) ("Permitting plaintiff to amend his complaint while the summary judgment motion is pending and on the eve of trial would be unduly prejudicial to the defendant."); *see also, e.g., Antrobus v. N.Y.C. Dep't of Sanitation*, No. 11-CV-5434 (CBA) (LB), 2016 WL 5394697, at \*11 (E.D.N.Y. Feb. 25, 2016) ("Prejudice is generally found where the motion to amend comes on the eve of trial after many months or years of pre-trial activity; the amendment would cause undue delay in the final disposition of the case; the amendment brings entirely new and separate claims, adds new parties or at least entails more than an alternate claim or a change in the allegations of a complaint." (internal quotation marks omitted)).

Second, and in any event, Dobbins provides no indication that he possesses facts with which he could allege valid claims against Captain O'Hara. *See, e.g., Rodriguez*, 1996 WL 14442, at \*2 (denying a motion for leave to add claims against two new defendants on the eve of trial where the plaintiff failed to "attach a copy of his proposed amended complaint to his declaration" and failed to "provide any grounds to suggest that plaintiff would even have a viable claim against" the two new defendants); *Hays v. City of New York*, No. 14-CV-10126 (JMF), 2017 WL 782496, at \*8 (S.D.N.Y. Feb. 28, 2017) (denying leave to amend where the *pro se* plaintiff had not "given any indication" that she was "in possession of facts" that would state a valid claim (internal quotation marks omitted)). The video of the February 1, 2014 incident shows that Captain O'Hara was walking upstairs during the

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 75 of 112

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

time that Officers Rivera and Ortiz were allegedly assaulting Dobbins in his cell. (Video 19:26-20:08). And Dobbins does not suggest that Captain O'Hara participated in the alleged assault in the intake unit or had a "realistic opportunity to intervene" in what is alleged to have been only a brief and unprovoked attack by Officer Richardson. *Holland*, 197 F. Supp. 3d at 549-50 (describing the elements of a failure-to-intervene claim). [6]

[6]    Liberally construed, Dobbins's motion could also be read to propose adding a claim or claims relating to the drugs found near his cell, which he disputes. (Pl.'s Mem. 3-4). Any such claim, however, would be barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), as Dobbins pleaded guilty to charges stemming from those drugs.

## CONCLUSION

For the foregoing reasons, Dobbins's motions for summary judgment and leave to amend the Second Amended Complaint are DENIED in their entirety, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part. In particular, Defendants' motion is granted with respect to Dobbins's deliberate indifference claim, his due process claims, and his excessive force (and assault and battery) claim to the extent it is based on Defendants' alleged conduct when Dobbins was escorted from his cell to the intake unit. By contrast, Defendants' motion and Dobbins's cross-motion are denied with respect to the excessive force claims relating to the conduct in Dobbins's cell and in the intake unit.

In light of the substance of Dobbins's surviving claims and the need for trial to resolve them, this Court exercises its discretion under Title 28, United States Code, Section 1915(e)

(1), and will seek to obtain *pro bono* counsel for Dobbins. *See Cooper v. A. Sargenti Co.*, 877 F.2d 170, 174 (2d Cir. 1989). Further, the Court believes—in light of this ruling; the possibility that Dobbins will obtain counsel in short order; and the fact that, all things considered, Dobbins's injuries were relatively minor—that the parties should attempt to settle the case without the need for trial. To that end, by separate Order to be entered today, the Court is referring the case to the assigned Magistrate Judge (the Honorable James L. Cott) for settlement purposes only. **No later than one week after *pro bono* counsel enters a notice of appearance or September 15, 2016, whichever is earlier**, the parties shall contact the Chambers of Magistrate Judge Cott to schedule a settlement conference as soon as possible. In the event that the case does not settle, the Court will issue a further Order with respect to the timing and procedures leading up to trial (the details of which will depend on whether Dobbins is represented or not).

**\*8**  The Clerk of Court is directed to terminate Docket No. 53; to terminate Officer Boyd and Hearing Officer Wiley (each of whom is named only in claims that have been dismissed) as Defendants; and to mail Dobbins a copy of this Opinion and Order.

This Court certifies, pursuant to Title 28, United States Code, Section 1915(a)(3), that any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is thus denied. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3309726

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,

v.

Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, The Capitol, Christopher W. Hall, Assistant
Attorney General, of Counsel, Albany, NY, for the Defendant.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. Introduction

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action
against defendant Doctor Kang Lee,[1] pursuant to 42 U.S.C.
§ 1983, alleging that Lee was deliberately indifferent to
Gray's serious medical needs in violation of the Eighth
Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1]     Gray also named Ms. Vonda L. Johnson as a defendant,
        (Compl.), but she has since been dismissed from this
        action, (Dkt. No. 10 at 6–7, 9).

[2]     In his complaint, Gray also asserted claims under
        the Americans with Disabilities Act, 42 U.S.C. §§
        12101–12213, and the Rehabilitation Act, 29 U.S.C.
        §§ 701–796*l*, (Compl.), but those claims have been
        dismissed, (Dkt. No. 10 at 5–6, 9).

On August 12, 2014, Lee filed a motion for summary
judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40).
In a Report and Recommendation (R & R) issued on March 9,
2015, Magistrate Judge David E. Peebles recommended that
Lee's motion for summary judgment be granted and Gray's
remaining Eighth Amendment claim be dismissed. (Dkt. No.

43.) Pending are Gray's objections to the R & R. (Dkt. No.
44.) For the reasons that follow, the R & R is adopted in its
entirety.

### II. Background[3]

[3]

Gray specifically objects to Judge Peebles'
recommendation that the court deem admitted all
properly supported facts contained in Lee's statement
of material facts. (Dkt. No. 43 at 3 n. 1; Dkt. No. 44
at 2.) The court reviews this portion of the R & R *de
novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ.
904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y.
Jan.18, 2006). Under this District's Local Rules, the
moving party must submit a statement of material
facts, which "set[s] forth, in numbered paragraphs, each
material fact about which the moving party contends
there is no genuine issue." N.D.N.Y. L.R. 7.1(a)(3). The
opposing party must file a response to the statement
of material facts, which must "mirror the movant's
[s]tatement of [m]aterial [f]acts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs." *Id.* If the opposing party fails
to comply, "[t]he [c]ourt shall deem admitted any
properly supported facts set forth in the [s]tatement
of [m]aterial [f]acts that the opposing party does not
specifically controvert," and, where the opposing party
is *pro se,* the moving party must advise the pro se
litigant about the consequences of his failure to respond.
*Id.* Here, while Gray filed a response opposing Lee's
summary judgment motion, (Dkt. No. 40), he did not
file anything that even remotely resembles a response
to Lee's statement of material facts, despite receiving
notice of the consequences of his failure to do so,
(Dkt. No. 32 at 3). In his defense, Gray argues that he
"submitted various pieces of evidence annexed to his
opposition to summary judgment, showing that [Lee]'s
narrative was self-serving," and that he "introduced to
the [c]ourt documentary evidence that [Lee] obviously
did not have a planned course of medical treatment, as
[Lee] routinely came to contradictory conclusions, and
would often ignore [Gray's] needs." (Dkt. No. 44 at 2.)
However, "a district court has no duty to perform an
independent review of the record to find proof of a factual
dispute-even if that nonmoving party is proceeding pro
se," and an individual's pro se status does not relieve
him of the ramifications associated with the failure to
comply with the court's local rules. *Davis v. City of
Syracuse,* No. 5:12–CV–0276, 2015 WL 1413362, at \*12
(N.D.N.Y. Mar.27, 2015). Therefore, the court adopts
Judge Peebles' recommendation to deem admitted all

properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS), and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13–17.) During those meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13–17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

## III. *Standard of Review*

**\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*45.

## IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12–21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and, therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16–19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19–20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee did not act with deliberate indifference. (Dkt. No. 44 at 3–6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains.[4] (*Id.*) The court reviews these objections *de novo. See Almonte,* 2006 WL 149049, at \*3, \*5.

4    The court notes that this is the first time that Gray has
     incorporated Lee's long-term prescription of Motrin as
     part of his Eighth Amendment claim. Indeed, both his
     complaint and response to Lee's motion for summary
     judgment are devoid of these allegations. (See generally
     Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical
care is analyzed under the Eighth Amendment's prohibition
of cruel and unusual punishment. See *Estelle v. Gamble,*
*429 U.S. 97, 101–03, 97 S.Ct. 285, 50 L.Ed.2d 251*
*(1976).* "[D]eliberate indifference to serious medical needs of
prisoners constitutes the unnecessary and wanton infliction
of pain proscribed by the Eighth Amendment." *Id.* at 104
(internal quotation marks and citation omitted). "To show that
he has been subjected to cruel and unusual punishment, a
prisoner must satisfy a standard that includes both objective
and subjective components." *Taylor v. Goorde,* 548 F. App'x
696, 697–98 (2d Cir.2013). The objective component asks
whether the prisoner was actually deprived of adequate
medical care and whether the denial in care was "sufficiently
serious." *Id.* at 698 (internal quotation marks and citation
omitted). The subjective component concerns the defendant's
mental state, and requires a showing that the defendant acted
"with deliberate indifference to inmate health"-"a mental state
equivalent to subjective recklessness," which "requires that
the charged official act or fail to act while actually aware
of a substantial risk that serious inmate harm will result."
*Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

*3 Here, Gray has failed to satisfy both the objective and
subjective components. In short, because Gray was frequently
treated, prescribed pain medication, tested with an x-ray
and MRI, and referred to an orthopedic specialist, he was
not actually deprived of adequate treatment-the objective
component-and, further, this extensive treatment and care is
evidence that Lee did not act with deliberate indifference-the
subjective component. The fact that Gray was not prescribed
the precise pain medication of his choosing is of no moment;
" 'a prisoner does not have the right to choose his medical
treatment as long as he receives adequate treatment.' "
*Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012)
(quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)).
Similarly, Gray's contentions that Lee violated DOCCS policy
and "accepted medical practice" by prescribing Motrin for
long-term use are equally without merit. First, a failure
to comply with DOCCS policy directives or regulations
is not a constitutional violation. See *Sanders v. Gifford,*
No. 9:11–CV–0326, 2014 WL 5662775, at *4 (N.D.N.Y.
Nov.4, 2014). Second, Gray alleges, at best, a negligence or

medical malpractice claim, which also does not give rise to
an Eighth Amendment violation. See *Hernandez v. Keane,*
*341 F.3d 137, 144 (2d Cir.2003).* Accordingly, the court
adopts Judge Peebles' findings that Gray was provided with
adequate medical care, and that Lee did not act with deliberate
indifference.

Second, Gray objects to Judge Peebles' findings of fact that
Gray "could not be in severe pain because he worked at the
Clinton ... mess hall" and that Gray ultimately "secured a less
strenuous work detail at the facility mess hall for reasons other
than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No.
43 at 16–17, 16 n. 4.) Because these proposed findings of fact
are not central, or even particularly relevant, to Judge Peebles'
ultimate recommendation to dismiss Gray's complaint, the
court construes these as general objections, which warrant
review only for clear error. See *Almonte,* 2006 WL 149049,
at *4–5.

At the outset of his analysis, Judge Peebles noted that the
undisputed facts did not support a finding that Gray's pain
was severe. (Dkt. No. 43 at 16–17.) Judge Peebles observed
that Gray's continued work as a server in the mess hall, and
his testimony that he was relieved of certain work duties
not because of his injury, but because he was friendly with
the corrections officer who assigned job responsibilities,
undermined his claims of severe pain. (*Id.* at 16 n. 4.) These
facts, however, were but a few of the facts that Judge Peebles
considered in determining that Gray's pain was not severe.
(*Id.* at 16–17 (noting that Gray's medical records also did not
support a finding of severe pain, as medical personnel often
discerned no acute distress, and further noting that Gray's
voluntary discontinuation of Naproxen also belied his claims
of severe pain).) In any event, notwithstanding the severity,
or lack thereof, of Gray's pain, Judge Peebles concluded that
Gray's claim should be dismissed because he was provided
with adequate medical care. (*Id.* at 16–19.) Accordingly, the
court finds no clear error in either this portion of the R & R or
the remainder of the R & R, and it is adopted in its entirety.

*4 Finally, the court notes that, in his objections to the R &
R, Gray takes issue with Judge Peebles' denial of his motion to
appoint counsel, arguing that, had he been appointed counsel,
"summary judgment would not have been granted," and the
failure to appoint counsel "may even rise to a violation
of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6–
7.) However, Gray's motion to appoint counsel was denied
before the R & R was even issued, (Dkt.Nos.35, 37), and,
therefore, Gray's dissatisfaction with the disposition of his

motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6–7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

### I. *BACKGROUND* [1]

[1]
Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug.22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

**\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32–2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32–3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm."*Id.* at 20; *Dkt. No. 32–2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32–2 at 57.* According to the plaintiff's health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days. [2] *Dkt. No. 32–2 at 55; Dkt. No. 32–3 at 20–21*

[2]  Naproxen is a non-steroidal anti-inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland's Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32–3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32–2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32–2 at 3,* 5–52. Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32–2 at 3; Dkt. No. 32–2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; see also Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No. 321 at 3; Dkt. No. 32–2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32–2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32–2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

**\*6** During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32–2 at 4,* 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32–2 at 4,* 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS PRESENT AT THE GLENOHUMERAL JOINT. THERE IS A LARGE SPUR ARISING FROM THE INFERIOR ASPECT OF THE ACROMION. THIS MAY CONTRIBUTE TO IMPINGEMENT.

CONSIDER CORRELATION WITH MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32–2 at 4*, 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32–2 at 72.*

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32–2 at 5*, 38, 73–74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32–2 at 5*, 33–37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32–2 at 5; Dkt. No. 32–3 at 31*. At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32–2 at 5.*

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5–6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32–3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

**\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No. 1*. Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1–2; *Dkt. No. 10*. Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8–9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32*. In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally* *Dkt. No. 32–4*. Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Deliberate Medical Indifference Claim*

In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally* Dkt. No. 1. Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally* Dkt. No. 32–4.

1. *Legal Standard Governing Deliberate Medical Indifference Claims*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care

is sufficiently serious. This inquiry
requires the court to examine how the
offending conduct is inadequate and
what harm, if any, the inadequacy has
caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)
(citations omitted).

The second inquiry of the objective test requires a court to
look at the seriousness of the inmate's medical condition if the
plaintiff alleges a complete failure to provide treatment. *Smith
v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors
relevant to the seriousness of a medical condition include
whether a reasonable doctor or patient would find it important
and worthy of comment, whether the condition significantly
affects an individual's daily activities, and whether it causes
chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280
(quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that
treatment was provided but was inadequate, the second
inquiry of the objective test is narrowly confined to
that specific alleged inadequacy, rather than focusing
upon the seriousness of the prisoner's medical condition.
*Salahuddin,* 467 F.3d at 280. "For example, if the prisoner
is receiving ongoing treatment and the offending conduct
is an unreasonable delay or interruption in that treatment,
[the focus of the] inquiry [is] on the challenged delay or
interruption in treatment, rather than the prisoner's underlying
medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must
demonstrate that the defendant had "the necessary level of
culpability, shown by actions characterized by 'wantonness.'
" *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In
medical-treatment cases ..., the official's state of mind need
not reach the level of knowing and purposeful infliction of
harm; it suffices if the plaintiff proves that the official acted
with deliberate indifference to inmate health." *Salahuddin,*
467 F.3d at 280. "Deliberate indifference," in a constitutional
sense, "requires that the charged official act or fail to
act while actually aware of a substantial risk that serious
inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at
837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546
(N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97–CV–
1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998)
(Kahn, J., *adopting report and recommendation by* Homer,

M.J.). "Deliberate indifference is a mental state equivalent to
subjective recklessness, as the term is used in criminal law."
*Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–
40). [3]

[3]    Copies of all unreported decisions cited in this document
have been appended for the convenience of the *pro se*
plaintiff. [Editor's Note: Attachments of Westlaw case
copies deleted for online display.]

### 2. *Analysis*

Addressing first the objective element of the governing test, I
note that the record evidence demonstrates defendant Lee and
other DOCCS medical personnel at Clinton provided plaintiff
with frequent treatment for his shoulder condition. *Dkt. No.
32–2 at 33–57.* Plaintiff's medical records, while indicating
complaints of pain, do not support his claims that he suffered
severe pain, and indeed, in some instances, medical personnel
treating plaintiff discerned no acute distress. *See, e.g., id.* at
46. Moreover, despite plaintiff's allegations that he suffered
severe pain, the evidence before the court reflects that he
was able to work as a server in the facility mess hall for
three hours per day, seven days a week, from approximately
June 2012 until August of that year, when he began ASAT
programing. *Dkt. No. 32–3 at 33–37.* In his job at the
mess hall, plaintiff would fill pitchers with water, clean the
tables, or disburse bread to inmates. [4] *Id.* at 34. The record
also reflects that plaintiff voluntarily discontinued taking
the pain medication Naproxen in or about the beginning
of June 2012. *Dkt. No. 32–2 at 51; Dkt. No. 32–3 at 21.*
At that time, rather than ignoring plaintiff's complaints of
pain altogether, defendant Lee provided a prescription for
Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32–3 at
23.* Thereafter, plaintiff was prescribed Percocet, an analgesic
comprised of oxycodone hydrochloride and acetaminophen,
and over-the-counter medications for his pain. *Dkt. No. 32–
2 at 33–47; Dorland's Illustrated Medical Dictionary,* 1377,
1429. Defendant Lee also thereafter ordered repeat x-rays of
plaintiff's shoulder in September 2012, and ordered an MRI
in January 2013, based on the x-ray results. *Id.* at 42, 45,
77–78. Based upon these circumstances, it is doubtful that a
reasonable factfinder could conclude that defendant Lee did
not provide plaintiff with consistent and appropriate care.

[4]    At his deposition in connection with this matter, plaintiff
first stated that he was removed from "table top" duty,
involving filling water pitchers and cleaning table tops,
due to the pain in his shoulder. *Dkt. No. 32–3 at 34.* Later,
however, plaintiff testified that he began disbursing the

bread not "because [his] shoulder was hurting him," but because he knew the corrections officer assigning jobs. *Id.* at 42.

**\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques—including x-rays and MRIs —and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32–2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33–57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 4749. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73–74, 77–78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's professional judgment was prescribed. *Dkt. No. 32–2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77–78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73–74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

**\*11** Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted.[5]

---

[5]     Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generally Dkt. No. 40.* For example, in his memorandum of law, plaintiff states the following:

       It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

    *Dkt. No. 40 at 8–9.* Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( "[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice

2015 WL 1724573

involves culpable recklessness."); *Morris v. Hoke,* No. 87–CV–7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983."). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's

remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2374116
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joe WILLIAMS, Plaintiff,

v.

Ms. SYKES, et al., Defendants.

9:17-CV-990 (TJM/ATB)
|
Signed 05/09/2019
|
Filed 05/10/2019

**Attorneys and Law Firms**

JOE WILLIAMS, Plaintiff, pro se.

DAVID A. ROSENBERG, Asst. Attorney General, for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1**  This matter has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
United States District Judge. Plaintiff brings this civil rights
action pursuant to 42 U.S.C. § 1983, claiming that he was
denied constitutionally adequate medical and dental care
while subject to civil confinement at Central New York
Psychiatric Center ("CNYPC"). (Dkt. No. 1).

Presently before the court is defendants' motion for summary
judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 31).
Plaintiff has not filed a response to defendants' motion. For the
reasons set forth below, this court will recommend granting
defendants' summary judgment motion, and dismissing
plaintiff's complaint in its entirety.

### I. Procedural History

The court will review the procedural history in this action
in order to clarify the recommendation below. Plaintiff filed
his original complaint on September 6, 2017. (Dkt. No.
1). At the same time, plaintiff filed a motion to proceed
in forma pauperis ("IFP"). (Dkt. No. 2). On October 3,
2017, Judge McAvoy issued an order in which he granted
plaintiff's motion for IFP, dismissed plaintiff's conspiracy

claims without prejudice, and ordered that a response to
plaintiff's Fourteenth Amendment claims be filed by the
defendants. (Dkt. No. 4).

On December 27, 2017, defendant Feinstein filed a motion
to dismiss the Fourteenth Amendment deliberate indifference
claim against him. (Dkt. No. 14). On February 27,
2018, plaintiff filed a response in opposition to defendant
Feinstein's motion. (Dkt. No. 24). This court issued a report-
recommendation on March 8, 2018, recommending that
defendant Feinstein's motion to dismiss be granted, and the
complaint dismissed in its entirety as against him. (Dkt. No.
25). Judge McAvoy issued an order accepting and adopting
the report-recommendation on April 12, 2018. (Dkt. No. 26).

Now, upon completion of discovery, defendants bring
the instant motion for summary judgment dismissing the
complaint in its entirety, arguing that plaintiff cannot carry
his burden of proving deliberate medical indifference against
each remaining defendant. (Dkt. No. 31-2 at 3).

### II. Summary Judgment

Summary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of
law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,
272–73 (2d Cir. 2006). "Only disputes over ["material"] facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
*Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986). It must be apparent that no rational
finder of fact could find in favor of the non-moving party
for a court to grant a motion for summary judgment. *Gallo
v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.
1994).

The moving party has the burden to show the absence of
disputed material facts by informing the court of portions
of pleadings, depositions, and affidavits which support the
motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party
satisfies its burden, the nonmoving party must move forward
with specific facts showing that there is a genuine issue for
trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context,
the nonmoving party must do more than "simply show that
there is some metaphysical doubt as to the material facts."
*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
However, in determining whether there is a genuine issue

of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

**\*2** To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.*, 2006 WL 1133247, at \*3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

### III. Deliberate Indifference to Medical Needs

#### A. Legal Standard

Plaintiff's claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted). The Supreme Court recently distinguished between Eighth and Fourteenth Amendment excessive force claims, holding that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. See *Kingsley v. Hendrickson*, — U.S. —, 135 S.Ct. 2466, 2470-71, 192 L.Ed.2d 416 (2015). In *Darnell*, the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell*, 849 F.3d at 35. District courts in this circuit have since further applied the *Kingsley* standard to claims of deliberate indifference to serious medical needs brought under the Fourteenth Amendment. See *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at \*19 (E.D.N.Y.

Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs"); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 718 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"); *Torrez v. Semple*, No. 17-CV-1211, 2017 WL 3841686, at \*3 (D. Conn. Sept. 1, 2017) ("[F]or a claim of deliberate indifference to mental health needs or unconstitutional conditions of confinement under the Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants 'knew, or should have known, that the condition posed an excessive risk to health or safety' ").

Furthermore, the *Kingsley* standard applies here, even though Plaintiff was civilly confined and not a pretrial detainee, because "[t]he distinction *Kingsley* drew was not between pretrial detainees and non-detainees. Instead, it was between claims brought under the Eighth Amendment's Cruel and Unusual Punishment Clause and those brought under the Fourteenth Amendment's Due Process Clause." *Durham v. Jones*, No. 9:17-CV-434 (LEK/DJS), 2019 WL 1103284, at \*3 (N.D.N.Y. Jan. 23, 2019) (quoting *Edrei v. Maguire*, 892 F.3d 525, 535 (2d Cir. 2018) (citations omitted)).

"[D]eliberate indifference to serious medical needs ... constitutes the 'unnecessary and wanton infliction of pain,' ... whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citation omitted). In order to state a claim based on constitutionally inadequate medical treatment, a plaintiff must satisfy a two-prong test. *Darnell*, 849 F.3d at 29. The first element is objective and "considers whether the alleged deprivation of adequate medical care [was] sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)) (quotation marks omitted). [1] The second, 'mental' element [2] ensures that the defendant acted with at least deliberate indifference to the challenged conditions. *See Darnell*, 849 F.3d at 29; see also *Bell v. Carson*, No. 9:18-CV-783, 2018 WL 5993686, at \*2 (N.D.N.Y. Nov. 15, 2018).

[1]    Although the Supreme Court, in *Kinglsey*, altered the standard for deliberate indifference claims, the objective prong remains the same whether analyzed under the

Eighth or Fourteenth Amendments. *Figueroa v. Cty. of Rockland*, No. 16-CV-6519 (NSR), 2018 WL 3315735, at *4 (S.D.N.Y. July 5, 2018).

2      In *Darnell*, the Second Circuit cautioned that this element, commonly referred to as the "subjective prong," was better classified as a "*mens rea* prong" or "mental element prong." The Court reasoned that the term "subjective prong" might be a misleading description because "the Supreme Court has instructed that 'deliberate indifference roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Darnell*, 849 F.3d at 29 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). After the Second Circuit concluded that deliberate indifference should be defined objectively for a claim of a due process violation, other courts in this circuit have adopted the phrase "mental element prong" to more appropriately describe the relevant standard. *See Durham*, 2019 WL 1103284, at *4; *Richardson v. Corr. Medical Care, Inc.*, No. 9:17-CV-0420 (MAD/TWD), 2018 WL 1580316, at *5-6 (N.D.N.Y. Mar. 28, 2018).

### 1. Objective Element

*3  In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844–47, 114 S.Ct. 1970).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Mental Element

Under the second prong of the deliberate indifference analysis, the Court must consider whether defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. "As a consequence, the relevant *mens rea* is recklessness, which, for present purposes, 'more closely resembles recklessness as the term is used in the civil context' and 'does not require a defendant to be subjectively aware of the harm resulting from his acts or omissions.' " *Singletary v. Russo*, No. 13-CV-04727, 2019 WL 1929819, at *10 (E.D.N.Y. Feb. 22, 2019) (citing *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017)) (citations omitted). Under this standard, "a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the [plaintiff] would occur." *Feliciano*, 2017 WL 1189747, at *13 (citing *Darnell*, 849 F.3d at 35).

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

**\*4** Furthermore, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not a plaintiff's constitutional rights. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107, 97 S.Ct. 285). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**B. Analysis**

This is not a case in which plaintiff could claim that he received no care for his various health conditions, despite plaintiff's characterization of the defendants' "denial of medical treatments." [3] (Dkt. No. 1 at 4). The primary issue in this case is the alleged inadequacy of the care plaintiff received, together with the alleged delay in care, relative to plaintiff's (1) dental treatment, (2) podiatric treatment, and (3) headaches. [4]

[3]   Plaintiff completed drafting his complaint and executed it before a notary public on April 25, 2017. (Dkt. No. 1 at 9). The complaint was not filed until September 6, 2017. (*Id.* at 1). The court notes that substantial treatment relative to plaintiff's lawsuit, including his ultimate foot surgery, continued to take place after the complaint was signed and filed.

[4]   Plaintiff raised the allegation of deliberate indifference relative to his headaches for the first time at his deposition. (Dkt. No. 31-5 at 94). Notwithstanding the fact that plaintiff's complaint does not raise a claim regarding his headaches, the court will address plaintiff's deliberate indifference claim with respect to his headaches, in the interest of achieving finality.

**1. Dental Treatment**

Plaintiff's claim regarding his toothache as against defendant nurse Audrey Sykes ("Skyes") and defendant nurse practitioner Candace Wilbur ("Wilbur") alleges defendants' "disregard of and failure to respond to [plaintiff's] ... dental requests, needs." (Dkt. No. 1 at 6). Defendants argue that plaintiff fails to meet both the objective and subjective criteria

of the deliberate indifference standard. (Dkt. No. 31-2 at 10-11).

This court addressed the issue of whether plaintiff's dental condition was sufficiently serious upon review of defendants' prior motion to dismiss. (Dkt. No. 25). For the reasons set forth in my March 8, 2018 Report-Recommendation, the fact remains that plaintiff's toothache does not rise to the level of a sufficiently serious medical need. (*Id.* at 10-13). The record as since developed does not contradict such a finding, nor does it indicate that this case approaches the severity of cases in which a serious medical need has been found relative to dental treatment. *See Caves v. Cuevas*, No. 3:17-CV-5709892, 2017 WL 5709892, at \*3 (D. Conn. Nov. 27, 2017) (serious medical need recognized where plaintiff had impacted wisdom teeth, causing severe pain, difficulty eating, and risk of abscess. In addition, plaintiff's condition was ignored "for nearly a year"); *Mendoza v. McGinnis*, No. 9:05-CV-1124 (TJM/DEP), 2008 WL 4239760, at \*10 (N.D.N.Y. Sept. 11, 2008) (broken tooth did not constitute serious dental need in absence of allegations that tooth "caused [inmate] to experience extreme pain or the likelihood, that if left untreated, his broken [tooth] would have resulted in degeneration").

Furthermore, since the evidence as developed indicates plaintiff was receiving on-going dental treatment, the court's inquiry is further narrowed to the question of whether defendants' conduct was "inadequate and what harm, if any, the inadequacy has caused or will likely cause the [plaintiff]." *Salahuddin*, 467 F.3d at 280. Otherwise stated, "it's the particular risk of harm faced by the [plaintiff] due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)(citing *Chance*, 143 F.3d at 702-03). Here, plaintiff has failed to produce any evidence that his medical condition worsened or that he was subjected to an unreasonable risk of future harm at the hands of defendants.

**\*5** The record indicates that on January 14, 2016, the morning after plaintiff's initial complaint of tooth pain, defendant Sykes emailed the dentist to request a consultation. (Dkt. No. 32-1 at 1-2). Defendant Sykes was informed that the dentist was not available that day, however pain medication was made available to plaintiff. (*Id.* at 1). Plaintiff submitted another request to see the dentist on January 27, 2016. (Dkt. No. 1-2 at 6). On February 7, 2016, defendant Sykes emailed

the dentist to report plaintiff's continued complaints of tooth pain, noting that there was no swelling and plaintiff was taking Motrin, with some relief. (Dkt. No. 32-2 at 1). Plaintiff was seen by the dentist on February 11, 2016 and diagnosed with an infected molar, which was extracted that day. (Dkt. No. 32-9 at 1). On February 16, 2016, plaintiff reported mouth pain; however upon examination by Nurse Sykes there were no signs of swelling or infection. (Dkt. No. 32-4 at 1).

Nevertheless, plaintiff was provided pain medication, [5] and defendant Sykes communicated plaintiff's complaint to the dentist. (Id.; Dkt. No. 32-3). Plaintiff once again complained of continued right side facial swelling and pain on February 24, 2016, in response to which defendant Sykes emailed the dentist on February 25, 2016. (Dkt. No. 32-5). Plaintiff was seen in the CNYPC medical clinic the next day, where he was diagnosed with an infection, prescribed Amoxicillin, and scheduled to follow up with the dentist in one week. (Dkt. Nos. 32-6; 32-7). Plaintiff was noted to be "healing well" at his March 3, 2016 follow-up appointment, and on April 28, 2016, plaintiff declined any further treatment with respect to his tooth. (Dkt. No. 32-9 at 2-3).

[5]     Based upon the relevant progress note, plaintiff was already receiving Motrin and Tylenol on an as needed basis for his complaints of "bone pain." (Dkt. No. 32-4).

Accordingly, there is no evidence to suggest that any alleged delay in treatment caused deterioration to plaintiff's physical condition, prevented him from eating and sleeping, or caused any permanent, lasting effects. Thus, plaintiff's claim does not meet the objective element of the deliberate indifference test. See Ray v. Zamilus, No. 13-CV-2201, 2017 WL 4329722, at *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay.).

Plaintiff has also failed to meet the mental element prong of the deliberate indifference standard. As it relates to defendant Sykes, there is simply no evidence that she "intentionally deprived plaintiff of adequate medical care," nor does the evidence support a finding that she "acted recklessly and 'knew or should have known' that her acts or omissions 'posed an excessive risk to [plaintiff's] health or safety.' " Young v. Fricke, No. 9:15-CV-1222 (MAD/TWD), 2018 WL 3121714, at *11 (N.D.N.Y. Feb. 12, 2018) (citing Lloyd v. City of N.Y., 246 F. Supp. 3d 704, 720 (S.D.N.Y. 2017)). On the contrary, defendant Sykes was responsive to plaintiff's complaints of tooth pain – timely documenting plaintiff's complaints, communicating with the dentist for referral of

treatment, and administering pain medication upon request. There is no evidence of "conscious delay" or failure to treat an inmate's serious medical condition "as punishment or for other invalid reasons." See Bullock v. DSS, No. 5:17-CV-1302 (BKS/TWD), 2018 WL 1115218, at *5 n.9 (N.D.N.Y. Jan. 18, 2018) (Rep't Rec.) (citing Harrison, 219 F.3d at 138), adopted 2018 WL 1111059 (N.D.N.Y. Feb. 26, 2018). Even assuming defendant Sykes initially failed to diagnose plaintiff's post-extraction infection, "negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference." Ahlers v. Kaskiw, No. 9:12-CV-501 (GLS/ ATB), 2014 WL 4184752, at *7 (N.D.N.Y. Aug. 21, 2014) (citing Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, plaintiff's allegations against defendant Sykes do not rise to the level of a constitutional violation.

Despite defendants' contentions, it does appear that defendant Wilbur was involved, to some extent, in treating plaintiff with respect to his tooth pain. (Dkt. 32-13 at 1). Plaintiff presented to defendant Wilbur on April 17, 2015, at which time plaintiff acknowledged that the Amoxicillin had relieved his mouth pain and swelling. (Dkt. No. 32-13 at 1). Defendant Wilbur noted slight tenderness to the right upper molar, "but better than last week." (Id.). She further noted decreased swelling. (Id.). Defendant Wilbur ultimately extended plaintiff's Amoxicillin prescription for three more days and contacted the dentist regarding plaintiff's treatment. (Id.). There is no indication that this defendant treated plaintiff with deliberate indifference.

*6 As stated above, plaintiff's initial complaint of tooth pain was timely addressed; his problem tooth extracted within a month of his initial complaint, without any significant affect on his daily activities; and the infection, once identified, subsequently treated to plaintiff's satisfaction. There is simply no evidence that either defendant Sykes or defendant Wilbur treated plaintiff with the requisite state of mind sufficient to raise a question of fact, as to the constitutionality of his medical care. Accordingly, summary judgment is warranted.

### 2. Podiatric Treatment

Plaintiff also brings a claim against defendants Wilbur, Gregory Rorick, D.P.M. ("Rorick"), and Shiv Bhatt, M.D. ("Bhatt") for "denying" medical care relative to his right foot pain. (Dkt. No. 1 at 4). Specifically, plaintiff claims that:

medical staff [went] beyond negligence. Some highly shown disregard and indifferent to my extreme medical needs. By not only prolonging my pain and suffering. Also by causing me to be in distress.

Some used their professional positions to [bully] me. By way of manipulation and twisted my words to fix their intentions of covering up their unprofessionalism.

[...]

In this place it's so easy for some staff to cover up their errors. Th[a]n to admit their oversights or wrongdoing.

(*Id.* at 7-8). In support of their motion for summary judgment, defendants argue that plaintiff cannot show defendant Wilbur, Rorick or Bhatt was deliberately indifferent to his serious medical needs, because the record demonstrates that any alleged delay of the foot surgery was entirely due to plaintiff's noncompliance. (Dkt. No. 31-2 at 12-13).

The medical records indicate that plaintiff first complained of right foot pain on June 10, 2015, [6] in response to which a podiatric consultation was requested. (Dkt. No. 32-37 at 1). On August 3, 2015, plaintiff presented to defendant Rorick, a doctor of podiatric medicine. (Dkt. Nos. 31-10 at 2-3; 32-37 at 2). Plaintiff reported that he was experiencing pain along the tip of his second toe "from the bunion running into and jacking up his toe." (*Id.*). Defendant Rorick examined plaintiff and diagnosed him with a hallux valgus (bunion) and hammertoe on the right foot. (*Id.*). Defendant Rorick ordered weight bearing x-rays, and arranged for plaintiff to return for follow-up in one to two months. (*Id.*).

[6]    Plaintiff testified at his deposition that he had experienced bunion pain "since [he] was a kid growing up." (Dkt. No. 31-5 at 17). He also stated that the pain in his right foot had developed in 2013, prior to arriving at CNYPC. (*Id.* at 88-89).

Plaintiff presented to defendant Rorick for his follow-up appointment on October 5, 2015. (Dkt. Nos. 31-10 at 3; 32-38 at 2-3). Plaintiff reported "terrible" right foot pain, with some pain over his bunion but the most pain at the tip of his second toe. (*Id.*). Upon physical examination and review of x-rays, defendant Rorick advised plaintiff of the various treatment options available, including shoe modification, padding, NSAIDs, and surgery. (*Id.*). Plaintiff expressed his desire to have surgical correction of his right foot. (*Id.*). Accordingly, defendant Rorick scheduled surgery [7] and advised, among

other things, that plaintiff obtain an EKG test within seven days of surgery. (*Id.* at 4).

[7]    Defendant Rorick scheduled multiple procedures to be performed on plaintiff's right foot, including: (1) McBride Bunionectomy Right; (2) Closing Base Wedge Osteotomy 1st Metatarsal Right; (3) Osteotomy Great Toe Right; and (4) Hammertoe Repair 2nd Digit Right. (Dkt. No. 31-10 at 4).

**\*7** On September 21, 2015, defendant Wilbur met with plaintiff to discuss the scheduled surgery, and explained to plaintiff that he needed an EKG test before receiving general anesthesia. (Dkt. No. 32-13 at 3). According to the progress report from that date, plaintiff became "very irrate" and responded that he "ain't going for that or the surgery then." (*Id.*). The surgery was canceled. (*Id.*).

According to plaintiff's medical records, he eventually had the EKG on December 8, 2015. (Dkt. No. 32-13 at 4). Plaintiff thereafter requested that his surgery be rescheduled. (Dkt. No. 32-39 at 1). On March 7, 2016, defendant Rorick saw plaintiff once more to consider rescheduling him for "surgical reconstruction of his right foot." (*Id.* at 2). During the examination, defendant Rorick found plaintiff to be "very confrontational ... threatening lawsuits, and it [had] become readily apparent [plaintiff was] NOT a good surgical candidate." (*Id.*). Defendant Rorick further expressed his belief that plaintiff would be non-compliant with post-operative instructions, including the necessity to remain non-weight bearing or else risk further deterioration. (*Id.;* Dkt. No. 31-10 at 5). Defendant Rorick discussed his opinion with defendant Wilbur, who agreed with the doctor's decision to cancel the surgery. [8] (*Id.*).

[8]    In support of his motion for summary judgment, defendant Rorick submits a sworn affidavit in which he maintains that the proposed reconstructive procedures to plaintiff's right foot were elective, that plaintiff was not in any immediate danger which would require surgery, and that the other, non-surgical options originally proposed to plaintiff remained available after the surgery was canceled. (Dkt. No. 31-10 at 6).

Almost a year later, on February 10, 2017, plaintiff met with defendant Wilbur to discuss his "recent"[9] concerns regarding his foot. (Dkt. Nos. 32-13 at 5; 32-18). Defendant Wilbur explained that defendant Rorick ultimately did not recommend surgery due to potential compliance issues. (*Id.*). According to the progress note, plaintiff responded that "he

wouldn't have [defendant Rorick] perform surgery on him 'if he begged me.' " (Dkt. No. 32-13 at 5). Defendant Wilbur then told plaintiff that she had requested a orthopedic consultation for plaintiff's complaints of left knee pain, and suggested plaintiff discuss foot surgery with the new doctor. (Id.).

9    Plaintiff disputes that he was belligerent toward Dr. Rorick, and maintains that he was never informed defendant Rorick 'canceled' the surgery. (Dkt. No. 31-5 at 34-38, 87-88). Plaintiff's assertion is belied by the fact he did not inquire about the proposed surgery, or complain of foot pain, for the eight months following his last appointment with defendant Rorick. When plaintiff did complain of foot pain in November 2016, the record reflects that he merely requested an increase in his pain medicine. (Dkt. No. 32-13 at 5). Plaintiff requested another increase in his pain medication on January 9, 2017, without inquiring about surgery. (Dkt. No. 32-2 at 2).

On March 21, 2017, plaintiff saw defendant Bhatt, an orthopedic surgeon, to address complaints of knee and foot pain. (Dkt. Nos. 31-11 at 1-3; 32-40 at 2). After examining plaintiff, Defendant Bhatt prescribed pain medication and physical therapy, administered a steroid injection into plaintiff's left knee, and recommended bunion surgery on plaintiff's right foot. (Dkt. Nos. 31-11 at 2-3; 32-40 at 2). Plaintiff was taken to Rome Memorial Hospital for bunion surgery with defendant Bhatt on April 13, 2017. However, plaintiff's surgery was postponed due to issues with other surgical patients. (Dkt. Nos. 31-11 at 3; 32-13 at 6). Plaintiff was subsequently returned to Rome Memorial Hospital on April 20, 2017 for his bunionectomy. According to various medical records, while he was being prepared for surgery, plaintiff told defendant Bhatt that the bunion was not "the problem" and did not bother him. (Dkt. Nos. 32-42; 32-43). Plaintiff told the doctor that it was another toe that was causing the pain in his foot, and that plaintiff wanted "all foot problems fixed at one time." (Id.). Because the surgery scheduled for that day was limited to a bunionectomy, defendant Bhatt canceled the procedure and indicated that he would speak to the medical staff at CNYPC to refer plaintiff to a different orthopedic surgeon, who could address the other surgical issues plaintiff wanted to pursue. (Id.).

*8    The next day, defendant Wilbur consulted with the medical team at CNYPC to determine if they should refer plaintiff a third time for the "elective procedure" to his right foot. (Dkt No. 32-21). Defendant Wilbur noted that plaintiff "insists on telling the surgeons how he wants his foot corrected," and that plaintiff had already, unsuccessfully

gone through two surgeons. (Id.). The medical staff decided to refer plaintiff for "this elective procedure" one last time. (Dkt. No. 32-13 at 7). Plaintiff was referred to orthopedic surgeon Scott M. VanValkenburg, M.D., who performed surgery to plaintiff's right foot on October 5, 2017. (Dkt. No. 32-24).

Turning to the first prong of the deliberate indifference standard, no material issue of fact exists as to whether plaintiff was "was actually deprived of adequate medical care." Young, 2018 WL 312714, at *9 (N.D.N.Y. Feb. 12, 2018). Therefore, the Court recommends granting defendants' motion for summary judgment on this basis alone. See, e.g., Dobbins v. Pont, No. 15-CV-3091, 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2107) (granting summary judgment to prison official where undisputed facts showed the pretrial detainee received medical treatment); Gray v. Kang Lee, No. 9:13-CV-258 (GLS/DEP), 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (finding inmate was not actually deprived of adequate treatment where record demonstrated that the inmate-plaintiff was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist).

Furthermore, defendants assert that plaintiff's foot condition did not constitute a sufficiently serious medical condition to meet the objective standard. (Dkt. No. 31-2 at 15). The court agrees, and in general "the case law holds that prisoner complaints about bunions or other foot problems do not establish the objective prong of the deliberate indifference standard." Houston v. Sheahan, No. 13-CV-6594, 2017 WL 3425271, at *4 (W.D.N.Y. Aug. 9, 2017) (citing Brown v. DeFrank, No. 06 CIV 2235, 2006 WL 3313821, at *21 (S.D.N.Y. Nov. 15, 2006) (holding that prisoner's claims that defendants unreasonably delayed referral for needed podiatry services; intentionally cancelled and unreasonably delayed his bunion surgery; and intentionally denied him a referral for prescription footwear did not state a deliberate indifference claim)); Hernandez v. Goord, No. 02 Civ. 1704 (DAB), 2006 WL 2109432 at *1, 5-6 (S.D.N.Y. July 28, 2006) (plaintiff's painful injured left foot diagnosed as hammertoe with an overlap not severe enough for deliberate indifference claim); McKinnis v. Williams, No. 00 Civ. 8357, 2001 WL 873078 at *3-4 (S.D.N.Y. Aug. 1, 2001) (painful toe injury did not "rise to the level of 'serious medical need' "); Cole v. Scully, No. 93 Civ.2066 (LAP), 1995 WL 231250 at *1, 5-6 (S.D.N.Y. Apr. 18, 1995) (bunions and tender feet after bunion surgery not a sufficiently serious medical condition).

With respect to any alleged delay in care, plaintiff was clearly not in urgent need of foot surgery, evidenced by the fact his procedures were repeatedly cancelled as a direct result of his own conduct. Defendants Rorick and Wilbur were prepared to move forward with plaintiff's procedure in October 2015, however plaintiff's undisputed noncompliance with the pre-surgical testing requirements prevented that surgery from taking place. Defendant Rorick was still willing to treat plaintiff once the EKG test was performed until he determined, based on plaintiff's belligerent behavior, that plaintiff was not a good surgical candidate. Dr. Bhatt was also prepared to perform a bunionectomy on plaintiff's right foot in April 2017 to alleviate some of plaintiff's alleged pain, however plaintiff declined the surgery because he desired that "all foot problems [be] fixed at one time." (Dkt. No. 32-42). "Under these circumstances, plaintiff cannot now be heard to complain of deliberate medical indifference." Johnson v. Adams, No. 9:14-CV-0811 (GLS/DEP), 2016 WL 6604129, at *6 (N.D.N.Y. July 25, 2016) (citing inter alia Scarbrough v. Thompson, No. 10-CV-0901 (TJM/CFH), 2012 WL 7761439, at *12 (N.D.N.Y. Dec. 12, 2012) (holding, where inmate plaintiff refused medical care from a nurse because he preferred to receive care from a different nurse, that "any alleged delay or interference in treatment was due to [inmate's] own actions" and could not subsequently "be transformed into an Eighth Amendment claim"); Brown v. Selwin, 250 F. Supp. 2d 299, 307-08 (S.D.N.Y. 1999) (no deliberate indifference when it was uncontroverted that plaintiff refused medical treatment on several occasions); Ross v. Kelly, 784 F. Supp. 35, 46-47 (W.D.N.Y. 1992) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), aff'd, 970 F.2d 896 (2d Cir. 1992); Evering v. Rielly, No. 98-CV-6718, 2001 WL 1150318, at *10 (S.D.N.Y. Sept. 28, 2001) ("[A]n inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to serious medical needs.")).

*9 Moreover, no reasonable jury could find that defendant Wilbur, Rorick or Bhatt were deliberately indifferent to plaintiff's medical needs in order to satisfy the mental element prong. Plaintiff was examined and treated for his foot problems on numerous occasions by these defendants. Despite plaintiff's conduct, defendants continued to treat plaintiff's condition with non-surgical interventions, including ordering plaintiff new orthotic shoes, prescribing physical therapy, [10] and administering pain medication and injections. In addition, notwithstanding plaintiff's behavior defendant Wilbur referred plaintiff to three different surgeons for what has been consistently identified as elective surgery. There is nothing to suggest that defendants here were reckless, that they deliberately prevented plaintiff from receiving care, or that their conduct was "objectively unreasonable." See Singletary v. Russo, No. 13-CV-04727, 2019 WL 1929819, at *12 (E.D.N.Y. Feb. 22, 2019) (granting summary judgment where there was no indication that defendant deliberately prevented plaintiff from receiving care, or that defendant was reckless, as opposed to merely negligent, in providing care). To the extent that plaintiff alleges any miscommunication with, or delay by, the defendants, such allegations could at most constitute negligence, [11] and summary judgment is therefore appropriate.

10    Plaintiff refused to attend physical therapy treatment. (Dkt. No. 32-19 at 2).

11    Plaintiff's deposition testimony particularly corroborates my conclusion that any alleged misconduct by defendant Wilbur constituted, at most, negligence. (Dkt. No. 31-5 at 72 ("[Defendant Wilbur is] overworked ... [s]he's overburdened with a lot of work. And she try [sic] to care, but she missed the mark when it came down to helping me)).

### 3. Headaches

Although not particularized in his complaint, plaintiff testified at his deposition that he was asserting a deliberate indifference claim relative to "a migraine headache that was being unaddressed." (Dkt. No. 31-5 at 94-100). Specifically, plaintiff claimed that "[defendant] Wilbur knew [plaintiff] was having migraine headaches and wouldn't give [him] anything to relieve [his] pain." (Id. at 99, 97 S.Ct. 285). Defendants argue plaintiff's claim is not supported by the evidence of record. (Dkt. No. 31-2 at 18).

On September 1, 2017, defendant Wilbur saw plaintiff for complaints of right temporal pain that had become progressively worse over the past three months, along with double vision. (Dkt. No. 32-27 at 2). At that time defendant Wilbur noted plaintiff had "extremely elevated blood pressure," which she opined was the source of plaintiff's headaches. (Dkt. Nos. 31-9 at 9; 32-27 at 2). Defendant Wilbur administered a diuretic and blood pressure medicine to plaintiff. Two hours later plaintiff's blood pressure had decreased, and plaintiff expressed that

his headache had improved. (*Id.*; Dkt. No. 32-13 at 8). Plaintiff denied complaints of headache at his medical visits throughout the remainder of September 2017. (*Id.* at 8-9).

On October 5, 2017, when plaintiff returned from his outpatient foot surgery, he complained to defendant Wilbur of right temporal pain. (Dkt. No. 32-13 at 9-10). Defendant Wilbur told plaintiff that the headaches could be due to high blood pressure or migraines. (Dkt. No. 32-13 at 9). At that time, she administered pain medication and ordered a CT scan of plaintiff's head to rule out any other anomaly. (*Id.*). Plaintiff was scheduled for a CT scan on October 19, 2017, however he refused to attend the appointment.[12] (*Id.* at 10, Dkt. Nos. 32-30; 32-31 at 2; 32-32).

[12]    According to the progress note prepared that day, plaintiff was informed that, for security purposes, he could not wear his hat to the off-site CT scan. (Dkt. No. 32-32). Plaintiff responded by shouting expletives and refusing to attend his CT scan if he was "forced" to take off his hat. (*Id.*).

Plaintiff complained of a headache to the medical staff five times in October 2017, and he was given Tylenol each time he requested it. (Dkt. No. 32-33). A CT scan of plaintiff's head was eventually performed on November 16, 2017. (Dkt. Nos. 32-13 at 12-13; 32-24). The test results were normal. (*Id.*). On December 2, 2017, plaintiff complained of head pain to his right temporal area, which he believed was triggered by the smell of "oils" used by another patient. (Dkt. Nos. 31-9 at 9-10; 32-35). Plaintiff was diagnosed with a migraine headache, and the treating provider administered Imitrex and ordered a neurology and ophthalmology consult. (Dkt. Nos. 31-9 at 10; 32-35 at 2).

**\*10** Although "chronic migraine headaches" have been found to be 'sufficiently serious' to warrant constitutional protection (*Moriarty v. Neubould*, No. 02-CV-1662, 2004 WL 288807, at \*2 n. 2 (D. Conn. Feb. 10, 2004) (migraine headaches constitute a sufficiently serious condition when they are "extremely painful and debilitating")), it is also well established that "terrible and extreme headaches ... do not satisfy the objective component" of a deliberate indifference claim. *Sledge v. Bernstein*, No. 11 Civ. 7450, 2012 WL 4761582, at \*5 (S.D.N.Y. Aug. 2, 2012) (citing *Bradley v. Rell*, 703 F. Supp. 2d 109, 122 (S.D.N.Y. 2010) (holding that "extreme headaches" do not constitute a sufficiently serious medical condition); *Qader v. New York*, 396 F. Supp. 2d 466, 470 (S.D.N.Y. 2005) (finding that "terrible headaches" do not satisfy the objective component)).

Here, the medical records suggest that plaintiff's occasional headaches were not severe enough to impair his daily activities. Plaintiff denied any complaints of head pain throughout the month of September 2017, after his initial headache was attributed to his high blood pressure and resolved by the medical staff. Although plaintiff did complain of head pain at various times throughout October 2017, his willingness to interfere with his own treatment over a baseball hat calls into question the alleged "severity" of his pain. Although plaintiff testified that his headaches brought him to tears on several occasions (Dkt. No. 31-5 at 97), plaintiff's headaches did not prevent him from asking to return to work, post-surgery, in November 2017. (Dkt. No. 32-13 at 13).

In any event, the evidence of record does not support a finding that the mental element prong can be met with respect to plaintiff's headaches. Even assuming plaintiff was suffering from sufficiently severe, chronic migraines, there is no evidence that defendant Wilbur was deliberately indifferent to plaintiff's medical needs. Defendant Wilbur consistently responded to plaintiff's complaint's of head pain by administering medication and ordering further diagnostic testing. To the extent that plaintiff contends the pain medication provided was not strong enough, or the right medication to alleviate his pain, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not plaintiff's constitutional rights. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107, 97 S.Ct. 285). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983. Accordingly, defendants would also be entitled to summary judgment on plaintiff's deliberate indifference claim relative to his headaches.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 31) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.

2019 WL 2374116

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2019 WL 2374116

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 96 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

2018 WL 3121714
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John YOUNG, Plaintiff,
v.
Dr. FRICKE [1] and Anthony Lucca, Defendants.

[1]   The Clerk is directed to amend the docket in this action from "Dr. Fricki" to "Dr. Fricke" to reflect the correct spelling of Defendant's surname. (*See* Dkt. No. 45.)

9:15-cv-1222 (MAD/TWD)
|
Signed 02/12/2018

**Attorneys and Law Firms**

JOHN YOUNG, 16-A-0363, Hudson Correctional Facility, Box 576, Hudson, New York 12534, pro se.

THUILLEZ, FORD, GOLD, BUTLER & MONROE, LLP, OF COUNSEL: MOLLY C. CASEY, ESQ., 20 Corporate Woods Blvd., 3rd Floor, Albany, New York 12211, Attorneys for Defendant Dr. Russell Fricke.

SHANTIZ & BELKIN, OF COUNSEL: M. RANDOLPH BELKIN, ESQ., 26 Century Hill Drive, Suite 202, Latham, New York 12110, Attorneys for Defendant Anthony Lucca.

### ORDER AND REPORT-RECOMMENDATION

Thérèse Wiley Dancks, United States Magistrate Judge

**\*1** This matter has been referred to the Court for a Report and Recommendation by the Hon. Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c). *Pro se* Plaintiff John Young, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. (Dkt. No. 1.) The allegations in Plaintiff's amended complaint, which is the operative pleading, relate to Plaintiff's previous confinement as a pretrial detainee at the Schenectady County Jail ("SCJ"). (Dkt. No. 8. [2] ) Plaintiff claims Defendants were aware of Plaintiff's prescribed dietary

needs but were "intentionally" and deliberately indifferent to these needs. *Id.* As a result, Plaintiff's medical conditions worsened. *Id.* Plaintiff's medical indifference claims against Dr. Fricke and Anthony Lucca, alleged to be the head kitchen chef, ("chef Lucca") survived initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 12.)

[2]   The amended complaint does not specify whether Plaintiff was a pretrial detainee or a convicted inmate during his confinement at the SCJ. (*See* Dkt. No. 8.) The record establishes Plaintiff was a pretrial detainee during his confinement at the SJC. (Dkt. No. 51-2 at ¶ 1.) *See also* http://nysdoccslookup.doccs.ny.gov (DIN 16-A-0363) (last visited Feb. 5, 2018).

Currently pending before the Court is Dr. Fricke's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 45. [3] ) Plaintiff opposes the motion. (Dkt. No. 51.) For reasons explained below, the Court recommends that Dr. Fricke's motion for summary judgment be granted. The Court further recommends that Plaintiff's deliberate indifference claim against chef Lucca be *sua sponte* dismissed pursuant to §§ 1915(e) and 1915A.

[3]   Upon review of the docket, it appears the "Supporting Affidavit of Russell Fricke, M.D.," was inadvertently omitted from the electronic filing submitted to the Court via the Clerk's CM/ECF system. (*See* Dkt. Nos. 45, 46.) Plaintiff has, however, attached a copy of Dr. Fricke's affidavit to his opposition (*see* Dkt. No. 51-3), which the Court will reference throughout this Report and Recommendation.

### I. BACKGROUND

#### A. Material Facts

During all times relevant to this action, Plaintiff was being held as pretrial detainee at the SCJ. (Dkt. No. 51-2 at ¶ 1; Dkt. No. 45-8 at 8-9, 24.) Prior to his incarceration at the SCJ, Plaintiff was diagnosed with, among other conditions, diabetes mellitus (Type II), ulcers, hepatitis C, and cirrhosis of the liver. (No. 8 at 4; Dkt. No. 45-8 at 19.) From the mid-1990s until 2014, Plaintiff was taking Metformin, a medication that is effective in controlling blood sugar levels in diabetic patients. (Dkt. No. 45-8 at 16; Dkt. No. 51-3 at ¶ 16.) Thereafter, Plaintiff controlled his diabetes with diet and exercise. *Id.*

Plaintiff treated with Ellis Primary Care and Family Medicine from February 13, 2013, through March 9, 2015. (*See*

Young v. Fricke; Not Reported in Fed. Supp. (2018)
Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 97 of 112

2018 WL 3121714

*generally* Dkt. No. 45-11.) As of March 9, 2015, Plaintiff had a history of, among other conditions, abdominal pain, aortic stenosis, ascites, asthma, chest pain, cirrhosis, hepatitis C, diabetes mellitus (type II), esophageal varices, gastric ulcer, gastritis, h.pylori, hypertension, latent tuberculosis, losing weight, peripheral neuropathy, sciatica, and valvular heart disease. *Id.* at 13-14. Plaintiff has a surgical history of hemorrhoidectomy. *Id.* at 13. Plaintiff was prescribed Lotrab for pain, Nadolol for hypertension, and hydrocortisone for hemorrhoids. *Id.* at 14. Plaintiff controlled his diabetes with diet and exercise. *Id.*

**\*2** According to documents attached to Dr. Fricke's motion for summary judgment, and not specifically opposed by Plaintiff, Plaintiff's medical conditions were being monitored on a regular basis by medical staff during his confinement at the SCJ. (*See generally* Dkt. No. 45-8; *see also* Dkt. No. 51-3 at ¶ 15; Dkt. No. 51-1 at ¶ 15.) On March 11, 2015, Plaintiff was booked into the SCJ. (Dkt. No. 51-2 at ¶ 1.) During his medical intake, Plaintiff reported controlling his diabetes with diet and exercise. (Dkt. No. 8 at 4; Dkt. No. 45-9 at 49; Dkt. No. 51-3 at ¶ 9.) Plaintiff was placed on the diabetic diet and enrolled in the "Chronic Disease Clinic" program. (Dkt. No. 8-1 at 1; Dkt. No. 45-9 at 17, 135-141.) Plaintiff's blood glucose levels in relation to his diabetes were ordered to be monitored on a daily basis with "finger sticks." (Dkt. No. 51-3 at ¶ 13.)

Dr. Fricke serves as the jail physician. *Id.* at ¶ 1. As the jail physician, among other things, Dr. Fricke places inmates on medically indicated diets, when such diets are appropriate given the inmate's history and presentation. (Dkt. No. 51-3 at ¶¶ 1, 5.) Dr. Fricke's involvement with respect to inmate diets is limited to determining whether an inmate requires a medical diet, and submitting the paperwork to the jail so that the appropriate meals will be provided by the kitchen. *Id.* at ¶¶ 5, 6. Dr. Fricke has no involvement with the formulation of the jail menus. *Id.* at ¶¶ 7, 8. The recipes at the SCJ are established by DOCCS and approved by a registered dietician. (Dkt. No. 45-12 at 2; Dkt. No. 51-3 at ¶ 7.)

On March 17, 2015, Plaintiff was examined by Dr. Fricke. (Dkt. No. 45-9 at 49; Dkt. No. 51-3 at ¶ 1.) Dr. Fricke filled out a "Medical Approved Items/Diet" form indicating Plaintiff was to continue receiving the diabetic diet for the duration of his stay at the SCJ, a copy of which was placed in Plaintiff's medical record. (Dkt. No. 51-3 at ¶ 5.)

On March 26, 2015, it was noted that Plaintiff was "critical of the diabetic diet." (Dkt. No. 45-9 at 50.) Plaintiff was informed that despite what the corrections officers may have told him, Dr. Fricke was not involved in the formulation or approval of the medical diets at the jail. *Id.*

On April 23, 2015, Plaintiff reported abdominal pain and upset stomach which Plaintiff believed was related to the "spicy sauces used to flavor the bean-based meals." *Id.* at 47. Plaintiff requested a "bland diet, with more variety." *Id.* In Dr. Fricke's clinical judgment, Plaintiff's complaints of "stomach upset were not meal linked." (Dkt. No. 51-3 at ¶ 10.) Dr. Fricke placed Plaintiff on the bland diet based on Plaintiff's own request and because it was not contraindicated. (Dkt. No. 51-3 at ¶ 10; Dkt. No. 45-9 at 10.) Plaintiff remained on the diabetic diet and the bland diet while incarcerated at the SCJ. (Dkt. No. 45-9 at 10.)

Plaintiff refused his finger sticks on April 15, April 27, May 2, and May 4, 2015. (Dkt. No. 45-9 at 45, 96-97.) The medical staff cannot force an inmate to have his finger stick done as ordered. (Dkt. No. 51-3 at ¶ 14.)

On May 7, 2015, it was noted that Plaintiff's blood glucose levels were elevated. (Dkt. No. 45-9 at 47.[4]) Dr. Fricke was made aware and suggested discussing Metformin with Plaintiff. (Dkt. No. 51-3 at ¶ 16.[5]) On May 9, 2015, it was also noted that Plaintiff's blood glucose levels were elevated. (Dkt. No. 45-9 at 47.) Plaintiff was not symptomatic and was scheduled to see Dr. Fricke on May 12, 2015. *Id.* Plaintiff refused his finger sticks on May 9, May 10, and May 11, 2015. *Id.* at 94-95.[6]

---

[4]   For a diabetic adult, the target blood glucose range is 90-130 mg/dL while fasting, and less than 180 mg/dL after a meal. (Dkt. No. 51-3 at ¶ 15.)

[5]   The May 7, 2015, encounter note states: "Dr. Fricke instructed to discuss [with] i/m the desire to start Metformin. If Pt. not agreeable, then chart to MD and he will see on Tues. 5/12/15. Spoke [with] Pt., he will wait for MD." (Dkt. No. 45-9 at 47.)

[6]   Plaintiff refused finger stick blood glucose testing on thirty (30) other occasions. (Dkt. No. 45-9 at 89-94.)

**\*3** On May 12, 2015, Dr. Fricke prescribed Metformin to control Plaintiff's blood glucose levels. *Id.* at 42. Plaintiff was prescribed Metformin for the remainder of his stay at the SCJ. *Id.* at 5, 25.[7]

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 98 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

7    Plaintiff admits taking Metformin and "did not want to go wrost cause diets was not working. See med. Records." (Dkt. No. 51-1 at ¶ 14 (unaltered text).)

Plaintiff's health conditions and complaints that he had at the time he was transferred out of the SCJ on January 29, 2016, were consistent with the health conditions, symptoms, and complaints that he had when he was booked into the SCJ on March 11, 2015. (Dkt. No. 51-3 at ¶¶ 24, 25; Dkt. No. 51-1 at ¶¶ 24, 25.)

**B. Plaintiff's Grievance**
On May 15, 2015, Plaintiff filed a grievance regarding the bland diet:

> On May 13, 2015, the diet was change, saying that bland diet can eat onions & peppers. This is the second time they change the diet. I have a ulcer and for me eating onions & peppers is very unhealthy for me. How can cook supercede medical. I also had bean & rice for 3 straight days.

(Dkt. No. 45-14 at 9 (unaltered text).) Plaintiff requested the following action:

> To put a menu on each floor. Take onions & peppers out of the bland diet. Stop changing the diet. Have a consistent diet. And stop giving me beans & rice & pasta every day.

*Id.* (unaltered text). In response, the grievance coordinator issued the following decision:

> After speaking with medical staff and kitchen staff only sweet onions and sweet peppers are used in this facility. These food items are constituted as a bland diet and approved by all parties involved. There is a rotating menu for all diets and if the rotating menu is not being utilized please bring this to my attention so that I can address the issue immediately. Your grievance at this point should be satisfied.

*Id.* at 10. [8] Plaintiff appealed his grievance to the New York State Commission of Correction, which was denied September 15, 2015. *Id.* at 29.

8    Plaintiff disputes the truth of the statement. (Dkt. No. 51-1 at ¶¶ 24, 25.) Plaintiff contends there are no statements from inmates to "back up grievance coordinator claim" and there is no paperwork confining that the onions and peppers were constituted as a bland diet and approved. *Id.*

**C. Plaintiff's Deposition Testimony**
Plaintiff described his numerous encounters with Dr. Fricke as "pleasant" and admitted he never had a conversation with chef Lucca. (Dkt. No. 45-8 at 101-02.) Plaintiff testified that it was possible for him to separate out, and remove, the onions and peppers from his meals. *Id.* at 52. Plaintiff testified that, while in DOCCS custody, he has worked in the kitchens, and admitted that "cooks don't necessarily get to decide what the menu is" at the facilities. *Id.* at 43-44, 101. Plaintiff understood that while he was incarcerated at the SCJ, the meals were "quick chill" [9] and approved by DOCCS. *Id.* Plaintiff frequented the commissary weekly and routinely purchased ramen noodles and barbeque potato chips. *Id.* at 103-114; [10] *see also* Dkt. No. 45-14 at 25-27.

9    Plaintiff explained "quick chill" means "everything is boiled in a bag, basically with soy products ... basically it's a big quick chill bag, like a stew. Like say if you have curry chicken. There's vegetables, onions, peppers, everything boiled in the bag, made in another facility, brought here. They put it in boiling water, heat the bag up, open it up and serve—serve you out of the bag." (Dkt. No. 45-8 at 43-44.)

10    As to his commissary purchases, Plaintiff stated for the record: "Everything that you see [on the receipts] that was purchased, that doesn't mean that I ate it all. I will say that I did eat the barbeque chips because I love them." (Dkt. No. 45-8 at 115.)

**D. Dr. Fricke's Opinions**

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 99 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

 **\*4**  Dr. Fricke is a licensed medical doctor and has worked as a physician in correctional facilities since 2009. (Dkt. No. 51-3 at ¶ 3.) Prior to that, Dr. Fricke served as the Commissioner of Public Health for the County of Schenectady. *Id.* He also spent many years as a family practice physician. *Id.* Dr. Fricke "routinely sees patients with a vast array of medical problems" and is "well versed in all aspects of treating patients based on the history, physical examination, lab values, and other diagnostic test results." *Id.* He is "familiar with monitoring and treating patients who have a history that includes conditions such as: diabetes, gastric ulcers, cirrhosis, gastritis, hypertension, latent tuberculosis, and hepatitis C, such as [Plaintiff]." *Id.*

Dr. Fricke submits the following opinions based on his education, knowledge, and experience, along with his treatment of Plaintiff:

11. It is my understanding that [Plaintiff] is claiming in this lawsuit that his stomach ulcer was bleeding, and that this was a result of the food he was given at the [SCJ]. [Plaintiff] had a history of hemorrhoids. Hemorrhoids can cause blood to appear in the stool, which can be visible to the naked eye. When a stomach ulcer bleeds, the stool can be black and tarry, but the blood is occult, which means that it cannot be seen by the naked eye. A diagnosis of a bleeding ulcer is based on blood tests and/or rectal examination. [Plaintiff] would not have been able to determine, based on the appearance of his stool, that his ulcer was bleeding.

12. There was no evidence that [Plaintiff's] ulcer was bleeding at any time while he was incarcerated in the [SCJ], or thereafter. There is also no clinical support for the notion that the food [Plaintiff] received at the [SCJ] would have caused his stomach ulcer to bleed.

16. On May 7, 2015, I was made aware that [Plaintiff's] glucose levels had risen and I recommended that he be put back on Metformin, a medication that is effective in controlling blood sugar levels. [Plaintiff] had been on Metformin in the past. Metformin is the optimal first-line drug in managing blood glucose levels in diabetic patients. There is no evidence in the medical literature that Metformin is detrimental to liver function, as [Plaintiff] has claimed. In fact, Metformin can be quite beneficial for patients with hepatitis C and cirrhosis. Metformin was an appropriate medication for [Plaintiff], taking into account all of his various health conditions. It was not contraindicated in any way, and did not impact his health negatively in any way.

17. It is my opinion that the food [Plaintiff] received at the jail while he was on the diabetic diet, did not cause or contribute to a rise in his glucose levels. In any event, I have no control over the diet-specific menus at the jail. I also have no control over the inmate's commissary purchases. To the extent that [Plaintiff] was purchasing food from the commissary that did not comport with the diabetic diet, I had no control over this.

18. I am aware that one of the injuries claimed by [Plaintiff] in connection with this lawsuit, is that his liver enzymes went up. There is no support for the notion that [Plaintiff's] diet contributed to a rise in liver enzymes. [Plaintiff] had hepatitis C and cirrhosis of the liver. To the extent that [Plaintiff's] liver enzymes rose at all during his incarceration, it would be attributable to his condition of hepatitis C, which I understand he had for decades. [Plaintiff's] liver function was not impeded at all by any diet or medication that he was given at the jail.

21. There is no evidence in the medical records that the condition of [Plaintiff's] pancreas was negatively impacted during incarceration. There is no medical support for the claim that taking Ultram or Tramadol would negatively impact [Plaintiff's] pancreas.

 **\*5**  23. I am aware that [Plaintiff] has claimed that I knew of his medical need and gave him drugs to mask the pain, rather than doing something about his diet. This is not true. I placed [Plaintiff] on the proper diets, given his conditions. I also constantly monitored [Plaintiff] during his admission, and adjusted his medications appropriately based on his symptoms and the tests that were constantly being done to monitor his condition.

24. It is my opinion within a reasonable degree of medical certainty that my care and treatment of [Plaintiff] was at all times within the standard of care. At no time did I act indifferent to any medical need. It is also my opinion within a reasonable degree of medical certainty that no medical treatment that [Plaintiff] received while incarcerated at the [SCJ] worsened any of his condition, or had any negative impact on his health whatsoever.

25. Finally, it is my opinion within a reasonable degree of medical certainty that [Plaintiff] did not suffer any negative impact to his health due as a result of the food that he received while he was incarcerated. While I personally do not have any control over the food that the inmates received, beyond placing them on medical diets, I do not

Young v. Fricke, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 100 of 112

2018 WL 3121714

see any evidence in the medical records that [Plaintiff] suffered any ill effects that could be attributed to the diets at the jail.

(Dkt. No. 51-3 at ¶¶ 11, 12, 16, 17, 18, 21, 23, 24, 25.)

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [11] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

[11]    The Court finds Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 8 at 5.)

**\*6** In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 & n.10 (N.D.N.Y. Apr. 24, 2006). [12] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

[12]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## III. DISCUSSION

### A. Fourteenth Amendment Due Process Clause

As a pretrial detainee, Plaintiff's deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("Pretrial detainees have not been convicted of a crime and thus 'may not be

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

punished in any manner—neither cruelly and unusually nor otherwise.' ") (quoting, *inter alia*, *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) ). Until recently, "this has been a distinction without an analytical difference" because in *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009), the Second Circuit instructed that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.' " *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 582-83 (N.D.N.Y. 2017) (Hurd, J.) (quoting *Caiozzo*, 581 F.3d at 72); *see also* Dkt. No. 7 at 4-5 & n.4.

Indeed, at the time of the November 16, 2015, Decision and Order, neither the Supreme Court nor the Second Circuit had yet addressed the possible implications of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015) (holding that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment "must show only that the force purposely or knowingly used against him was objectively unreasonable"), for deliberate indifference claims brought by pretrial detainees. (Dkt. No. 7 at 5 n.4.) Thus, the district courts in this Circuit which had addressed the issue concluded the Eighth Amendment standards applied. *Id.* (collecting cases).

**\*7** In 2017, the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell*, 849 F.3d at 35. The *Darnell* Court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

Although *Darnell* involved a challenge to conditions of confinement, district courts in this Circuit have applied the *Kingsley* standard to all deliberate indifference claims by pretrial detainees. *See, e.g., Lloyd v. City of New York*, No. 1:14-CV-9968, 2017 WL 1207838, at \*8-9 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); *Feliciano v. C.O. Anderson*, No. 15-CV-4106 (LTS)(JLC), 2017 WL 1189747,

at \*13 (S.D.N.Y. Mar. 30, 2017) ("Applying *Darnell* to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result."); *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at \*19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs") (collecting cases) ). This Court will do the same. [13]

[13]    For the reasons explained herein, inasmuch as Plaintiff cannot meet the lower threshold of "objective deliberate indifference" under the Fourteenth Amendment, Plaintiff would be unable to demonstrate "subjective deliberate indifference" under the Eighth Amendment.

**B. Deliberate Indifference**

To establish a claim for deliberate indifference under the Due Process Clause, a plaintiff must satisfy a two-prong test. *Darnell*, 849 F.3d at 29. First, the deprivation must have been "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks omitted). Second, the defendant must have acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases" is "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective. *Darnell*, 849 F.3d at 35. [14] Thus, while the second prong now varies from Eighth Amendment cases, the first prong remains the same. *See White v. City of New York*, No. 16 Civ. 6183, 2017 WL 3575700, at \*3 (S.D.N.Y. Aug. 17, 2017) ("The objective prong is the same regardless of whether the plaintiff is a pretrial detainee or a prisoner."); *Cuffee v. City of New York.*, No. 15 Civ. 8916, 2017 WL 1134768, at \*5 (S.D.N.Y. Mar. 27, 2017) (same); *Padilla v. Corr. Care Solutions*, No. 9:17-CV-1150 (MAD/TWD), 2018 WL 550610, at \*3 (N.D.N.Y. Jan. 22, 2018) (same).

[14]    In *Darnell*, the Second Circuit clarified that the second element of a deliberate indifference claim though often characterized as "subjective" is better understood as an element simply analyzing "*mens rea*" because it is "defined objectively." *Darnell*, 849 F.3d at 29, 35.

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 102 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

When an inmate plaintiff claims that the failure to provide him with a special diet amounts to deliberate indifference to a serious medical need, "the claims must be reviewed under the more particularized standards applicable to such medical indifference claims." *Mejia v. Goord*, No. 9:03-cv-124 (LEK/DEP), 2005 WL 2179422, at *6 (N.D.N.Y. Aug. 156, 2005). However, "[n]ot every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279. A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

 **\*8** To determine whether an alleged deprivation of medical care is "sufficiently serious," a court is required to first determine whether the medical care was inadequate and, if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 279-80 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993) ).

As to the first inquiry, "the prison official's duty is only to provide reasonable medical care." *Id.* (citing *Farmer*, 511 U.S. at 845). "Thus, 'prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable' ... and, conversely, failing 'to take reasonable measures' in response to a medical condition can lead to liability." *Id.* (internal quotation marks and citations omitted; brackets in original).

The second inquiry varies according to the plaintiff's allegations. *See Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. [15] If, however, the plaintiff alleges that the medical treatment received was inadequate, the inquiry is narrower and the court should focus on the specific inadequacy of the treatment, not the underlying medical condition alone. *Id.*

[15]  Indeed, "there is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." *Smith*, 316 F.3d at 185-86.

Accordingly, the objective prong is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin*, 467 F.3d at 279-80).

For a plaintiff to satisfy the second prong—concerning *mens rea*—the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 8949 F.3d at 35. "Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." *Smith v. Outlaw*, No. 15-cv-9961 (RA), 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (internal citation omitted); *see also Kingsley*, 135 S. Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.") (emphasis is original).

### C. Analysis

Plaintiff alleges Dr. Fricke and chef Lucca were deliberately indifferent to his serious medical needs. (Dkt. No. 8 at 4.) Specifically, Plaintiff claims that chef Lucca, kept giving Plaintiff "peppers and onions and other foods not listed on [his bland] diet." *Id.* Even after filing a grievance, chef Lucca "continued to intentionally give [Plaintiff] foods that made [him] sick, like peppers [and] onions in [his] bland diet, which made [Plaintiff's] ulcers bleed" and caused his "sugar" to go "hi" (sic). *Id.* Plaintiff had to re-start taking Metformin, which "is very bad for [his] liver." *Id.* As a result, Plaintiff alleges his medical conditions worsened. *Id.* [16]

[16]  Dr. Fricke's memorandum of law does not address *Darnell*, and therefore, addresses the second prong under the Eighth Amendment's subjective analysis. (Dkt. No. 45-18 at 6-8.)

 **\*9** Even viewing the facts and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that no reasonable factfinder could find that Dr. Fricke was deliberately indifferent to Plaintiff's serious medical needs.

As to the first inquiry of the objective component, no reasonable juror could find Plaintiff "was actually deprived of adequate medical care." Plaintiff's various medical

Young v. Fricke, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 103 of 112

2018 WL 3121714

conditions were closely and frequently monitored by Dr. Fricke and medical staff. (*See generally* Dkt. No. 45-9.) At all times, Plaintiff was prescribed and received a diabetic diet. *Id.* at 10, 17; Dkt. No. 51-3 at ¶ 5. Plaintiff was enrolled in the Chronic Care Clinic. (Dkt. No. 8-1 at 1; Dkt. No. 45-9 at 17, 135-141.) Plaintiff submitted more than twenty-six (26) sick-call slips during his incarceration and in response to each of these, was seen be either Dr. Fricke or another medical provider. (Dkt. No. 45-9 at 31, 32, 35, 36, 37, 39, 40, 46, 51, 55, 57, 58, 61, 62, 63, 64, 65, 67, 68, 69, 71, 72, 73, 75, 76, and 77.)

Plaintiff was prescribed Metformin to control his blood glucose levels. (Dkt. No. 45-9 at 42.) Plaintiff was also prescribed a host of medications to manage and control his various medical conditions and subjective complaints of pain and discomfort, including Tramadol (Ultram), Omeprazole (Prilosec), Ansoul (hemorrhoid cream), Motrin (ibuprofen), Baclofen (muscle relaxant), Colace (stool softener and laxative), Bisacodyl (for constipation), Miralax (laxative), Glipizide (type II diabetes), Norvasc (high blood pressure), Clonidine (high blood pressure), Nadolol (high blood pressure), Neurontin (nerve pain), and Amoxicillin (penicillin antibiotic). (*See* Dkt. No. 45-9 at 3-15, 18.)

Further, Plaintiff was admitted to Ellis Hospital on April 18, 2015, after reporting chest pain (*id.* at 48), had a left shoulder X-ray related to a rotator cuff strain (*id.* at 81), received a hydrocortisone shot in left shoulder to manage pain (*id.* at 64), was prescribed TED knee high stockings (*id.* at 29), and an infected tooth was extracted (*id.* at 118-19).

Based on the foregoing, the Court finds no material issue of fact as to whether Plaintiff was "was actually deprived of adequate medical care." Therefore, the Court recommends granting Dr. Fricke's motion for summary judgment. *See, e.g., Dobbins v. Pont*, No. 15-CV-3091 (JMF), 2017 WL 3309726, *6 (S.D.N.Y. Aug. 2, 2107)* (granting summary to prison official where undisputed facts showed the pretrial detainee received medical treatment); *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at * (N.D.N.Y. Apr. 15, 2015) (finding inmate was not actually deprived of adequate treatment where record demonstrated that the inmate-plaintiff was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist).

Evening assuming, *arguendo*, Plaintiff was actually deprived of adequate medical care, Plaintiff cannot satisfy the second

inquiry of the objective prong, which "asks whether the inadequacy in medical care is sufficiently serious." *Bellotto*, 248 F. App'x at 236.

Here, because the record evidence does not support a finding, and Plaintiff does not allege, that he was denied medical care altogether, the Court's inquiry is narrowed to the question of whether Dr. Fricke's conduct was "inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Stated differently, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." *Smith*, 316 F.3d 186. [17]

[17]     In contrast, if the unreasonable medical care is a failure to provide *any* treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. *Salahuddin*, 467 F.3d at 280.

**\*10** Plaintiff has failed to produce any evidence, admissible or otherwise, that his medical condition worsened or that he was subjected to an unreasonable risk of future harm. According to his testimony, Plaintiff had been living with diabetes since the 1990s, and for approximately twenty years had been taking Metformin to control his blood glucose levels. Dkt. No. 45-8 at 19. Plaintiff was also diagnosed with cirrhosis of the liver in 1990s. *Id.* at 16.

Plaintiff alleges, in wholly conclusory and speculative fashion, that Metformin is "very bad for [his] liver. That [is] why my doctor outside of jail put me on my diet which was working." (Dkt. No. 8 at 4.) Liberally construed, Plaintiff claims his medical conditions worsened. However, "to defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554. Indeed, "there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* Thus, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Plaintiff has failed to do so. *See, e.g., Gantt v. Horn*, No. 09 Civ. 7310, 2013 WL 865844, at *9 (S.D.N.Y. Mar. 8, 2013) (granting summary judgment to prison official where the inmate had not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy in treatment, put him at an "unreasonable risk of future harm"). In contrast, Dr. Fricke has submitted an uncontroverted medical opinion that:

Case 9:17-cv-01150-MAD-TWD Document 48 Filed 01/13/20 Page 104 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

Metformin is the optimal first-line drug in managing blood glucose levels in diabetic patients. There is no evidence in the medical literature that Metformin is detrimental to liver function, as [Plaintiff] has claimed. In fact, Metformin can be quite beneficial for patients with hepatitis C and cirrhosis. Metformin was an appropriate medication for [Plaintiff], taking into account all of his various health conditions.

(Dkt. No. 51-3 at ¶ 16.)

Significantly, Dr. Fricke has also opined to a reasonable degree of medical certainty that Plaintiff's medical treatment in no way "worsened any of his conditions, or had any negative impact on his health whatsoever." *Id.* at ¶ 24. Dr. Fricke further opines within a reasonable degree of medical certainty that the food Plaintiff received at the SCJ did not have "any negative impact to his health." *Id.* at ¶ 25.

As to Plaintiff's assertion that he "was never given a rectal examination to see if [his] ulcer was bleeding (Dkt. No. 51-2 at ¶ 6), such claim amounts to nothing more than a "mere disagreement over the proper treatment." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998). Indeed, "so long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [constitutional] violation." *Id.* Here, Dr. Fricke opines "within a reasonable degree of medical certainty that [his] care and treatment of [Plaintiff] was at all times within the standard of care." (Dkt. No. 51-3 at ¶ 24.) Additionally, the Court notes that despite the numerous sick-call slips Plaintiff submitted, not one complains of "ulcer bleeding." Further, Dr. Fricke opines that no medical treatment Plaintiff received while incarcerated at the SCJ worsened any of his conditions, or had any negative impact on his health whatsoever. *Id.* Significantly, it is undisputed that:

> **\*11** there are no medical records indicating that [Plaintiff] suffered any medical consequences from any food or medications that were given to

him at the [SCJ]. All of the health conditions, and complaints, that he had at the time of he was transferred out of the [SCJ] were consistent with the health conditions, symptoms, and complaints that he had when he was booked into that facility.

(Dkt. No. 51-3 at ¶ 29; Dkt. No. 51-1 at 29.)

While Plaintiff contends the spicy food, i.e., peppers and onions, upset his stomach, the record evidence demonstrates Plaintiff received the bland diet based on his personal preferences and because it was not contraindicated. *Id.* at ¶ 10. Further, all medical diets are controlled by DOCCS and approved by a nutritionist. *Id.* at ¶ 7. [18]

[18] Personal preferences for food does not give rise to a constitutional violation. *See Mejia,* 2005 WL 2179422, at *6 ("While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g., Word v. Croce,* 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001), it does require that prisoners be given nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."). Thus, Plaintiff's complaint regarding peppers and onions does not rise to a constitutional violation. *See Collado v. Sposato,* No. 12-CV-2151 (SJF)(WDW), 2012 WL 3133837, at *4 (E.D.N.Y. July 25, 2012) ("Preference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.").

Significantly, Plaintiff admits that all of the health conditions and complaints that he had at the time he was transferred out of the SCJ were consistent with his health conditions, symptoms, and complaints that he had when he was booked into the facility. (Dkt. No 51-1 at ¶ 29.)

Based on the forgoing, the Court concludes that no reasonable factfinder could find that, objectively, Plaintiff was deprived of adequate medical care. *See, e.g., Morgan v. Shivers,* No. 1:14-cv-7924-GHW, 2018 WL 618451, at *3 (S.D.N.Y. Jan. 29, 2018) (granting summary judgment to prison official where pretrial detainee could not satisfy the objective prong of the deliberate indifference claim); *Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir. 2010) (same).

Young v. Fricke, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 105 of 112

2018 WL 3121714

Similarly, based on Dr. Fricke's affidavit and the treatment afforded Plaintiff by Dr. Fricke as documented in Plaintiff's medical records, the Court finds no reasonable factfinder could conclude that Dr. Fricke acted with deliberate indifference. There is no record evidence that Dr. Fricke intentionally deprived Plaintiff of adequate medical care and the evidence does not support a finding that Dr. Fricke acted recklessly and " 'knew or should have known' that his actions or omissions ... 'posed an excessive risk to [Plaintiff's] health or safety.' " *Lloyd*, 246 F. Supp. 3d at 720 (quoting *Darnell*, 849 F.3d at 35).

The record reflects that on each occasion Plaintiff was seen by Dr. Fricke and the medical staff, Plaintiff's complaints were noted, his conditions were monitored, and medication consistent with Dr. Fricke's professional judgment was prescribed. (Dkt. No. 51-3 at ¶¶ 23-24.)

In opposition to Dr. Fricke's motion, Plaintiff argues, he was served meals that contained chili powder, black pepper, mustard, Spanish onions, and vinegar, which, according to Plaintiff, are "all bad stuff for my gastric ulcers." (Dkt. No. 51-2 at ¶ 5.) Plaintiff continues, "the facts that Dr. Russell Fricke never once look at the ingredients that whenin to the food I was serve on my diets it is his responsible to make sure the food is healthy and safe for someone like me who was on a special diet!" *Id.* at 7 (unaltered text). However, as set forth above, the record evidence demonstrates Dr. Fricke was not responsible for the medical diets, which were under the control of DOCCS and approved by a nutritionist. (Dkt. No. 51-3 at ¶ 7.) Here, at most and which the Court seriously doubts, Plaintiff's claims amount to nothing more than negligence, which cannot form the basis of a deliberate indifference claim. *See, e.g., Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351 (JPO) (SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth Amendment."); *Lloyd*, 246 F. Supp. 3d at 720 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.") (citation omitted).

**\*12** Accordingly, because the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or *mens rea* prongs of Plaintiff's deliberate indifference claim, the Court recommends that Dr. Fricke's motion for summary judgment be granted.

The Court also recommends that the action be *sua sponte* dismissed as against chef Lucca, who is also alleged to have been deliberately indifferent to Plaintiff's medical needs. (Dkt. No. 8 at 4.) 28 U.S.C. § 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, the court shall dismiss the case *at any time* if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *see also Webster v. Penzetta*, 458 F. App'x 23, 25 (2d Cir. 2012) ("A district court has inherent authority to dismiss meritless claims *sua sponte.*"); *Ramrattan v. Fischer*, No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *3 (S.D.N.Y. June 9, 2015) ("[E]ven where [the defendants] have not sought dismissal of a particular claim, the Court has the authority to screen *sua sponte* an *in forma pauperis* complaint and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.") (citing 28 U.S.C. § 1915(e)(2)(B); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner *pro se* complaints).

Plaintiff's allegations supporting his Fourteenth Amendment due process claim for medical indifference against chef Lucca is essentially the same as that asserted against Dr. Fricke. (Dkt. No. 8 at 4.) Indeed, Plaintiff claims that chef Lucca kept giving him "peppers and onions ... which made [Plaintiff's] ulcers bleed" and caused his "sugar" to go "hi" (sic). *Id.* Plaintiff had to re-start taking Metformin, which "is very bad for [his] liver." *Id.* As a result, Plaintiff alleges his conditions worsened. *Id.*

Based on the record now before the Court and for the reasons stated above, inasmuch as Plaintiff cannot satisfy the objective prong of his deliberate indifference claim, the Court further recommends *sua sponte* dismissing the action

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 106 of 112

Young v. Fricke, Not Reported in Fed. Supp. (2018)

2018 WL 3121714

as against chef Lucca pursuant to 28 U.S.C. §§ 1915(e) and 1915A.

**IV. CONCLUSION**
**WHEREFORE**, it is hereby

**ORDERED** that the Clerk is directed to amend the docket in this action from "Dr. Fricki" to "Dr. Fricke" to reflect the correct spelling of Defendant's surname; and it is further

**RECOMMENDED** that Defendant Dr. Fricke's motion for summary judgment (Dkt. No. 45) be **GRANTED**; and it is further

 **\*13 RECOMMENDED** that Plaintiff's medical indifference claim against Defendant Anthony Lucca be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e) and 1915A; and it is further

**ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [19] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[19]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121714

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 107 of 112

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

KeyCite Yellow Flag - Negative Treatment

Distinguished by Singletary v. Russo, E.D.N.Y., February 22, 2019

2017 WL 2274485
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Paul GRIMMETT, Plaintiff,
v.
CORIZON MEDICAL ASSOCIATES OF NEW
YORK; Allan Matthew, DDS; Dr. Sharma,
MD, Site Medical Director of New York
City Department of Correctional Services,
Manhattan Detention Center, Defendants.

15-CV-7351 (JPO) (SN)
|
Signed 05/24/2017

**Attorneys and Law Firms**

Paul Grimmett, Beacon, NY, pro se.

Austa Starr Devlin, David Rosen, Heidell, Pittoni, Murphy
& Bach, LLP, New York, NY, Daniel Gerard May, Heidell,
Pittoni, Murphy & Bach, LLP, White Plains, NY, for
Defendants.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

*1  Plaintiff Paul Grimmett, proceeding *pro se*, brings this
action pursuant to 42 U.S.C. § 1983, alleging that he was
denied dental care while incarcerated at Manhattan Detention
Center ("MDC"). Specifically, he alleges that Allan Matthew,
D.D.S., and Dr. Sharma, M.D., the MDC Site Medical
Director, were deliberately indifferent to Grimmett's serious
dental condition and related ear pain and hearing loss in
violation of the Eighth and Fourteenth Amendments to the
United States Constitution. He further alleges municipal
liability under § 1983 on the part of Corizon Medical
Associates of New York ("Corizon"). Grimmett also raises
state medical malpractice and negligence claims against
all Defendants. Defendants move to dismiss Grimmett's
second amended complaint ("SAC") pursuant to Federal Rule
of Civil Procedure 12(b)(6). For the reasons that follow,
Defendants' motion is granted in part and denied in part.

## I. Background

### A. Procedural History

Grimmett filed this lawsuit in September 2015. (Dkt. No. 2.)
He filed a first amended complaint ("FAC") in April 2016
and named as defendants the City of New York, Corizon,
Dr. Matthew, Dr. Sharma, and Acting MDC Warden Cooper.
(Dkt. No. 38.) On August 12, 2016, the Honorable Analisa
Torres dismissed the FAC, but granted Grimmett leave to file
a second amended complaint against Dr. Matthew and Dr.
Sharma. (Dkt. No. 56.)

On November 18, 2016, Grimmett filed his SAC against
Defendants Corizon, Dr. Matthew, and Dr. Sharma. (Dkt. No.
61.) The SAC asserts claims under § 1983 for deliberate
indifference to Grimmett's serious medical needs in violation
of the Eighth and Fourteenth Amendments, along with state
medical malpractice and negligence claims. Defendants have
moved to dismiss the SAC pursuant to Rule 12(b)(6). (Dkt.
No. 73.) The motion is fully submitted. The case was
reassigned to the undersigned on April 5, 2017.

### B. Plaintiff's Claims [1]

[1]   The following facts are taken from Grimmett's SAC and
      opposition brief and are accepted as true for purposes
      of this motion. *See, e.g., Gill v. Mooney,* 824 F.2d 192,
      195 (2d Cir. 1987) (considering facts alleged in affidavit
      submitted by *pro se* plaintiff in opposition to motion to
      dismiss); *Flores v. N.Y.C. Human Res. Admin.,* No. 10
      Civ. 2407, 2011 WL 3611340, at *1 n.1 (S.D.N.Y. Aug.
      16, 2011) ("Because of [plaintiff's] *pro se* status, ... the
      Court may consider factual allegations [plaintiff] makes
      in her opposition papers, in addition to the allegations
      in the complaint...."). Grimmett has also attached several
      exhibits to the SAC, which were filed under seal because
      they contain Grimmett's medical and other confidential
      personal information. (Dkt. No. 64.) The Court has
      considered these exhibits to the extent that they are
      referenced in or integral to the SAC. *See Sira v. Morton,*
      380 F.3d 57, 67 (2d Cir. 2004).

Grimmett was first incarcerated at MDC in June 2013.
(SAC ¶¶ 2, 9, 11.) On July 2, 2013, Grimmett had a
dental appointment with Dr. Matthew. (*Id.* ¶ 27.) During
this appointment, Grimmett told Dr. Matthew that, before he
was arrested, his personal dentist had recommended "a full
mouth extraction" of all his teeth due to preexisting dental
problems. (*Id.* ¶¶ 8, 28.) Grimmett alleges that, at the time
of this appointment, he had "swollen gums that were already

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 108 of 112

2017 WL 2274485

infected," along with "dental caries and badly decayed teeth," and that Dr. Matthew saw these conditions. (Dkt. No. 83 at 36.) Dr. Matthew examined Grimmett's mouth and told him he "would put [him down] for all of the necessary work that needs to be done." (SAC ¶ 29; *see also* Dkt. No. 83 at 35; SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew intentionally omitted the real facts of Grimmett's condition from Grimmett's medical records so that Dr. Matthew could avoid providing further treatment. (Dkt. No. 83 at 36.) The medical records from the initial visit do not mention infection or the need for extraction, though they do indicate "swollen gums" and some "bone loss." (SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew never scheduled the follow-up treatment he promised. (SAC ¶ 147.)

**\*2** After the initial appointment, Grimmett sent "numerous" dental slips to Dr. Matthew and to the dental department but received no response for approximately three months. (*Id.* ¶ 30.)

On October 5, 2013, Grimmett went to the infirmary because he was in "agonizing pain from an abscess in [his] mouth." (*Id.* ¶¶ 31-32.) A nurse directed him to Dr. Sharma. (*Id.* ¶ 34.) When Grimmett asked for amoxicillin and ibuprofen to help control the pain and treat the infection, Dr. Sharma told him that there was no one available to administer any medication. (*Id.* ¶¶ 35-36.) Grimmett then asked Dr. Sharma to examine his mouth, but the doctor refused. (*Id.* ¶ 37.) Grimmett described his condition to Dr. Sharma, who replied that he would have to report to sick call to be seen. (*Id.* ¶ 38.) Grimmett alleges that, despite the doctor's representations to the contrary, Dr. Sharma in fact had "all the keys to the cabinet to provide 'emergency medication.'" (Dkt. No. 83 at 47.)

Two days later, on October 7, 2013, Grimmett went to sick call and explained to a physician assistant ("PA") that his mouth was in "agonizing pain" and that he could not "hear anything out of [his] left ear." (SAC ¶¶ 39-40.) He explained that he had been experiencing that level of pain for the past two days. (*Id.* ¶ 46.) The PA told Grimmett that he had a tooth abscess, prescribed him medication for the pain and infection, and generated dental and ENT referrals. (*Id.* ¶¶ 42-44; *id.* Ex. G at 59.)

Grimmett went back to sick call the next day because he had not received his pain medication (SAC ¶¶ 47-48), and again on October 11 because the ibuprofen and penicillin were not helping his toothache (*id.* ¶¶ 49, 52). He was prescribed a

new regimen of medications, which included Augmentin and Tylenol with codeine. (*Id.* ¶¶ 53-55; *id.* Ex. G at 61-62.)

On October 24, 2013, Mariane Molfetas, D.D.S., a non-party to this lawsuit, extracted two of Grimmett's teeth. (SAC ¶ 64; *id.* Ex. G at 70.) On December 13, 2013, a hearing aid for Grimmett was approved (SAC ¶ 68; *id.* Ex. G(2) at 7), and he received the hearing aid on January 21, 2014 (SAC ¶ 73; *id.* Ex. G(2) at 11-13). Grimmett was then transferred to Downstate Reception Center, where a nurse told him that he could have a full extraction once he got to his "primary facility." (SAC ¶¶ 75, 78.) On September 12, 2014, after Grimmett was transferred to Auburn Correctional Facility, where he would stay for at least six months, an oral surgeon extracted his lower teeth. (*Id.* ¶¶ 82, 83, 90-93.) A month later, after Grimmett had completed a course of amoxicillin for an infection in his upper gums, his upper teeth were removed. (*Id.* ¶¶ 94-95.) As of May 2015, Grimmett was being fitted for dentures. (*Id.* ¶¶ 103-04.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**\*3** When evaluating whether a complaint meets these requirements, courts "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and "draw all inferences in the light most favorable to the non-moving party[ ]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Additionally, a complaint "filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## III. Discussion

### A. Deliberate Indifference to Serious Medical Needs

Case 9:17-cv-01150-MAD-TWD  Document 48  Filed 01/13/20  Page 109 of 112
Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)
2017 WL 2274485

Grimmett brings claims for deliberate indifference to his serious medical needs under the Eighth Amendment, which applies to convicted prisoners, and the Fourteenth Amendment, which applies to pretrial detainees under state custody. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017). Under either provision, a plaintiff must satisfy a two-prong test to make out such a claim. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). Second, the defendant must have acted with deliberate indifference, or a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). The Court addresses each prong in turn.

### 1. Serious Deprivation of Adequate Medical Care

For a medical condition to be sufficiently serious under the first prong, it must be " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66); *see also Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " (quoting *Chance*, 143 F.3d at 702)). In the specific context of dental care, the Second Circuit has held that "[a] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities." *Chance*, 143 F.3d at 703 (citations omitted); *see also id.* (finding a serious medical condition where plaintiff "alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly"). When an inmate alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," a court should focus on "the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702). Thus, even though "[p]risoners are not entitled to a 'perfect plan for dental care,' " *Alster v. Goord*, 745 F. Supp. 2d 317, 333 (S.D.N.Y. 2010) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)), tooth decay and cavities may qualify as serious medical conditions, *see Harrison*, 219 F.3d at 137.

**\*4** Here, Grimmett alleges that he suffered from "swollen gums" that were "infected," along with obvious tooth decay and bone loss (Dkt. No. 83 at 36)—dental conditions "that tend[ ] to cause acute infections, debilitating pain and tooth loss if left untreated." *Harrison*, 219 F.3d at 137; *see id.* ("Because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). He further alleges that the delay in appropriate dental care exacerbated his injuries or increased the risk of future harm. *See Smith*, 316 F.3d at 185-86. Specifically, Grimmett alleges that the delay in care "allowed the infection in [his] gums to fester and develop into a full blown painfully agonizing oral abscess" (Dkt. No. 83 at 37), and resulted in hearing loss (*id.* at 34, 40).

Accordingly, Grimmett has satisfied the first prong: "the alleged deprivation of adequate medical care," by both Dr. Matthew and Dr. Sharma, is "sufficiently serious." *Spavone*, 719 F.3d at 138.

### 2. State of Mind

Under the second prong of the deliberate indifference standard, a plaintiff must show that a defendant acted with a sufficiently culpable state of mind. Until recently, the analysis under this prong was identical whether the claim was brought under the Eighth Amendment or the Fourteenth Amendment. *See Darnell*, 849 F.3d at 33. In February 2017, however, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and while the parties were briefing the instant motion, the Second Circuit held that the analysis differs depending on whether the inmate is a convicted prisoner or a pretrial detainee. *Darnell*, 849 F.3d at 35. [2] In particular, under the Eighth Amendment, deliberate indifference is equivalent to recklessness "according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of ... subjective awareness" on the part of the defendant. *Id.* at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). Deliberate indifference under the Eighth Amendment, therefore, means that a prison official "appreciate[d] the risk to which a prisoner was subjected." *Id.* at 35. In contrast, after *Darnell*, a plaintiff suing under the Fourteenth Amendment is required to show only that the prison official acted with objective

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01150-MAD-TWD    Document 48    Filed 01/13/20    Page 110 of 112

2017 WL 2274485

recklessness, or that the defendant "knew, or should have known" that "an excessive risk to health or safety" would result. *Id.*; *see also Lloyd v. City of New York*, No. 14 Civ. 9968, 2017 WL 1207838, at *9 (S.D.N.Y. Mar. 31, 2017). As before, however, more than negligence is required to hold a defendant liable for violating either constitutional provision. *Darnell*, 849 F.3d at 36.

2    "Although *Darnell* involved a challenge to conditions of confinement, the holding of the decision is broad enough to extend to medical deliberate-indifference claims." *Feliciano v. Anderson*, No. 15 Civ. 4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017); *see Darnell*, 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.").

It is unclear from the SAC whether Grimmett was a pretrial detainee or a convicted prisoner during the relevant time period. Under either the Eighth or Fourteenth Amendment, however, Grimmett has made out a claim against Dr. Matthew but has failed to state a claim against Dr. Sharma.

***Dr. Matthew.*** According to Grimmett, Dr. Matthew deliberately refused to provide treatment for three months, despite the fact that Grimmett sent "numerous dental slips to [Dr. Matthew] and to the dental department." (SAC ¶ 30.) Although the three-month delay on its own may not be enough to allege deliberate indifference, Grimmett has included additional allegations—beyond those recited in the FAC—to sufficiently plead that Dr. Matthew also acted "with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. In particular, Grimmett alleges that Dr. Matthew "omit[ted] the real facts of plaintiff's condition [from his medical records] so that he would not have to address plaintiff's serious dental condition" (Dkt. No. 83 at 36), and that Dr. Matthew "omitted [information] that would have placed plaintiff at a level to receive required treatment" (*id.* at 38; *see also* SAC ¶ 147 ("Plaintiff was never scheduled for a follow up by [Dr. Matthew].... [F]urthermore, when plaintiff wrote to [Dr. Matthew], plaintiff never received a response....")). Grimmett therefore has alleged facts that, even under the subjective recklessness standard of the Eighth Amendment, plausibly plead that Dr. Matthew was deliberately indifferent to Grimmett's serious medical needs. Accordingly, Defendants' motion to dismiss Grimmett's claim against Dr. Matthew is denied.

**\*5  *Dr. Sharma.*** Grimmett alleges that Dr. Sharma was deliberately indifferent when Grimmett reported to sick call on October 5, 2013, in agonizing pain from an abscess in his mouth (SAC ¶¶ 31-38), and that Dr. Sharma refused to examine Grimmett's mouth or prescribe any medication, despite the fact that Dr. Sharma had "all of the keys to the cabinet" (Dkt. No. 83 at 47). Dr. Sharma instead told Grimmett that there was nothing he could do, and that Grimmett should sign up for sick call. (SAC ¶ 38; Dkt. No. 83 at 43-44.) Indeed, Grimmett went to sick call two days later, where he was seen by a PA who prescribed him medication for the pain and infection and generated dental and ENT referrals. (SAC ¶¶ 39, 42, 44, 48; *id.* Ex. G at 58-59.) This two-day delay in treatment on its own is insufficient to plead recklessness, and Grimmett's allegations that Dr. Sharma "knew, or should have known" that "an excessive risk to health or safety" would result, *Darnell*, 849 F.3d at 35, are conclusory. *See Feliciano*, 2017 WL 1189747, at *13 ("Instead of seeing [plaintiff] immediately, [the defendant doctor] instructed him to rinse out his eye with cold water and to sign up for sick call in the morning. Although [plaintiff] did not receive immediate medical care, this fact is insufficient to establish that [the doctor] knew, or should have known, that the brief delay put [plaintiff's] health in jeopardy." (citation omitted)). Furthermore, although Grimmett may have preferred to be seen by a doctor rather than a PA during sick call (SAC ¶ 143; Dkt. No. 83 at 47-48), "mere disagreement over the proper treatment does not create a constitutional claim," *Chance*, 143 F.3d at 703. At the most, therefore, Grimmett has alleged that Dr. Sharma was negligent. Because negligence alone is insufficient to make out a deliberate indifference claim even under the Fourteenth Amendment, *see Darnell*, 849 F.3d at 36, Grimmett's § 1983 claim against Dr. Sharma is dismissed.

## B. Municipal Liability Against Corizon Medical Associates [3]

3    The SAC includes claims against Corizon, despite the fact that Judge Torres granted Grimmett leave to replead his claims only against Dr. Matthew and Dr. Sharma. The Court could dismiss these claims on this ground alone. *See Palm Beach Strategic Income, LP v. Salzman*, 457 Fed.Appx. 40, 43 (2d Cir. 2012) (summary order) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."); *see also Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar. 13, 2002) (dismissing with prejudice new claims in an amended complaint that were outside the

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

Case 9:17-cv-01150-MAD-TWD   Document 48   Filed 01/13/20   Page 111 of 112

scope of the court's order granting the *pro se* plaintiff leave to amend). However, given Grimmett's *pro se* status, the Court declines to dismiss these claims solely because they exceed the scope of the leave granted. *See Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12 Civ. 974, 2015 WL 5729969, at *22 (S.D.N.Y. Sept. 30, 2015) ("Given Plaintiff's pro se status, and the Court's obligation to liberally construe pro se pleadings, the Court is hesitant to dismiss Plaintiff's [amended complaints] on this ground."); *see also Moriates v. City of New York*, No. 13 Civ. 4845, 2016 WL 3566656, at *2-3 (E.D.N.Y. June 24, 2016) ("For *pro se* litigants, broad leave to replead is generally appropriate, since they lack the legal acumen and experience to differentiate successful claims from unsuccessful ones.").

Corizon, although a private entity, is treated as a municipal actor for purposes of this lawsuit. *See Bess v. City of New York*, No. 11 Civ. 7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality."). "It is axiomatic that municipalities cannot be held liable pursuant to § 1983 on a *respondeat superior* theory." *Betts v. Shearman*, No. 12 Civ. 3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009) (quotations and citation omitted). There are four ways a plaintiff can allege a policy or custom:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly

> train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

**\*6** *Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088, at *5 (S.D.N.Y. Dec. 12, 2016) (quoting *Guzman v. United States*, No. 11 Civ. 5834, 2013 WL 5018553, at *3-4 (S.D.N.Y. Sept. 13, 2013)).

As in the FAC, Grimmett alleges in the SAC that Corizon "had an unwritten policy of avoiding high costs in detainee's medical bills," and that this policy is why Dr. Matthew and Dr. Sharma delayed Grimmett's access to a dentist for approximately three months. (*See* FAC ¶ 56; SAC ¶ 146.) "To state there is a policy," however, "does not make it so," and Grimmett has alleged no facts from which the Court can plausibly infer that Corizon had such an unwritten policy. *Shearman*, 2013 WL 311124, at *16; *see also Zherka v. City of New York*, 459 Fed.Appx. 10, 12 (2d Cir. 2012) (summary order) ("It has long been well-settled that 'the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995))). In addition, the SAC lacks allegations that would allow the Court to infer that any such policy was the cause of Grimmett's alleged constitutional injuries. Although Grimmett alleges that Corizon's contract with the New York City Department of Correctional Services was terminated "due to a pattern of violations of detainee's Civil and Constitutional rights" (SAC ¶ 148; Dkt. No. 83 at 50), there is no indication that the termination was due to a policy of avoiding costs. The two press clippings that are attached to and referenced in the SAC concern the inadequate treatment that one MDC inmate received and problems with Corizon employee background checks, respectively, but do not support Grimmett's contention that the company had an unwritten cost-cutting policy. (Dkt. No. 83 at 49-50; SAC Ex. I.)

Grimmett also alleges that Dr. Matthew and Dr. Sharma were "final decision makers" and were therefore granted municipal policymaking authority. (Dkt. No. 83 at 35, 48.) Even if Dr. Matthew and Dr. Sharma were "final decision makers" with respect to Grimmett's care, which is what Grimmett appears to allege, that allegation is insufficient to plead that they were final *policymakers* with regard to Corizon's billing policies.

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

In particular, allegations that Dr. Matthew and Dr. Sharma chose a treatment plan for Grimmett that would keep costs down is not enough to plausibly plead that they possessed final authority to establish pricing policy. *See Hurdle v. Bd. of Educ. of City of N.Y.*, 113 Fed.Appx. 423, 427 (2d Cir. 2004) (summary order) ("Even if [the defendant] was the *decisionmaker* with regard to [the plaintiff's] transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers."). Accordingly, even accepting Grimmett's factual allegations as true and liberally construing his pleadings, the Court concludes that Grimmett has failed to plausibly allege the existence of a policy or custom. Accordingly, his § 1983 claim against Corizon is dismissed.

### C. State Law Claims

**\*7** Liberally construed, the SAC also asserts claims against Defendants under New York law for medical malpractice and negligence. (SAC ¶ 145; Dkt. No. 83 at 51.) Defendants do not contest that the Court has supplemental jurisdiction over Grimmett's state law claims under 28 U.S.C. § 1367; instead, they request that the Court decline to exercise supplemental jurisdiction on the ground that Grimmett has failed to state a federal claim under § 1983. (Dkt. No. 77 at 16; Dkt. No. 86 ¶ 23.) However, because the Court has not dismissed all of Grimmett's federal claims, it will retain supplemental jurisdiction over his state law claims. *See, e.g., Rodriguez v. Cnty. of Westchester*, No. 15 Civ. 9626, 2017 WL 118027, at \*11 (S.D.N.Y. Jan. 11, 2017). Defendants have not moved to dismiss Grimmett's medical malpractice or negligence claims on their merits. Accordingly, Defendants' motion to dismiss Grimmett's state law claims on jurisdictional grounds is denied.

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate the motion at Docket No. 73.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2274485

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.